780 So.2d 707 (1999)
Willie Dorrell MINOR
v.
STATE.
CR-95-1968.
Court of Criminal Appeals of Alabama.
October 29, 1999.
*722 Randall Scott Susskind, Montgomery; and L. Dan Turberville, Birmingham, for appellant.
Bill Pryor, atty. gen., and A. Vernon Barnett IV, asst. atty. gen., for appellee.

On Application for Rehearing
FRY, Judge.[1]
This Court's opinion of August 27, 1999, is withdrawn, and the following opinion is substituted therefor.
During the July 1995 term, a Tuscaloosa County grand jury returned an indictment charging the appellant, Willie Dorrell Minor, with the capital offense of murder when the victim is less than 14 years old. See § 13A-5-40(a)(15), Ala.Code 1975. The jury returned a verdict finding Minor guilty of capital murder as charged in the indictment. The jury, by a vote of 12 to 0, recommended that Minor be sentenced to death. A sentencing hearing was held on July 23, 1996, and on that same day, the trial court entered a written sentencing order, which included findings of fact. (C.R.311-15.) In that order the trial court held:
"After carefully considering the jury's advisory verdict, and after carefully weighing and balancing the aggravating and mitigating circumstances, the court finds that the aggravating circumstances outweigh the mitigating circumstances and the court sentences the defendant to death by electrocution."
(C.R.315.) On July 26, 1996, Minor filed a motion for new trial. On September 24, 1996, the trial court, after a hearing, entered a written order denying Minor's motion for a new trial. This appeal followed.
The evidence at trial tended to show that Ebious Jennings, Minor's two-month-old son, died as a result of being severely shaken and beaten.
Ebious was born on February 13, 1995. Dr. Elizabeth Cockrum, a pediatrician at Druid City Hospital in Tuscaloosa, testified she examined Ebious when he was about two hours old. Dr. Cockrum stated that at the time of her examination Ebious was "a normal, healthy term baby." (R. *723 598.) On February 15, 1995, Dr. Cockrum performed Ebious's discharge examination and again determined that he was a "healthy baby." (R. 604.) Linda McGarroh, a registered nurse at the Tuscaloosa County Health Department, testified she performed a two-week checkup on Ebious on February 27, 1995, and "found him to be a normal baby." (R. 623.) Donna Richardson, a registered nurse at the Tuscaloosa County Health Department, testified that on April 12, 1995, she examined Ebious for his two-month checkup and determined "that [the baby's health] was fine." (R. 642.)
Dorothy Richardson, Ebious's greatgrandmother, testified that on April 15, 1995, she saw Ebious at "around 6 o'clock [p.m.]" and "he was fine." (R. 650-51.) Diana Pitts, Ebious's grandmother, testified that she saw Ebious that same evening between 8 p.m. and 9 p.m. and that he "seemed fine and happy." (R. 755.)
Lakeisha Jennings, Ebious's mother, testified that she shared an apartment with Minor. On April 15, 1995, between 9:35 p.m. to 9:40 p.m. she left the apartment and entrusted Ebious and her other two children to Minor. According to Lakeisha, when she left the children in Minor's care, Ebious was "okay"; he was not injured or hurt. (R. 679.) When Lakeisha returned to the apartment, she went into her bedroom and saw Ebious lying on the bed. Lakeisha testified that while she was in the bedroom, Minor entered the room, picked Ebious up, and sat down on the bed. A short time later Lakeisha joined Minor on the bed. While seated beside Minor, Lakeisha talked to Ebious and called his name. Ebious, however, did not respond. Lakeisha noticed that his eyes were half open, that he did not appear to be breathing, and that he was not moving. According to Lakeisha, she immediately telephoned her mother, Diana Pitts, and asked her to come over, because Ebious "didn't look too good and he wasn't breathing." (R. 673.) After Diana arrived and examined Ebious, Lakeisha and Diana decided to take Ebious to Druid City Hospital (D.C.H.). Lakeisha stated that in her haste as she was leaving the apartment with Ebious in her arms, she hit her arm on the door frame. (R. 674.) Lakeisha testified that they waited for Minor to get in the car before leaving for the hospital. Diana repeatedly blew the car's horn to hurry Minor. Just as they had decided to leave without him, Minor ran out of the apartment and got in the car. Lakeisha testified that she held Ebious on the way to the hospital. Once at the hospital, Minor, however, "grabbed the baby from [Lakeisha] and took him into the hospital." (R. 678.)
Lakeisha admitted that Ebious had previously fallen off the couch in her apartment. (R. 703.) However, she denied hitting Ebious's head on the door frame as she was leaving the apartment. (R. 713.)
Diana Pitts testified that on the evening of April 15, 1995, Lakeisha telephoned her and said "[M]y baby don't look right." (R. 746.) Diana testified that she went to Lakeisha's apartment and found that Ebious "was just [lying] there" on the bed. (R. 747.) Diana reiterated Lakeisha's testimony that after she, Lakeisha, and Ebious got inside the car to take Ebious to the hospital, they had to wait to leave because Minor took "so long." (R. 748.)
Latia Pitts, Lakeisha's sister, testified that she accompanied her mother, Diana, to Lakeisha's apartment after Lakeisha telephoned about Ebious. Latia Pitts testified that she saw Lakeisha with Ebious in her right arm and saw Lakeisha "hit her left arm on theon the wall." (R. 760.) She testified unequivocally that Lakeisha did not hit Ebious's head on the door frame as they were leaving. Latia stated that while her mother and Lakeisha waited in the car, Minor was "running around and stuff...." (R. 761.) Latia testified that her mother blew the horn of her car and screamed at Minor "telling him to come on." (R. 761.)
*724 Cindy Perkins, a registered nurse employed at D.C.H., testified that she was on duty the night Ebious was brought to the hospital. Perkins said when Ebious arrived at the hospital he was not breathing and he had no pulse.
Dr. Steve Lovelady, an emergency-medicine physician at D.C.H., testified that when he examined Ebious in the emergency room Ebious had no pulse and he was not breathing. Dr. Lovelady stated that although acute cardiac life-support procedures were immediately implemented, the emergency room personnel were able to establish a pulse for only a few minutes. Dr. Lovelady's examination of Ebious revealed no external bruises, but Ebious's X-rays indicated "multiple rib fractures." (R. 799.) Additionally, during his examination of Ebious's eyes, Dr. Lovelady discovered bleeding in the retina. According to Dr. Lovelady, the retinal bleeding was a sign that Ebious had been violently shaken to such a degree that severe brain damage could have occurred (the violent shaking that results in brain damage is known as "shaken baby syndrome"). Dr. Lovelady testified that Ebious's injuries constituted the most severe case of shaken baby syndrome he had ever seen. Dr. Lovelady further testified that the X-ray of Ebious's skull revealed at least two skull fractures. Dr. Lovelady explained that the severity of this injury is magnified by the fact that an infant's bones are more bendable than those of adults and, therefore, are harder to break. Lastly, Dr. Lovelady testified about Ebious's internal bleeding. When asked if the injuries suffered by Ebious could have resulted from Ebious's falling off a sofa, Dr. Lovelady rejected the hypothesis because the injuries suffered by Ebious were "too severe" to have been caused by a fall from a sofa. (R. 807.)
Dr. Ashley Evans, a pediatrician on the staff at D.C.H., testified she was called to the hospital on the evening on April 15, 1995. Dr. Evans testified that her examination of Ebious revealed severe bilateral hemorrhages in Ebious's retina. Dr. Evans concurred with Dr. Lovelady's opinion that the injuries suffered by Ebious indicated that Ebious had been severely shaken. (R. 918.) On a doll provided by the state, Dr. Evans demonstrated the amount of force needed to inflict the type of injury caused by shaken baby syndrome. Dr. Evans also illustrated how an individual, if he squeezed hard enough while shaking an infant, could fracture the infant's ribs. (R. 921.) Dr. Evans testified that the X-rays taken of Ebious's abdomen indicated fresh fractures. According to Dr. Evans, "shaking alone [would] not cause a fracture." (R. 930.) Dr. Evans further testified that in her opinion Ebious suffered, at a minimum, three traumatic events, including severe shaking, a blow or blows to the head, and a blow or blows to the abdomen.
Dr. Kenneth Warner, a physician with the Alabama Department of Forensic Sciences, performed the autopsy on Ebious. Dr. Warner indicated that his examination revealed that Ebious's injuries included 12 recently fractured ribs, internal bleeding caused by a torn liver and a torn spleen, skull fractures, and trauma to the scrotum area. According to Dr. Warner, the cause of Ebious's death was blunt-force trauma to the head and chest, in addition to the brain damage caused by shaking.
When asked about the amount of force necessary to cause the type of fractures suffered by Ebious, Warner stated:
"So most of thethe vast majority of what we call basal skull fractures, or fractures to the base of the skull, are things like a major automobile accident, somebody killed in an airplane accident, somebody thrown, you know, through a windshield at 60 miles an hour. Something tremendously powerful like that.
". . . .
"A baby's skull is very, very, soft. It's made not to break because they are justthey have not calcified yet.
"The same thing with the ribs. Babies' ribs are cartilage. They don't break nearly as easily as an adult's ribs.

*725 "And it takes a certain amount of force to break an adult's skull and it takes a tremendous amount of force to break a child's skull because a kid's skull will just give. It will justkind of like a rubber ball. It will just give in and pop back out. But you break it, you really hit it."
(R. 1075-76.)(Emphasis added.)
Minor testified on his own behalf. Minor stated that he met Lakeisha in the ninth grade and that they dated during high school. Minor indicated he and Lakeisha began living together in March 1995. According to Minor, he would keep Ebious while Lakeisha was at work or at school.
Minor admitted that on the day of Ebious's death, he had smoked marijuana "around twelve, one o'clock [p.m.]" and had consumed "several beers." According to Minor, he arrived at the apartment he shared with Lakeisha around 6:00 or 7:00 p.m. Minor testified that Lakeisha left their apartment at about 9:45 p.m. and he was alone with Ebious and the other children until she returned. Minor testified that he did not leave the apartment from the time he got there until he went to the hospital; he further testified that while Lakeisha was gone he was the only adult present with Ebious and the other children.
According to Minor, when Lakeisha returned to the apartment, she went into the bedroom where Ebious was and she was alone with him for about 15 minutes. Minor claimed he heard Ebious crying and when he went to the bedroom Lakeisha was changing Ebious's diaper. When Minor questioned Lakeisha about why Ebious was crying, Lakeisha informed him Ebious was crying because he was sore from falling off the couch earlier that evening. When Minor picked Ebious up, he was not breathing. However, after he laid Ebious down to check his breathing, Minor felt a heartbeat and he believed Ebious was okay. According to Minor, he told Lakeisha to telephone her mother. Minor testified that he was not in a hurry to get in the car to go to the hospital because he did not believe Ebious's injuries were serious. Additionally, Minor stated that when he realized that they were really going to take Ebious to the hospital, he telephoned his mother and asked her to meet them there.
Minor maintained that he did not kill Ebious and that he did not strike him in any way. According to Minor, Lakeisha admitted during a telephone conversation with him that she had killed Ebious because she believed Ebious's death was the result of falling from a couch. Minor further maintained that he had never seen Lakeisha violently strike Ebious but that he had seen her hit Ebious. Additionally, Minor stated that Lakeisha was angry with him on the evening of Ebious's death. Minor also claimed he saw Ebious hit the door of the apartment as Lakeisha was leaving with him to go to the hospital.
Minor admitted that he had prior convictions for assault in the second degree, for possession of cocaine, and for rape in the second degree. Minor also admitted that he had escaped from the county jail while he was awaiting trial on the capital-murder charge.
During the state's cross-examination of Minor, he admitted that he had given several statements to law enforcement officers that were not true. According to Minor, he did nothing intentionally or accidentally to cause Ebious's death, but he made up a story about an accident that he told law enforcement officers in order to get released on bond. Additionally, he maintained that his statements were made in an effort to protect Lakeisha.
In his brief to this Court, Minor raises several issues, many of which were not presented to the trial court. Because Minor was sentenced to death, his failure to raise these claims at trial does not prevent our review of these issues. It does, however, weigh against Minor as to any claim of prejudice he now makes on *726 appeal. See Roy Burgess v. State, [Ms. CR-94-0475, December 18, 1998] ___ So.2d ___ (Ala.Cr.App.1998)("Roy Burgess v. State"); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). Additionally, this Court has said:
"`[This] plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."' United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982))."
Dunaway v. State, 746 So.2d 1021, 1027 (Ala.Cr.App.1998).
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
Rule 45A, Ala.R.App.P,
Accordingly, we will now address the issues raised by Minor for our review.

Guilt-Phase Issues

I.
Minor contends that the trial court should have quashed the indictment against him because, he says, it was "unnecessarily prejudicial and only served to inflame the passions of the jury." (Issue XIII in Minor's brief to this Court.)
Minor's indictment stated as follows:
"The Grand Jury of said County charge that before the finding of this indictment, WILLIE DORRELL MINOR, alias WILLIE D. MINOR, alias DORRELL MINOR, alias WILLIE MINOR, alias DARRELL MINOR, alias `SHORT DOG,' whose name is otherwise unknown to the Grand Jury, did intentionally cause the death of another person, to-wit: Ebious Jennings, by hitting or striking him with his hands, fists, and/or other object a better description of which is otherwise unknown to the Grand Jury, and/or by kicking him with his feet and/or by squeezing, mashing, or crushing him, and/or by violently shaking him, and/or by throwing or smashing him against a floor, wall, and/or other object a better description is otherwise unknown to the Grand Jury, the said Ebious Jennings being less than fourteen (14) years of age, in violation of Section 13A-5-40 of the Code of Alabama against the peace and dignity of the State of Alabama."
(C.R.16-17.)
An indictment must state the facts constituting the offense in ordinary and concise language. See Copeland v. State, 456 So.2d 1150, 1151 (Ala.Cr.App. 1984); Chambers v. State, 364 So.2d 416, 419 (Ala.Cr.App.), cert. denied, 364 So.2d 420 (Ala.1978). Minor's indictment contained only that language necessary to adequately describe the nature of the crime charged. An indictment by nature includes statements prejudicial to the defendant. Minor's indictment identified the charge, cited the applicable statute, enabled him to prepare for his defense, protected him against double jeopardy and enabled the court, after conviction, to pronounce judgment on the record. The indictment was sufficient to charge a crime and to apprise the appellant of the acts allegedly constituting the crime without creating substantial prejudice. Additionally, Minor has made no showing that he was actually prejudiced in any way by the indictment. Therefore, the trial court did not err in refusing to quash the indictment.
Moreover, the trial court's instruction to the jury that the indictment was not evidence in the case cured any possible prejudicial effect caused by the language *727 in the indictment. See Flowers v. State, 441 So.2d 1053 (Ala.Cr.App.1983) (although references in an indictment to various items, such as a "cocaine kit," a "coke spoon," and a "power hitter," created some prejudice, the error was cured by trial judge's oral instruction to jury).
The record reveals that the trial court instructed the jury as follows regarding the indictment:
"Now, this case began when the indictment in this case was filed in circuit court.
"This indictment, which I will read to you in just a moment, is not evidence in this case and should not be considered by you as evidence.
"Likewise, you should not infer that the defendant is guilty simply because he has been indicted.
"An indictment is simply a means or method by which a case comes into court from the grand jury for trial."
(R. 1335.)
The trial court's instruction to the jury was sufficient, and it cured any alleged prejudice created by the language of the indictment. Therefore, we find no error, plain or otherwise, in the trial court's refusing to quash the indictment.

II.
Minor contends that the trial court erred in denying his motion to allow him to view the scene of the crime with his attorneys. He argues that the trial court's refusal to allow him to visit the scene with his attorneys prevented him from adequately preparing his defense. (Issue XXII in Minor's brief to this Court.)
In a pretrial motion, Minor requested to be allowed to visit the scene of the crime with his attorneys, alleging the following in support of his request:
"1. That the facts of this case are so complicated that there is no way for the Defendant to properly explain the situation to his defense attorneys in a manner whereby they could take pictures, take measurements, or otherwise properly investigate the scene of the alleged crime without his assistance.
"2. That to deny him the right to do this would amount to a denial of due process of law and effective assistance of counsel as guaranteed by the Alabama and Unites States Constitutions. To allow the Defendant to view the scene as requested would not prejudice the state's case in any manner and would only serve to promote a fair and impartial trial."
(C.R.123.)
Although the trial court denied Minor's motion, the trial court ordered that arrangements be made for Minor to view a videotape of the crime scene with his attorneys. (C.R.193.)
Minor did not at trial, and does not on appeal, offer any compelling reason why his presence at the crime scene was necessary nor did he offer any specific explanation as to how his defense was prejudiced by his not being allowed to view the scene. Therefore, we conclude no error resulted from the trial court's denial of Minor's motion to view the scene of the crime with his attorneys. See Mason v. State, 768 So.2d 981 (Ala.Cr.App.1998).

III.
Minor contends that the trial court erred in granting the state's motion that he be subjected to a mental examination to establish his competency to stand trial. He further argues that the state improperly used the results of his mental examination against him at a bond hearing to set bond. (Issue XII in Minor's brief to this Court.) Because Minor failed to object when the state moved for the mental examination, our review is for plain error. Rule 45A, Ala.R.App.P.
Minor's competency to stand trial was never an issue at trial, and the results of Minor's mental examination were not admitted into evidence at trial. Therefore, *728 Minor has failed to establish that the alleged error seriously affected his substantial rights and that the evidence had an unfair prejudicial impact on the jury's deliberations. See Dunaway v. State, supra.
Moreover, Rule 11.3(a), Ala. R.Crim.P., provides that:
"If the circuit court determines that reasonable grounds for [a mental] examination exist, it shall either appoint a psychiatrist or psychologist to examine the defendant and to testify regarding the defendant's mental condition, or order that an examination be conducted by a psychiatrist or psychologist appointed by the Commissioner of the Department of Mental Health and Mental Retardation."
In deciding whether to order a mental examination, "[t]he trial judge should consider any information bearing on [the] question of [a] defendant's mental state." Reese v. State, 549 So.2d 148, 148 (Ala.Cr. App.1989), overruled on other grounds, Huntley v. State, 627 So.2d 1013 (Ala. 1992). The determination whether to order a mental examination is within the sound discretion of the trial court. Id. at 150. Cf. Frazier v. State, 758 So.2d 577 (Ala.Cr.App.1999).
In its motion seeking a court-ordered mental examination, the state alleged the following grounds:
"1. The defendant is awaiting Grand Jury action upon a warrant charging capital murder.
"2. A preliminary hearing was held on the said charge on June 23, 1995, and probable cause was found by District Judge Chandler.
"3. The defendant has been incarcerated in the Tuscaloosa County Jail pending trial.
"4. On Friday, July 21, 1995, the defendant escaped from the Tuscaloosa County Jail along with other inmates after they overpowered a jail guard....
"5. After his capture on July 21, 1995, and as he was being escorted back to the Tuscaloosa County Jail, the defendant is reported to have stated: `I hadn't had any medical attention ... and I wanted to see my psychiatrist because they wouldn't give me no medical attention here.'...
"6. The defendant has been charged with the offense of Escape in the First Degree by arrest warrant, warrant no. WR95-001201, and is awaiting District Court and Grand Jury action on that charge."
(C.R.43-44.) Additionally, the state incorporated in its motion a copy of an article published in the Tuscaloosa News, which detailed Minor's escape from jail and his subsequent capture, which reported Minor's comment about the need for medical attention and for an examination by a psychiatrist. Given the possible punishment Minor was facing and his own comments made when he was captured after his escape from jail, we find no abuse of discretion in the trial court's ordering Minor to submit to a mental examination.
Moreover, we reject Minor's claim that the results of his mental examination were improperly used against him. Specifically, he argues that the state's use of the results of his mental examination at a bond hearing violated Rule 11.2(b)(1), Ala. R.Crim.P., which provides:
"The results of examinations conducted pursuant to subsection (a)(1) of this rule, Rule 11.3, or Rule 11.4 on the defendant's mental competency to stand trial shall not be admissible as evidence in a trial for the offense charged and shall not prejudice the defendant in entering a plea of not guilty by reason of mental disease or defect."
(Emphasis added.) The language of Rule 11.2(b)(1) and its commentary clearly indicate that the word "trial" as used by the rule refers to a proceeding at which there is a determination of the guilt or innocence of the defendant, not a proceeding to determine whether a defendant is eligible for bond before his trial. Furthermore, Rule *729 7.2, Ala.R.Crim.P., indicates that the trial court, when determining whether to grant a bond, may take into account "the defendant's reputation, character, and [mental and physical] health." The results of Minor's mental examination were not admitted in evidence at trial. Consequently, the state did not improperly use the results of Minor's mental evaluation against him.
Accordingly, because Minor has failed to show any prejudice, we find no plain error with regard to this issue.

IV.
Minor contends that the trial court violated his constitutional right to represent himself and to participate in his defense. (Issue XV in Minor's brief to this Court.) Before trial Minor moved the trial court to allow him to act in the capacity of co-counsel during his trial. The state objected to Minor's serving as co-counsel, stating that it was concerned that Minor might "badger and browbeat" certain witnesses. (R. 244.) Additionally, Minor's lead counsel expressed concern to the trial court that if Minor was allowed to participate as co-counsel it would lead to "some problems." (R. 247.) After taking the request under advisement, the trial court denied the motion.
"`"While a defendant has a Sixth Amendment right to be represented by counsel or to represent himself, ... he does not have the right, under either the federal or state constitutions, to hybrid representation." Christianson v. State, 601 So.2d 512, 519 (Ala.Cr.App.1992).' Holland v. State, 615 So.2d 1313, 1320 (Ala.Cr.App.1993). `"[A]n individual does not have a right to hybrid representation.... Rather, the decision to permit a defendant to proceed as co-counsel rests in the sound discretion of the trial court." Cross v. United States, 893 F.2d 1287, 1291-92 (11th Cir.), cert. denied, 498 U.S. 849, 111 S.Ct. 138, 112 L.Ed.2d 105 (1990).' Burks v. State, 600 So.2d 374, 380 (Ala.Cr.App.1991). See also Whitehead v. State, 593 So.2d 126, 129 (Ala.Cr.App.1991); Ford v. State, 515 So.2d 34, 43-44 (Ala.Cr.App.1986), aff'd, 515 So.2d 48, 51 (Ala.1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988)."
Hunt v. State, 659 So.2d 933, 938 (Ala.Cr. App.1994), aff'd, 659 So.2d 960 (Ala.), cert. denied, 516 U.S. 880, 116 S.Ct. 215, 133 L.Ed.2d 146 (1995).
Minor has offered no factual support for his argument on appeal, and the record does not support a finding of abuse of discretion by the trial court. Therefore, we find no error. Cf. Arthur v. State, 711 So.2d 1031 (Ala.Cr.App.1996), aff'd, 711 So.2d 1097 (Ala.1997); and Drinkard v. State, 777 So.2d 225 (Ala.Cr.App.1998).

V.
Minor contends that the trial court erred in admitting into evidence statements he made to the police because, he says, the statements were not voluntary, they were the "fruits of a poisonous treean illegal arrest," and they were unreliable because his "entire" statement was not recorded and presented to the jury. (Issue IV in Minor's brief to this Court.)
First, Minor claims the trial court erred in admitting his statements to law enforcement officers because, he says, they were not voluntary. Specifically, Minor claims the officers induced him to make the statements by offering to assist him in obtaining bond. (Minor's brief to this Court at p. 18.)
"For a confession, or an inculpatory statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary. Ex parte Singleton, 465 So.2d 443, 445 (Ala. 1985). The initial determination is made by the trial court. Singleton, 465 So.2d at 445. The trial court's determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong. Marschke v. State, 450 So.2d 177 (Ala.Crim.App. 1984)....

*730 "The Fifth Amendment to the Constitution of the United States provides in pertinent part: `No person ... shall be compelled in any criminal case to be a witness against himself....' Similarly, § 6 of the Alabama Constitution of 1901 provides that `in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself.' These constitutional guarantees ensure that no involuntary confession, or other inculpatory statement, is admissible to convict the accused of a criminal offense. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Hubbard v. State, 283 Ala. 183, 215 So.2d 261 (1968).
"It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe, 367 U.S. at 602, 81 S.Ct. at 1879, the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, `if his will has been overborne' by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added).
"The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the `totality of the circumstances.' Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant's will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim. App.1990) (stating that, to admit a confession, a court must determine that the defendant's will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is `whether the defendant's will was overborne at the time he confessed') (emphasis added). Thus, to determine whether [a defendant's] confession was improperly induced, we must determine if his will was `overborne' by an implied promise of leniency."
". . . .
"... Thus, the test of involuntariness of a confession, or other inculpatory statement, is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant's will was overborne by `apprehension of harm or hope of favor.' See [Ex parte] Gaddy, 698 So.2d [1150] at 1154 [(Ala.1997)] (quoting Ex parte Weeks, 531 So.2d 643, 644 (Ala.1988)); Culombe, 367 U.S. at 602, 81 S.Ct. at 1879; Jackson, 562 So.2d at 1380. To determine if a defendant's will has been overborne, we must assess `[t]he conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure'; `[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant's] susceptibility to police pressures.' Jackson, 562 So.2d at 1380-81 (citations omitted)."
McLeod v. State, 718 So.2d 727, 729-30 (Ala.), cert. denied 524 U.S. 929, 118 S.Ct. 2327, 141 L.Ed.2d 701 (1998)(footnotes *731 omitted.). See also Craig v. State, 719 So.2d 274 (Ala.Cr.App.1998).
During a pretrial suppression hearing, Lt. Larry Lee of the Tuscaloosa Police Department testified as follows about the statements Minor made to him:
"[Lee]: I received a call to headquarters. I came in from work one afternoon and I had a message that Willie had called and wanted me to come by the county jail to talk with him. And this was late in the afternoon. I was late getting off from work, so I waited till the next day.
"I talked with Chief Swindle, told him that Willie had called and wanted me to come by and talk with him. I didn't know what he wanted. But I talked with him before I went up there.
"And he told me that whatever, you know, not to make him any promises or anything like that, you know, because, like I said, I didn't know what he wanted. But I figured he wanted something or he wouldn't be calling me up there.
"So I got up there and Willie wanted to try to make
"[Prosecutor]: Well, let me ask you this, now
"[Lee]: Okay.
"[Prosecutor]: Did you go talk to him at the county jail?
"[Lee]: Yes, sir.
"[Prosecutor]: Did you record or tape-record that conversation?
"[Lee]: Yes, sir.
"[Prosecutor]: During the conversation, did you offer him any reward or hope of reward to talk to you?
"[Lee]: No, sir.
"[Prosecutor]: Or tell him that it would be better or worse to talk to you?
"[Lee]: No, sir.
"[Prosecutor]: Or threatenDid anyone else threaten or coerce him to talk to you?
"[Lee]: No, sir.
"[Prosecutor]: And, at that time, without going into all of the substance of the conversation because, as you said, it is tape-recorded, did he talk to you primarily about his case or about other investigations?
"[Lee]: About other investigations, information that he might could assist us with.
"[Prosecutor]: Okay. And, at that time, did you read him his Miranda rights?
"[Lee]: III don't remember. I don't have a copy of the first transcript. I don't remember, really, what took place because, the best I can remember, I didn't take any information from him that first day. He just mostly told me what he wanted and what he was referring to. I didn't really take a statement or anything from him.
"[Prosecutor]: Okay. Now, you have told us that you went back a second time?
"[Lee]: Yes, sir.
"[Prosecutor]: Was that the next day, on May 31?
"[Lee]: Yes, sir, the following day.
"[Prosecutor]: Was that conversation also recorded?
"[Lee]: Yes, sir, it was.
"[Prosecutor]: Now, what were the circumstances and how was it arranged for you to go back that second day?
"[Lee]: I went back and talked with Chief Swindle and Willie wanted us to assistance or try to help him get a bond is what he had asked the day before. And I didn't make any promises to him, so I told him I had run it by the chief and I said I had no authority to make any kind of decisions or any deals or anything like that.
"So I went back and I talked with Chief Swindle and the chief said, `Well,' said, `go back and talk with him. Record it. Let him know that it's being recorded and that you're recording the interview with him and we can't promise him anything. We will do anything for him if he does help us.' He said if he *732 does give us some information, good information, conviction of a robbery or somethingI mean a murder, a murder that had taken place over there, that he would entertain the idea of contacting the D.A. or someone and talking to them about a bond fora bond for him.
"[Prosecutor]: Okay. And did you then go back and talk with Minor?
"[Lee]: Yes, sir.
"[Prosecutor]: And, again, was this at the request of Mr. Minor?
"[Lee]: On [May 31], yes, sir.
"[Prosecutor]: And, at that time, did you or anyone else to your hearing, presence, or knowledge threaten or coerce him it talk to you?
"[Lee]: No, sir.
"[Prosecutor]: Or tell him that it would be better or worse to talk to you?
"[Lee]: No, sir.
"[Prosecutor]: Or offer him any reward or hope of reward to talk to you?
"[Lee]: No, sir.
"[Prosecutor]: Do you remember if you read him his Miranda rights that second time?
"[Lee]: No, sir, I don't remember. Let me look at myno, sir. I don't see it on here.
"[Prosecutor]: Okay. But, again, did you go there at the request of Mr. Minor?
"[Lee]: Yes, sir.
"[Prosecutor]: Or on your own initiative?
"[Lee]: On his request.
"[Prosecutor]: Did you have any other contacts with Willie Minor concerning this case?
"[Lee]: No, sir."
(R. 198-205.)
Our review of the record indicates that Minor's statements to Lt. Lee were voluntary. Like the appellant in McLeod, Minor initiated the contact with Lt. Lee. Minor indicated that he wanted to cooperate with Lee in an attempt to secure a bond. The statement made by Minor based on the above testimony was not inculpatory, but identified other individuals who had committed other crimes. There is no indication in the record that Minor suffered any "physical intimidation or psychological pressure" or that Lee made any promises or threats or used coercion in order to get Minor to talk with him. Further, Minor had been in custody for approximately six weeks before making the allegedly induced statement; therefore, the record does not indicate that Minor was under the influence of alcohol or drugs when he made these statements. Additionally, Minor had had prior experience with the criminal justice system. Because the record does not support a finding that an "exertion of physical or psychological force or any particular and peculiar susceptibility to inducement" occurred to induce Minor to make a statement, there was insufficient evidence to find that his statement was involuntary.
Moreover, we note that our review of the entire record indicates that Lee was never called as a witness by the state or the defense. There is no indication in the record that Minor's statements made to Lee were ever admitted into evidence. Therefore, we fail to see how Minor was prejudiced by the statements given to Lee; we will not predicate error on matters not admitted in evidence.
Next, Minor claims the admission of his statements into evidence was error because, he says, they were the "fruits of a poisonous tree." Specifically, he contends that his arrest was illegal because, he says, the arrest warrant was not supported by an affidavit presenting facts that would supply probable cause. He further argues that as a result of his allegedly "illegal arrest," any statements he gave the officers after his arrest should have been suppressed. Minor raises this issue for the first time on appeal; therefore, our review is for plain error. Rule 45A, Ala.R.App.P.
*733 Initially, we note that the affidavit supporting the arrest warrant contains "`nothing more than the affiant's conclusions that the individual named therein had perpetrated the described offense, without setting out any factual basis for such conclusion.'" Smith v. State, 727 So.2d 147, 156 (Ala.Cr.App.1998), aff'd, 727 So.2d 173 (Ala.1999), quoting Swain v. State, 504 So.2d 347, 352 (Ala.Cr.App. 1986). As was the case in Smith, however, we do not conclude that the deficiency was reversible error.
"Section 15-10-3(a)(3), Ala.Code 1975, provides that an officer may arrest someone without a warrant when he has reasonable cause to believe that the person arrested committed a felony. `"Reasonable cause is equated with probable cause."' Sockwell v. State, 675 So.2d 4 (Ala.Cr.App.1993), aff'd, 675 So.2d 4 at 38 (Ala.1995). `Probable cause is knowledge of circumstances that would lead a reasonable person of ordinary caution, acting impartially, to believe that the person arrested is guilty.' Sockwell, 675 So.2d at 13.
"`Probable cause to arrest exists when, at the time the magistrate issues the warrant or the officer makes the arrest, there are reasonably trustworthy facts and circumstances sufficient, given the totality of the circumstances, to lead a reasonable person to believe there is a fair probability that the suspect is committing or has committed an offense.'

"Swain v. State, 504 So.2d 347 (Ala.Cr. App.1986), citing Fifteenth Annual Review of Criminal Procedure; United States Supreme Court and Courts of Appeal 1984-1985, 74 Geo. L.J. 499, 518 (1986). As concerns probable cause, we note that the Alabama Supreme Court has held:
"`Probable cause exists if facts and circumstances known to the arresting officer are sufficient to warrant a person of reasonable caution to believe that the suspect has committed a crime. "In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians[,] act...." "`The substance of all the definitions of probable cause is a reasonable ground for belief of guilt.'" "Probable cause to arrest is measured against an objective standard and, if the standard is met, it is unnecessary that the officer subjectively believe that he has a basis for the arrest." The officer need not have enough evidence or information to support a conviction in order to have probable cause for arrest. Only a probability, not a prima facie showing, of criminal activity is the standard of probable cause.'

"Dixon v. State, 588 So.2d 903, 906 (Ala. 1991) (citations omitted)."
Smith v. State, 727 So.2d at 156-57.
First, we must examine the totality of the circumstances surrounding Minor's arrest to determine if probable cause for a warrantless arrest existed. Smith, supra. At the suppression hearing, Officer Stan Bush of the Tuscaloosa Police Department testified that he and his partner, Officer Rocky Montgomery, conducted the investigation into Ebious's death. Bush testified that they talked with Minor, Ebious's mother, and Ebious's grandmother at the hospital during the early morning hours of April 16, 1995, and later at approximately 5:00 a.m. that same day at the residence of Lakeisha and Minor. According to Bush, these two interviews clearly established that Minor had been alone with Ebious on the evening of April 15, 1995, when the fatal injuries were alleged to have occurred. Bush testified that during each of these interviews, Minor was not in custody. On April 17, 1995, Bush and Montgomery asked Minor to come to the homicide unit for further questioning about Ebious's death. During this interview, *734 Montgomery informed Minor of his Miranda[2] rights. Minor waived his rights and made a videotaped statement to Bush and Montgomery. In this statement, although Minor denied killing Ebious, he admitted being alone with Ebious during the time when the injuries were alleged to have occurred. His statement contained numerous inconsistencies. Bush testified that he had verified that Minor was alone with Ebious by talking with Ebious's mother and grandmother. Additionally, the record indicates that Bush had been informed that the injuries suffered by Ebious were not accidental and that Ebious could have not lived more than an hour after the injuries were inflicted.
"`"An officer may arrest any person without a warrant, on any day and at any time ... [w]hen a felony has been committed and he has reasonable cause to believe that the person arrested committed it."'" Smith v. State, 727 So.2d at 157, quoting Taylor v. State, 589 So.2d 804, 805-806 (Ala.Cr.App.1991), quoting in turn § 15-10-3(a)(3), Ala.Code 1975. In State v. Johnson, 682 So.2d 385 (Ala.1996), the Alabama Supreme Court held:
"The level of evidence needed for a finding of probable cause is low. `An officer need not have enough evidence or information to support a conviction [in order to have probable cause for arrest].... "[O]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause."` Stone v. State, 501 So.2d 562, 565 (Ala.Cr.App. 1986). `"Probable cause exists where `the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that `an offense has been or is being committed."` Young v. State, 372 So.2d 409, 410 (Ala.Cr.App.1979)(quoting Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959))."
682 So.2d at 387-88.
Based on their knowledge obtained through their investigation, Bush and Montgomery had sufficient probable cause for a warrantless arrest. Consequently, even if Minor's arrest warrant itself was not adequately supported by an affidavit showing probable cause, Minor's arrest was proper; the trial court's denial of Minor's motion to suppress his statements made subsequent to his arrest was proper.
Minor also claims the trial court erred in overruling his motion to suppress his videotaped statement because, he says, there were questions asked and statements made before the recording began; consequently, the recorded statement was not a complete version of his confession. He further argues that, because the state was allowed to present only portions of his statements, the admission of the statements violated his right against self-incrimination. (Minor's brief to this Court at p. 24.)
"`If a part of a conversation is adduced in evidence by the state as proving the defendant's declarations or confessions of guilt, the defendant has the right to call for the whole of what was said in that conversation relative to the subject matter of the issue. Chambers v. State, 26 Ala. 59 (1855); William v. State, 39 Ala. 532 (1865); Mullis v. State, 258 Ala. 309, 62 So.2d 451 ([1952]). The accused is entitled, on cross-examination, to bring out all that he said, at the same time and on the same subject. Parke v. State, 48 Ala. 266 (1872).
"`However, the rule which frowns upon incomplete confessions is designed to cover cases where an accused, after admitting commission of the criminal act, is prevented from going further and saying anything *735 which might explain or justify his act. William, supra; United States v. Wenzel, 311 F.2d 164 (4th Cir.1962); see generally 29 Am.Jur.2d 586, Evidence, § 535.'

"King v. State, 355 So.2d 1148, 1151 (Ala.Cr.App.1978). See also Ashford v. State, 472 So.2d 717, 720 (Ala.Cr.App. 1985)."
Bridges v. State, 516 So.2d 895, 898 (Ala. Cr.App.1987). Cf. Drinkard v. State, supra.
At trial, Minor argued that the recorded tapes were inadmissible because "[t]here apparently [were] somesome statements, some questions before the tape recording was initiated and, therefore, ... it is not a completed and full tape-recording of the interview." (R. 897.) Minor, however, offered no evidence to support this assertion. Additionally, Minor was provided ample opportunity during his examination of Bush and Montgomery to elicit testimony concerning the "entire" statement. We cannot predicate error on a silent record. Hunt v. State, supra.
Moreover, the fact that a videotaped recording did not include the entire statement does not render the recording inadmissible; that fact affects only the weight that the recording should be given by the jury. Jackson v. State, 582 So.2d 598 (Ala.Cr.App.1991). Therefore, the videotaped statement was properly admitted into evidence.
Furthermore, "[t]he admission of tape recordings into evidence is a matter within the discretion of the trial judge. Bufford v. State, 382 So.2d 1162 (Ala.Cr. App.), cert. denied, 382 So.2d 1175 (Ala. 1980), and appeal after remand, 399 So.2d 894 (Ala.Cr.App.1981)." Bridges v. State, 516 So.2d at 899. A proper foundation was laid for the admission of the recorded tapes in the present case. The prosecutor established that Minor made the statement voluntarily. Montgomery testified that he read Minor his Miranda rights and that Minor freely waived his rights and agreed to talk to him. Montgomery further testified that no one threatened or coerced Minor, nor did anyone offer him any reward or hope of reward, in order to get Minor to talk to law enforcement officers. (R. 890.) The record clearly established that Minor was informed of his Miranda rights before he gave his statement and that he knowingly and voluntarily waived his rights before giving his statement.
Regarding Minor's argument that the statement was incomplete, Minor was free to, and did, cross-examine Montgomery concerning his statement and could have brought out any deficiencies, if any, in the statement. As this Court has previously held "[t]rial courts are vested with considerable discretion in determining whether evidence is relevant, and such a determination will not be reversed absent plain error or an abuse of discretion." Hayes v. State, 717 So.2d 30, 36 (Ala.Cr. App.1997) (citation omitted). There was no abuse of discretion in the trial court's admission of Minor's videotaped statement. Finally, because Minor's statements were voluntary and properly admitted in evidence, no violation of Minor's right against self-incrimination occurred here.

VI.
Minor contends the trial court erred in failing to order a change of venue for his trial because, he says, many of the jurors had heard about the case through what he says was extensive media coverage, and this exposure prevented him from receiving a fair trial. (Issue XXI in Minor's brief to this Court.) Because Minor did not move for a change of venue at trial or raise this matter in any other fashion before the trial court, our review is for plain error. Rule 45A, Ala.R.App.P. Moreover, Minor's failure to raise this issue in the trial court weighs against any finding of prejudice. Boyd v. State, 715 So.2d 825, 847 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).
*736 Initially, we note that the record does not include any pretrial publicity regarding this offense, with the exception of an article about Minor's escape from jail. During the voir dire examination of potential jurors, the members of the venire were asked whether they had read or heard anything concerning Ebious's death. Those who responded that they did have prior knowledge of the offense were questioned individually. All of the potential jurors indicated that they could put what they had read in the newspaper or seen on television out of their minds.
"`"[A] change of venue must be granted only when it can be shown that the pretrial publicity has so `pervasively saturated' the community as to make `the court proceedings nothing more than a "hollow formality"'... or when actual prejudice can be demonstrated. The burden of showing this saturation of the community or actual prejudice lies with the appellant."'

"George v. State, 717 So.2d [827] at 833 [(Ala.Cr.App.1996) ], quoting Oryang v. State, 642 So.2d 979, 983 (Ala.Cr.App. [1993]).
". . . .
"`The defendant is not entitled to jurors who are totally ignorant of the facts and issues involved in the case or to jurors who never entertained a preconceived notion as to the defendant's guilt of innocence. Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985). A defendant is entitled to a trial by jurors who can lay aside any preconceived impressions or opinions and render a verdict based on the evidence which is presented at trial, id. The record in this case indicates that the appellant received such a trial. See also Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961). Because the appellant has failed to show that the pre-trial publicity in this case was "inherently prejudicial," Holladay v. State, [549 So.2d 122 (1988)], or "presumptively prejudicial," Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), affirmed, 577 So.2d 531 (Ala.1991), and the appellant has also failed to show that there was actual juror prejudice, we find no abuse of discretion by the trial court or manifest error in his finding of impartiality and his denial of the appellant's motion for change of venue. Irvin v. Dowd, 366 U.S. at 724, 81 S.Ct. at 1643; Ex parte Grayson, 479 So.2d at 80.'
"Oryang v. State, 642 So.2d at 993-94." Boyd v. State, 715 So.2d at 848.
Because Minor did not move for a change of venue, the record contains little evidence of the media coverage of the events. Moreover, the voir dire conducted by the trial court and by counsel clearly showed that none of the prospective jurors was prejudiced by the pretrial publicity. Therefore, Minor has failed to show any actual prejudice resulting from the pretrial publicity. Boyd v. State, supra; Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); Oryang v. State, 642 So.2d 989, 993 (Ala.Cr.App.1994). Cf. Ex parte Neal, 731 So.2d 621 (Ala.1999); Roy Burgess v. State, supra; Hyde v. State, 778 So.2d 199 (Ala.Cr.App.1998); and Price v. State, 725 So.2d 1003 (Ala.Cr.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999). No reversible error occurred in this regard.

VII.
Minor contends that the trial court erred in denying his pre-trial motion for a continuance. (Issue XXIII in Minor's brief to this Court.) Specifically, he argues that "[b]ecause of the lack of time to prepare for trial and fully investigate *737 the case, [he] was unable to adequately present a defense." (Minor's brief at pp. 70-71.)
"`The guidelines for determining whether a trial court has abused its discretion in denying a continuance are set out in Ex parte Saranthus, 501 So.2d 1256, 1257 (Ala.1986):
"`"A motion for a continuance is addressed to the discretion of the court and the court's ruling on it will not be disturbed unless there is an abuse of discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973). If the following principles are satisfied, a trial court should grant a motion for continuance on the ground that a witness or evidence is absent: (1) the expected evidence must be material and competent; (2) there must be a probability that the evidence will be forthcoming if the case is continued; and (3) the moving party must have exercised due diligence to secure the evidence. Knowles v. Blue, 209 Ala. 27, 32, 95 So. 481, 485-86 (1923)."'

"Fortenberry v. State, 545 So.2d 129, 138 (Ala.Cr.App.1988)."
Ex parte Clark, 728 So.2d 1126, 1134 (Ala. 1998). See also Hyde v. State, supra.
"`[N]ormally, a reviewing court determines the correctness of a trial court's ruling "as of the time when it was made and according to what the record shows was before the lower court at that time."` Henry v. State, 468 So.2d 896, 899 (Ala.Cr.App.1984), cert. denied, 468 So.2d 902 (Ala.1985)."
Dozier v. State, 630 So.2d 137, 140 (Ala.Cr. App.1993).
The trial court held status conferences throughout pretrial preparation and closely monitored the activities of counsel. When Minor requested the continuance, his trial was scheduled for the following month. Minor offered only a general assertion that his counsel had not had adequate time to prepare and to develop evidence and, therefore, that his representation would be less than adequate. On appeal, he further argues that the trial court's denial of his motion violated his rights and "undermined the fairness of the trial." Minor, however, does not offer any evidence as to how the trial court's refusal of his request prejudiced his defense. Based on the record before us, the trial court did not abuse its discretion in denying Minor's motion for a continuance. See Connor v. State, 447 So.2d 860, 863 (Ala.Cr.App. 1984) ("The speculative allegations of defense counsel regarding the possible existence of potential witnesses or evidence are insufficient to show that the trial judge abused his discretion.").

VIII.
Minor contends that the trial court's denial of his pretrial request for impeachment evidence regarding the state's witnesses was improper. (Issue X in Minor's brief to this Court.) In his motion for disclosure of impeachment information on witnesses for the state, Minor requested the following information:
"1. Any and all consideration or promises of consideration given to or made on behalf of government witnesses. By `consideration' defendant refers to absolutely anything of value or use, including but not limited to immunity grants, witness fees, special witness fees, transportation assistance, assistance to members of witness's family or associates of witness, assistance or favorable treatment with respect to any criminal, civil, or administrative dispute with the State or the United States, and anything else which could arguably create an interest or bias in the witness in favor of the State or against the defendant or acts as an inducement to testify or to color testimony.
"2. Any and all prosecutions, investigations or possible prosecutions pending or which could be brought against the witness *738 and any probationary, parole or deferred prosecution status of the witness;
"3. Any and all records and information revealing felony convictions attributed to this witness;
"4. Any and all records and information showing prior misconduct or bad acts committed by the witness;
"5. Any and all personnel files for the witness."
(C.R.92-93.) At the hearing on this motion, the prosecutor objected on the grounds that the motion was overly broad and that it requested information that was beyond the district attorney's access. Additionally, the prosecutor stated that he did not know of any grants of immunity or assistance offered to any of the state's witnesses and that if he learned of any criminal convictions, he would inform the defense. After hearing the arguments of the prosecutor and the defense counsel, the trial court held as follows:
"Well, I will rule that the motion as written is overbroad, but I will order the state to disclose any promises or grants of immunity to any witness.
"And should the witness make a statement while testifying which is inconsistent with a prior written statement, to disclose that to the defense, or should any exculpatory information that should be provided under Brady v. Maryland, the state disclose that."
(R. 74-75.)
On appeal, Minor claims the trial court should have required the state to provide him with "information regarding prior felony convictions, current or potential prosecutions, probationary or parole status, records regarding prior misconduct or bad acts committed by the witness[es] and personnel files." (Minor's brief at p. 43). Minor claims he was entitled to such evidence because, he says, "[s]uch evidence would likely have revealed any self-interest and bias on the part of state witnesses ..." Id. He further argues that the trial court's ruling
"denied [him] his right to material evidence under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 10 L.Ed.2d 215 (1963), violated Alabama discovery rules in capital cases under Ex parte Monk, 557 So.2d 832 (Ala.1989), and violated [his] rights to confrontation, to effective cross-examination, to present a defense, to due process, to a fair trial and to a reliable sentencing protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama Constitution and Alabama law."
(Minor's brief at p. 46.)
In Davis v. State, 720 So.2d 1006 (Ala.Cr.App.1998), cert. denied, 525 U.S. 1149, 119 S.Ct. 1049, 143 L.Ed.2d 55 (1999), this Court stated:
"`"In order to establish a Brady violation, appellant must prove: `(1) The prosecution's suppression of evidence; (2) The favorable character of the suppressed evidence for the defense; (3) The materiality of the suppressed evidence.'" Knight v. State, 478 So.2d 332, 335 (Ala.Cr.App.1985). Impeachment evidence, as well as exculpatory evidence, falls within the Brady rule. See Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
"`"The holding of Brady v. Maryland requires disclosure only of evidence that is both favorable to the accused and `material either to guilt or punishment.' 373 U.S. [83] at 87[, 83 S.Ct. 1194 at 1196]. See also Moore v. Illinois, 408 U.S. 786, 794-95, 92 S.Ct. 2562, 2567-2568, 33 L.Ed.2d 706 (1972).
"`"The Court explained in United States v. Agurs, 427 U.S. 97, 104, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976): `A fair analysis of the holding in Brady indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial.'

*739 "`"... Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial:
"`"`For unless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose....
"`"`But to reiterate a critical point, the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial.' 427 U.S. at 108, 96 S.Ct. at 2399.'"

"`United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 3379-80, 87 L.Ed.2d 481 (1985). "Pursuant to United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), undisclosed evidence is material under the Brady rule... only when it is reasonably probable that the outcome of the trial would have been different had the evidence been disclosed to the defense." Hamilton v. State, 520 So.2d 155 (Ala.Cr.App.1986); Spellman v. State, 500 So.2d 110 (Ala. Cr.App.1986).'

"Kinder v. State, 515 So.2d 55, 63-64 (Ala.Cr.App.1986).
"`"[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome.'"

"Johnson [v. State], 612 So.2d [1288] at 1293 [ (Ala.Cr.App.1992) ] (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).
"`The term suppression "means nondisclosure of evidence that the prosecutor, and not the defense attorney, knew to be in existence." Ogden v. Wolff, 522 F.2d 816, 820 (8th Cir. 1975), cert. denied, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203, (1976). "The concept of `suppression' implies that the Government has information in its possession of which the defendant lacks knowledge and which the defendant would benefit from knowing." United States v. Natale, 526 F.2d 1160, 1170 (2d Cir.1975), cert. denied, 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976).'

"Donahoo v. State, 552 So.2d 887, 895-96 (Ala.Cr.App.1989).
"The appellant contends that the State violated Brady because it did not make the defense aware that Curtis Smith had two prior convictions involving sexual offenses. During discovery, the appellant asked that the State be required to make the defense aware of the prior convictions of State witnesses. The trial court denied that request. There is no absolute right to discovery, including discovery of prior convictions of witnesses or of possible impeachment evidence, in criminal cases. Smith v. State, 639 So.2d 543 (Ala.Cr.App.1993); Bailey v. State, 421 So.2d 1364 (Ala.Cr. App.1982). Rather, the trial court has discretion in determining whether to order discovery of the prior convictions of witnesses or other possible impeachment evidence, and such a decision will not be overturned absent an abuse of discretion. Ross v. State, 555 So.2d 1179 (Ala. Cr.App.1989); Williams v. State, 451 So.2d 411 (Ala.Cr.App.1984); Wright v. State, 424 So.2d 684 (Ala.Cr.App.1982); Mardis v. State, 423 So.2d 331 (Ala.Cr. App.1982). The appellant has not shown that the trial court abused its discretion in denying his request for the prior convictions of the State's witnesses."
Davis v. State, 720 So.2d at 1026-27. (Emphasis added.)
Like the defendant in Davis, Minor has failed to meet his burden of proving that *740 the state committed a Brady violation. There is no evidence that the State suppressed evidence of any of its witnesses' prior convictions or that it had any knowledge of "future prosecutions or records of prior bad acts." The record indicates that the trial court provided funds to Minor to hire an investigator. Additionally, there was no evidence to indicate that the state's witnesses were not available to Minor for interviews before trial. Therefore, Minor has not shown any prejudice or discovery violation.
Furthermore, the trial court ordered the state to maintain an ongoing "open file" policy with the exception of notes and work product of the district attorney's office. This order complied with the mandates of Ex parte Monk, 557 So.2d 832 (Ala.1989). Minor offers only a general assertion that the trial court's order violated his right to discovery and that it was improper. The record does not support that assertion. See Davis, supra.
The trial court engaged in an active role during the pretrial discovery process. We do not find any violations of Brady or Monk.

IX.
Minor contends that the "state should have recorded [his] grand jury proceedings." (Minor's brief to this Court at p. 73.)(Issue XXV in Minor's brief to this Court.) Specifically, he argues that "the failure to record the grand jury proceedings denied [him] his rights to adequately cross-examine and impeach witnesses testifying against him, to identify constitutional errors related to the grand jury, and to an adequate appellate record." (Minor's brief to this Court at p. 73.)
This Court addressed this same issue in Drinkard v. State, supra, holding:
"We find no plain error in the failure to record the grand jury proceedings. Alabama law does not require that grand jury proceedings be recorded. Section 12-17-275, Code of Alabama 1975, provides `[w]hen directed by the judge' an official court reporter `shall attend the investigations of the grand jury and there take such notes of the testimony as directed by the district attorney or foreman.' (Emphasis added.) Furthermore, even if the grand jury proceedings should have been recorded, the appellant did not make the requisite showing that he was entitled to inspect the transcript of those proceedings. See Arthur v. State, 711 So.2d 1031 (Ala.Cr. App.1996), aff'd, 711 So.2d 1097 (Ala. 1997)."
Drinkard v. State, 777 So.2d at 258.
In accordance with our holding in Drinkard, we reject Minor's argument.

X.
Minor contends that the trial court erred in denying his motion to quash the indictment, in which he alleged a systematic underrepresentation of blacks, poor people, and women in the pool from which grand and petit juries and grand jury forepersons in Tuscaloosa County were selected. (Issue XIV in Minor's brief to this Court.)
The record indicates that the trial court that presided over Minor's trial also conducted the grand jury that indicted Minor. At the hearing on Minor's motion to quash the indictment, Doris Turner, Tuscaloosa County's circuit court clerk, testified that the individuals selected as members of the pool from which the grand and petit juries were drawn from a random list developed from the list of registered voters in Tuscaloosa County. At the hearing, Minor offered no statistical evidence in support of his motion. The trial court allowed the parties to submit briefs on the matter. After taking it under consideration, the trial court entered the following order:
"This cause came to be heard on defendant's motion to quash the indictment because of the composition of the grand and petit juries, and defendant's motion to quash the indictment on account of *741 discrimination in the selection of the grand jury foreperson.
"First, it should be noted that the defendant [pleaded] to the indictment on 9/22/95, therefore waiving any nonjurisdictional defects.
"Defendant claims that the Tuscaloosa County juror selection process violates the fair cross section requirement by excluding the economically disadvantaged from serving as jurors. The defendant, to prevail on this claim, must first demonstrate that the group alleged to be excluded is a distinctive group in the community. The [United States] Supreme Court let stand, by denying certiorari, a ruling by a California Court that the economically disadvantaged is not a cognizable group. (See People v. Nicolaus, [54 Cal.3d 551,] 817 P.2d 893, [286 Cal.Rptr. 628 (Cal.1991)]).
"The second prong that defendant must prove, is that representation of this group, in venires, from which juries are selected, is not fair and reasonable in relation to the number of such persons in the community. There was no statistical evidence presented at the hearing from which a comparison could be made. The defendant is himself a black man, which is a cognizable group, but there was no statistical evidence presented of the historical ratios of blacks to other groups either in the community or who are selected for grand and petit juries.
"Finally, there was no evidence presented of systematic exclusion of any cognizable group from either the grand or petit juries.
"The defendant also moved to quash the indictment because of unconstitutional procedures in the selection of the grand jury foreperson.
"As the state points out in its brief, the 6th amendment right to a fair cross section does not extend to the office of foreperson of the grand jury. (United States v. Sneed, 729 F.2d 1333 (11th Cir.1984)). In addition, there has been no showing of systematic exclusion. This Court can take judicial notice that during this Judge's tenure as Presiding Circuit Judge, there were two black and two white forepersons. The procedure used to select the foreperson for the grand jury which returned the indictment in the defendant's case was to take 18 juror cards, who were selected to serve on the grand jury, shuffle them, and blindly select a card. Such process is race- and gender-neutral. [Cf. Harris v. State, 683 So.2d 26 (Ala.Cr.App.1996).]
"The defendant failing to meet his burden of proof as to either a 6th Amendment violation, or 14th Amendment Equal Protection violation in the selection of jurors, both grand and petit, and selection of grand jury forepersons, defendant's motions are hereby overruled and denied.
"Even if defendant had met his burden, the claims are procedurally barred because they were not raised before defendant pled to the indictment."
(C.R.239-41.)
The record supports the trial court's finding that Minor has failed to establish a prima facie violation of the Sixth Amendment's fair cross-section requirement, as delineated in Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). Additionally, he has failed to show that an equal protection violation occurred in the context of grand jury selection. See Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). Finally, he has failed to meet his burden of proof to establish a prima facie case of discrimination in the selection of a grand jury foreman. See Anderson v. State, 641 So.2d 1299 (Ala.Cr.App.1994). Therefore, the trial court did not err in denying Minor's motion to quash the indictment in this regard. Pressley v. State, 770 So.2d 115 (Ala.Cr.App.1999); Stewart v. State, 730 So.2d 1203 (Ala.Cr.App.1996); Price v. State, 725 So.2d at 1060-61. Cf. Alonzo Burgess v. State, 723 So.2d 742, 749-52 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 *742 S.Ct. 1360, 143 L.Ed.2d 521 (1999)("Alonzo Burgess v. State").

XI.
Minor argues that "in a community where there had been prejudicial and inflammatory pretrial publicity, and a substantial possibility of prejudice existed, the trial court should have conducted fully sequestered voir dire." (Minor's brief at p. 62.)(Issue XVII in Minor's brief to this Court.) The record indicates that Minor filed a pretrial motion requesting a fully sequestered voir dire. Although the trial court denied this motion, the court implemented precautionary measures in an attempt to limit the possibility of prejudice. The record reveals that members of the venire who indicated that they had any knowledge of the murder were sequestered and questioned individually. (R. 437, 457, 460, 461, 474, 475, 490, 508, 510, 530, 531, 533.)
"`A trial court is vested with great discretion in determining how voir dire examination will be conducted, and that court's decision on how extensive a voir dire examination is required will not be overturned except for an abuse of that discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973); Lane v. State, 644 So.2d 1318 (Ala.Cr.App.1994); Harris v. State, 632 So.2d 503 (Ala.Cr.App. 1992), affirmed, 632 So.2d 543 (Ala. 1993), affirmed, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).' Ex parte Land, 678 So.2d 224 (Ala.1996), cert. denied, [519] U.S. [933], 117 S.Ct. 308, 136 L.Ed.2d 224 (1996).
"`As the general rule, the decision whether to voir dire perspective jurors individually or collectively is in the sound discretion of the trial court. Waldrop v. State, 462 So.2d 1021 (Ala. Cr.App.1984), cert. denied, 472 U.S. 1019, 105 S.Ct. 3483, 87 L.Ed.2d 618 (1985). This discretion is limited, however, by the requirements of due process. United States v. Hawkins, 658 F.2d 279 (5th Cir.1981); Waldrop v. State. Individual questioning may be necessary under some circumstances to ensure that all prejudice has been exposed. United States v. Hurley, 746 F.2d 725 (11th Cir. 1984).'"
Boyd v. State, 715 So.2d at 848-49, quoting Haney v. State, 603 So.2d 368, 402 (Ala.Cr. App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).
"Even in capital cases, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination, and it is within the trial court's discretion whether to allow such a request. Bell v. State, 475 So.2d 601 (Ala.Cr.App. 1984), aff'd, 475 So.2d 609 (Ala.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985); Raines v. State, 429 So.2d 1104 (Ala.Cr.App.), aff'd, 429 So.2d 1111 (Ala.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983)."
Hallford v. State, 548 So.2d 526, 538 (Ala. Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989). See also Taylor v. State, 666 So.2d 36 (Ala.Cr.App.), aff'd, on return to remand, 666 So.2d 71 (Ala.Cr. App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).
A complete review of the voir dire indicates that the method of the examination and the precautions taken by the trial court "provided reasonable assurance that prejudice would have been discovered if present." Haney v. State, 603 So.2d at 402.

XII.
Minor contends that the trial court erred in granting the state's challenges for cause of veniremembers based on their opposition to capital punishment. (Issue XVIII in Minor's brief to this Court.) This contention is raised for the *743 first time on appeal; therefore, our review is for plain error. Rule 45A, Ala.R.App.P.
"`[W]hether a prospective juror in a capital murder case is properly excluded based on the juror's views concerning the death penalty involves a question of fact. Therefore, a proper review of this determination requires that we give great deference to the trial judge's discretion, because the judge was present and capable of observing the potential jurors and their responses.' Price v. State, 725 So.2d 1003, 1025 (Ala.Cr.App. 1997), aff'd, 725 So.2d 1063 (Ala.1998), citing Wainwright v. Witt, [469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) ].
"In Clemons v. State, 720 So.2d 961 (Ala.Cr.App.1996), aff'd, 720 So.2d 985 (Ala.1998), this court stated:

"`"Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), set the early standard for a court's exclusion for cause of venirepersons who oppose the death penalty. The Court in dicta in Witherspoon limited exclusion for cause to those venirepersons who made it `unmistakably clear (1) that they would automatically vote against imposition of capital punishment ... or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt.' Id. [at] 522-23 n. 21, 88 S.Ct. at 1777 n. 21. Subsequently, in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court clarified or modified its decision in Witherspoon by holding that the state may exclude venirepersons in capital cases whose views would `"prevent or substantially impair the performance of [their] duties as a juror in accordance with his instruction and [their] duties as a juror in accordance with his instruction and [their] oath."' Id., 469 U.S. at 424, 105 S.Ct. at 852 (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). The new Witt standard dispensed with the Witherspoon reference to `automatic' decisionmaking, and eliminated the requirement that a venireperson's bias be proved with `unmistakable clarity.' 469 U.S. at 424, 105 S.Ct. at 852."'
"720 So.2d at 972. See also Travis v. State, 776 So.2d 819 (Ala.Cr.App.1997); and Daniels v. State, 650 So.2d 544 (Ala. Cr.App.1994), cert. denied, 514 U.S. 1024, 115 S.Ct. 1375, 131 L.Ed.2d 230 (1995)."
Roy Burgess v. State, ___ So.2d at ___.
In his brief to this Court, Minor argues that the trial court erred in granting the state's challenges for cause of 10 prospective jurors because, he says, the prospective jurors "indicated that they could follow the law even though they had opinions about the death penalty." (Minor's brief to this Court at p. 62.)
According to the record, each of these prospective jurors as to whom the trial court granted challenges for cause clearly indicated his or her opposition to the death penaltyeither in a juror questionnaire mailed by the prosecution or during the initial voir dire questioning by the trial court, the prosecution, and/or the defense. The record further reveals that after the veniremembers had been dismissed for the day, the trial court, the prosecution, and the defense conducted individual voir dire of each of these prospective jurors. The following is a portion of the pertinent testimony elicited with regard to each of the jurors dismissed on a challenge for cause:
"[Defense counsel questioning juror K.H.]: Could youIf Willie Minor is convicted as charged of capital murder and, of course, the Judge would provide instructions to the jury concerning its recommendation either for the death penalty or life without parole could you sitin good conscience sit on that sentencing phase of the jury and recommend the death penalty if you thought the facts in the case warranted the death penalty?

*744 "[K.H.]: No. I could not recommend the death penalty."
"[Defense counsel questioning prospective juror J.A.]: ButAnd I understand [J.A.] why you'reyou're taking it very seriously, as you should.
"But ifWith the Court's instructions, could you follow those instructions and weigh the evidence and be a fair and impartial juror in this case including and up to recommending the death penalty if you felt like the evidence warranted recommending the death penalty?
"[J.A.]: I am against it, so I would have to go all the way against it."
"[Defense counsel questioning prospective juror J.M.]: [J.M.], are there any circumstances under which you would not be opposed to the death penalty?
"Say, for example, you served on this jury and you got to the sentencing phase and, of course, aggravating circumstances would be presented and mitigating.
"Mitigating meaning in favor of the defendant. Aggravating showing that it was really a terrible, heinous crime that was committed.
"If the aggravating evidence and circumstances was strong enough, couldn't you, in fact, vote for the death penalty in the case?
"[J.M.]: I couldn't. I couldn't vote for guilty if I knowed it was the death penalty."
"[Defense counsel questioning prospective juror L.W.]: Religious reasons, okay. Are you opposed to the death penalty in every instance?
"[L.W.]: Yes, sir."
"[Prosecutor questioning prospective juror R.R.]: And would it be correct to say that as a juror you could not vote to recommend the death penalty regardless of the evidence?
"[R.R.]: No, I wouldn'tI couldn't do that."
"[Defense counsel questioning prospective juror M.H.]: [M.H.], ifOf course, I know we have, you know, religious beliefs andwhich sometimes conflict maybe with our existing law. Alabama law and, I guess, the laws in this country do recognize a death penalty.
"If you were selected to be on this jury and the jury convicted Mr. Minor of this case, could you lay your religious convictions aside and apply the law? Which I think religion basically also talks about enforcing the law.
"Could you in that circumstance, if the jury determined that he was guilty, apply the law and consider aggravating and mitigating circumstances and if this case were so heinous and the aggravating circumstances outweighed the mitigating, could you in that instance apply the law and vote for the death penalty?
"[M.H.]: I don't believe I could. I justI justI couldn't believe in taking another person's life. I just don't think I could do that. I am sorry, honestly."
"THE COURT [questioning prospective juror E.M.]: Of course, then the case would proceed to the sentencing phase and there would be further evidence presented regarding aggravating circumstances and mitigating circumstances.
"The Court would then instruct the jury that they are to weigh the aggravating circumstances and the mitigating circumstances.

*745 "If they find thethe jury finds thator you find as an individual juror that the aggravating circumstances outweigh the mitigating circumstances, then they are to recommend the death penalty.
"On the other hand, if the jury finds that the mitigating circumstances outweighs the aggravating, they are to recommend life without parole.
"Would you be able to follow the Court's instructions and objectively view the evidence and if in your judgment the aggravating circumstances outweighed the mitigating circumstances, make a recommendation of the death penalty?
"[E.M.]: No, sir."
"[Prosecutor questioning prospective juror P.B.]: And isAnd is it also correct to say, then, that, as a juror, if you were called upon to do so, you could not make a recommendation for the death penalty?
"[P.B.]: (Shook head in the negative.)
"[Prosecutor]: And that is regardless of the evidence?
"[P.B.]: No.
"[Prosecutor]: Okay. That is correct, then?
"[P.B.]: Yes.
"[Prosecutor]: Okay.
"[Defense counsel]: Just as a point of information, [P.B.], What is the basis of your opposition to the death penalty?
"[P.B.]: I was going by what a person done, that doesn't give nobody else a right to take nobody else's life because what that person done. They got to answer to the Lord for it. That is my opinion."
"[Defense counsel questioning prospective juror L.N.]: [L.N.], givenI realize that you have some personal opposition to the death penalty. But given the fact that the State of Alabama has a death penalty, it is the law, if you sat on this jury and that jury determinedfor sake of argument, if the jury determined that Mr. Minor was guilty, could you also consider the aggravating and mitigating circumstances and make a recommendation regarding death versus life without parole in this case?
"Now, I haven't heard you say you're absolutely opposed to the death penalty. I am hearing you saying that you would have a difficult time making that decision. Is that a fair statement?
"[L.N.]: Yes. But I am opposed to the death penalty. I don't believe in taking another life. I don't believe in taking life, period.
". . . .
"THE COURT: And just assume for a moment, further, that the evidence in this case and the facts and circumstances justified a finding that the aggravating circumstances outweighed the mitigating. Would you be able to follow the Court's instruction and recommend athe death penalty?
"[L.N.]: I don't think so."
"[Prosecutor questioning prospective juror J.W.]: If you were selected as a juror, is it correct to say that there aren't any circumstances where you could vote in favor of it?
"[J.W.]: There are no circumstances where I can vote in favor of the death penalty."
(R. 423, 455, 476-77, 489, 496, 502-03, 519-20, 522-23, 526-29, 535.)
The record clearly indicates that the questioning of these prospective jurors elicited as a response either that the prospective juror could not follow the trial court's instructions or that his or her view against the death penalty was unaltering. Unquestionably, the responses of the these prospective jurors who were excluded for *746 cause showed more than just a "reluctance" to impose the death penalty. All the prospective jurors provided answers to the questions asked during voir dire indicating that their views on the death penalty would "prevent or substantially impair" their duties as jurors. The trial court did not err in granting the state's challenges for cause. Pressley v. State, supra; Smith v. State, supra; Travis v. State, 776 So.2d 819 (Ala.Cr.App.1997); Ex parte Trawick, 698 So.2d 162 (Ala.), cert. denied 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997); Boyd v. State, 715 So.2d 825 (Ala. Cr.App.1997); Clemons v. State, 720 So.2d 961 (Ala.Cr.App.1996), aff'd. 720 So.2d 985 (Ala.1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999); and Williams v. State, supra. Cf. Hyde v. State, supra.
As a part of this issue, Minor also argues that his rights to equal protection and due process were violated because "the use of strikes for cause or the use of peremptory strikes to exclude jurors with reservations about the death penalty is unconstitutional because jurors with reservations about the death penalty possess a commonality that makes them a cognizable group." (Minor's brief at p. 63.) Minor offers no factual support or argument to bolster this assertion. Nothing in the record supports this claim. Our review clearly reflects that the trial court made every effort to ensure that Minor received a trial by a fair and impartial jury; therefore, we reject this claim.

XIII.
Minor claims the trial court committed reversible error in denying his challenge for cause of a prospective juror. (Issue II in Minor's brief to this Court.) Specifically, Minor claims that the trial court should have granted his strike for cause of juror no. 120, F.W., because, he says, F.W. stated that he presumed Minor was guilty before he heard any evidence. (Minor's brief at p. 5.)
"`Section 12-16-150, Code of Alabama 1975, provides that, when a juror "has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict," a challenge for cause is proper. Nobis v. State, 401 So.2d 191 (Ala.Cr. App.), cert. denied, 401 So.2d 204 (Ala. 1981). The juror must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused. The juror's opinion must be fixed to the point that it would bias the verdict which the juror would be required to render. Johnson v. State, 356 So.2d 769 (Ala.Cr.App. 1978); McCorvey v. State, 339 So.2d 1053 (Ala.Cr.App.), cert. denied, 339 So.2d 1058 (Ala.1976); Tidmore v. City of Birmingham, 356 So.2d 231 (Ala.Cr. App.1977), cert. denied, 356 So.2d 234.' "Thomas v. State, 539 So.2d 375, 380 (Ala.Cr.App.), aff'd, 539 So.2d 399 (Ala. 1988), cert. denied, 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989).
"`"Ultimately, the test to be applied is whether the juror can set aside [his] opinions and try the case fairly and impartially, according to the law and the evidence. This determination again is to be based on the juror's answers and demeanor and is within the discretion of the trial judge. Thus, a prospective juror should not be disqualified for prejudices or biases if it appears from his or her answers and demeanor that the influence of those prejudices and biases can be eliminated and a verdict rendered according to the evidence."'

"Marshall v. State, 598 So.2d 14, 16 (Ala.Cr.App.1991), quoting Knop v. McCain, 561 So.2d 229, 232 (Ala.1989) (citations omitted)....
"... As the United States Supreme Court noted in Patton v. Yount, 467 U.S. 1025, 1039, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984):
"`This is not unusual on voir dire examination, particularly in a highly publicized criminal case. It is well to remember that the lay persons on the *747 panel may never have been subjected to the type of leading questions and cross-examination tactics that frequently are employed, and that were evident in this case. Prospective jurors represent a cross section of the community, and their education and experience vary widely. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially.'"
Burgess v. State, [Ms. CR-93-2054, November 20, 1998] ___ So.2d ___, ___ (Ala.Cr.App.1998)("Willie Burgess v. State"). See Pressley v. State, supra; Ex parte Davis, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999); Ex parte Trawick, supra.
The trial court is in the best position to determine a juror's competency to serve. Thomas v. State, 539 So.2d 375 (Ala.Cr.App.), aff'd, 539 So.2d 399 (Ala. 1988), cert. denied, 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989). "[T]he test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law." Ex parte Davis, 718 So.2d at 1171. Even in cases where a potential juror has expressed some preconceived opinion as to the guilt of the accused, the juror is sufficiently impartial if he indicates he can set aside that opinion and render a verdict based upon the evidence in the case. Id at 1171. "The ruling that the [trial] court makes on a challenge for cause based upon a juror's supposed bias is afforded great deference and will not be disturbed on appeal unless there is a clear showing of abuse of discretion by the trial court." Little v. State, 676 So.2d 959, 961 (Ala.Cr. App.1996), citing Ex parte Rutledge, 523 So.2d 1118, 1120 (Ala.1988).
After the general voir dire, the following individual voir dire was conducted:
"THE COURT: This will be juror no. 120, [F.W.].
"[F.W.], you had indicated that you had either heard or read something about this case. What was the source of you information?
"[F.W.]: Read it in the paper and TV.
"THE COURT: Okay.
"[F.W.]: Or saw it on TV.
"THE COURT: Okay. Based on what you saw on TV and read in the newspaper, have you formed an opinion as to the guilt or innocence of the defendant in this case?
"[F.W.]: My assumption that the person that they picked up was guilty of what it waswhat they was charged with.
"THE COURT: Well, let me ask you this: Would you be able to lay aside what opinion you have formed and independently judge the guilt or innocence of the defendant based on the evidence you have heardor that you would hear during the course of this trial and the law given to you by the court?
"[F.W.]: Yes. I think I would do that, yeah.
"THE COURT: Okay. The attorneys may want to ask you some additional questions.
"[Prosecutor]: I do not.
"[Defense counsel]: [F.W.], you just stated that youhaving seen the paper, you assumed that the defendant, which, in this case, is Willie Minor, was guilty and he was charged and arrested.
"[F.W.]: Right.
"[Defense counsel]: Now, I mean, that that thought process is still with you, isn't it? I mean
"[F.W.]: When you read it in the paper that Mr. Jones was there and was picked up for such and such, then you assume that that is the right person.

*748 "[Defense counsel]: Yes, sir.
"[F.W.]: I mean, that is what I assumed, that the paper stated it was.
"[Defense counsel]: Right. Now, with that assumption and given the fact that youthat you have assumed that Willie Minor is guilty of this crime, that does substantially impair your ability to be objective, doesn't it, and to serve as a juror?
"[F.W.]: It would not impair it if I was sitting and heard the evidence otherwise.
"[Defense counsel]: All right, sir. Would it be fair to say that right now you're operating under the presumption and assumption that he is guilty?
"[F.W.]: Right.
"[Defense counsel]: And you know then the evidence might prove him otherwise. But right now
"[F.W.]: Yes, sir. Right.
"[Defense counsel]:your opinion is that he is guilty unless evidence comes forward to show that he is not guilty?
"[F.W.]: Yes, sir.
"THE COURT: Well, let me ask you this, [F.W.]:
"At the beginning of every trial, I give some opening remarks to the jurors and one thing that I tell the jurors is that the defendant is presumed to be innocent.
"Would you be able to follow that instruction and lay aside what you now feelyour assumption that the defendant is guilty and give the defendant a fair trial or do you feel like that the preconceived notion that you have would interfere with you ability to do that?
"[F.W.]: I feel likeEven though that I feelmy assumption that it feels like that he is guilty, that I could lay it aside and give him a fair trial based on what I hear at the trial at the time that he is being tried.

"THE COURT: Okay. Did you want to ask him anything else?
"[Defense counsel]: Nothing further, Your Honor.
"THE COURT: Okay. Thank you, [F.W.]. 8:30 in the morning.
"THE COURT: Either side wish to challenge [F.W.]?
"[Defense counsel]: Your Honor, the defense would like to challenge [F.W.].
"I mean, clearly, he's already made the assumption that it's his opinion that Willie Minor is guilty in this case. There is just no way that he could be fair and impartial with that assumption.
"He's taken just the reverse approach that Willie Minor essentially has to prove himself not guilty in order to be found not guilty and he doesn't bear that burden and I don't think [F.W.] can do that, not based on any of his statements.
"THE COURT: Well, I have to judge it as a whole, what he said, and he indicated that he would be able to lay aside any preconceived notions, so I will overrule the challenge."
(R. 469-474.)(Emphasis added.)
The above-quoted portion of the individual voir dire of F.W. indicates that, although F.W. may have had an opinion as to Minor's guilt, he indicated that he could "lay it aside and give him a fair trial based on what [he heard] at the trial at the time that [Minor was] being tried." (R. 472.) Clearly, the record does not establish an absolute bias or fixed opinion on the part of F.W. "`Even though a prospective juror admits to potential bias, if further voir dire examination reveals that the juror in question can and will base his decision on the evidence alone, then a trial judge's refusal to grant a motion to strike for cause is not error.'" George v. State, 717 So.2d 827, 834 (Ala.Cr.App.), rev'd on other grounds, 717 So.2d 844 (Ala.1996), quoting Perryman v. State, 558 So.2d 972, 977 (Ala.Cr. App.1989). Accordingly, no error resulted from the trial court's denial of Minor's challenge for cause. See Hyde v. State, supra; Willie Burgess v. State, supra; *749 Stewart v. State, supra; and Kinder v. State, 515 So.2d 55 (Ala.Cr.App.1986).

XIV.
Minor contends that the trial court erred in not removing for cause prospective jurors who indicated that they knew the victim's grandmother, that they had been exposed to pretrial publicity, or that they had "too close of relationships" to law enforcement officers. (Issue XIX in Minor's brief to this Court.) This claim is raised for the first time on appeal; therefore, we review it for plain error. Rule 45A, Ala.R.App.P.
Minor maintains that the trial court erred by not striking prospective juror T.S. for cause because juror T.S. knew Ebious's grandmother.
"That a prospective juror knows the victim's family is not a statutory ground for excluding that juror. § 12-16-150, Code of Alabama 1975. `"To justify a challenge of a juror for cause, there must be a statutory ground, or some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court."' Barnett v. State, 639 So.2d 527 (Ala.Crim.App.1993) (quoting Nettles v. State, 435 So.2d 146 (Ala.Crim.App.1983), aff'd, 435 So.2d 151 (Ala.1983)) (emphasis in the original) (citations omitted).
"`"[A] proper challenge for cause exists only when a prospective juror's opinion is so fixed that he or she could not ignore it and try the case fairly and impartially according to the law and the evidence.'"

"Siebert v. State, 562 So.2d 586, 595 (Ala.Crim.App.1989) (quoting Ex parte Rutledge, 523 So.2d 1118, 1120 (Ala. 1988)). See, also, § 12-16-150(7), Code of Alabama 1975."
McKinney v. State, 654 So.2d 95, 100-01 (Ala.Cr.App.1995).
The following occurred when the trial court questioned T.S. individually:
"THE COURT: Okay. Let me ask you this: The fact that you know the wife ofI guess it would be the grandmother of the victim in this case, would that influence you in any way in this case or would you be able to lay that aside?
"[T.S.]: (Shakes head in the negative.)
"THE COURT: You would be able to
"[T.S.]: Yeah."
(R. 461-62.)
The record fails to establish that T.S. had an opinion so fixed that she could not ignore it, nor does it establish that T.S. indicated she was unable to try this case fairly and impartially. Consequently, the trial court did not err in failing to strike T.S. for cause. See Drinkard v. State, supra.
Minor also contends that the trial court erred in not striking 14 prospective jurors because "of their knowledge about the case from exposure to pretrial publicity." (Minor's brief to this Court at p. 65.)
"`"The test to be applied is can the juror eliminate the influence of his scruples and render a verdict according to the evidence. Ordinarily a juror is not disqualified where it appears that he is willing to follow the instructions of law given by the trial court and is able to decide the case impartially according to the evidence notwithstanding his scruples. The determination of this question is based on the juror's answers and demeanor and is within the sound discretion of the trial judge. Tidmore v. City of Birmingham, 356 So.2d 231 (Ala.Cr. App.1977), cert. denied, 356 So.2d 234 (Ala.1978). A juror is incompetent whose answers show that he would follow his own views regardless of the instructions of the court. Watwood v. State, 389 So.2d 549, 550 (Ala.Cr.App.), cert. denied, 389 So.2d 552 (Ala.1980). "`Barbee v. State, 395 So.2d 1128, 1130-31 (Ala.Cr.App.1981)....
"`"Thus, where a juror states that he has opinions but that he would try *750 the case fairly and impartially according to the law and the evidence and that he would not allow his opinion to influence his decision, it is not error for a trial judge to deny a challenge for cause. Howard v. State, 420 So.2d 828, 831 (Ala.Cr.App.1982). `A juror who brings his thoughts out into the open in response to voir dire questions may be the one who later "bends over backwards" to be fair....' Clark v. State, 443 So.2d 1287, 1289 (Ala.Cr. App.1983)." `Mahan v. State, 508 So.2d 1180 (Ala.Cr.App.1986).'"

"Kinder v. State, 515 So.2d 55, 60-61 (Ala.Cr.App.1986)."
Harris v. State, 632 So.2d 503, 520-21 (Ala.Cr.App.1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).
The record reflects that during the general voir dire several prospective jurors indicated that they had heard about the case. These jurors were asked to remain for individual voir dire at the end of the day. The trial court questioned each of these prospective jurors individually. The following occurred during the questioning of these jurors[3]:
"THE COURT [questioning prospective juror M.O.]: Okay. Well, let me ask you this: Based on anything that you have seen on TV or anything that you have read in the newspaper, have you formed an opinion as to the guilt or innocence of the defendant in this case?
"[M.O.]: No.
"THE COURT: Okay. Would you be able to lay aside what you have heard in the newspaper andexcuse me, read in the newspaper and heard on the TV and give both sides in this case a fair trial and render a decision based solely on the evidence that you have heard and the law given to you by the Court?
"[M.O.]: Yes."
"THE COURT [questioning prospective juror M.K.G.]: Well, let me ask you this: From what you have read in the paper and what you have heard secondhand, so to speak, from the case, have you formed an opinion as to the defendant's guilt or innocence?
"[M.K.G.]: No, because I really don't know anything except like what I have seen in the paper and just the little bits that I have heard. So I don't really know anything about it other than that.
"THE COURT: Well, let me ask you this
"[M.K.G.]: What is he accused of.
"THE COURT: Would you be able to disregard or lay aside what you may have heard or what you read in the paper and listen to the evidence in this case and give both sides a fair and impartial trial?
"[M.K.G.]: Is it fair to ask if heif he denied doing this?
"THE COURT: Well, I can't really comment on anything.
"[M.K.G.]: Well, I don't know if he
"THE COURT: There will be evidence presented in the case, and would you be able to base your decision on what you heard at the trial of [the] case?
"[M.K.G.]: Uh-huh (yes). Yes."
"THE COURT [questioning prospective juror G.B.]: Okay. Well, let me ask you this: Based on what you have [heard] on the TV and read in the newspaper, have you formed an opinion as to the guilt or innocence of the defendant in this case?
"[G.B.]: No, sir.
"THE COURT: Okay. Would you be able to lay aside what you have heard on the TV and read in the newspaper and *751 independently listen to the evidence you hear in this courtroom and the law given to you by the Court?
"[G.B.]: Yes, sir."
"THE COURT [questioning prospective juror S.S.]: Okay. Based on what you have read about this case in the Tuscaloosa News, have you formed an opinion as to the guilt or the innocence of the defendant?
"[S.S.]: No, sir.
"THE COURT: Okay. Would you be able to lay aside anything that you may have read in the paper and base your decision in this case on the evidence you hear in this case, the law given to you by the Court?
"[S.S.]: Yes, sir."
"THE COURT [questioning prospective juror T.S.]: Okay. Based on what you have read in the newspaper, have you formed an opinion as to the guilt or innocence of the defendant in this case?
"[T.S.]: I don't even remember what I read.
"THE COURT: Okay. So you would be able to lay aside what you read in the paper and if, during the course of the trial, you were to remember something that you had read, would you be able to base your judgment in this case on the evidence that you hear up there on the witness standin the jury box, from the witness stand, and the law given to you by the Court?
"[T.S.]: Uh-huh (yes)."
"THE COURT [questioning prospective juror F.W.]: Well, let me ask you this: Would you be able to lay aside what opinion you have formed and independently judge the guilt or innocence of the defendant based on the evidence you have heardor that you would hear during the course of this trial and the law given to you by the Court?
"[F.W.]: Yes. I think I would do that, yeah."
"THE COURT [questioning prospective juror C.V.]: Okay. Based on what you read in the Tuscaloosa News, have you formed an opinion as to the guilt or innocence of the defendant in this case?
"[C.V.]: No.
"THE COURT: Okay. All right. Would you be able to lay aside what you read in the paper and independently listen to the evidence in this case and give make your judgment based on the evidence, the law given to you by the Court?
"[C.V.]: Yes, I think so."
"THE COURT [questioning prospective juror L.W.]: Would you be able to lay aside the opinion that you have formed [from the television and newspaper reports] and listen to the evidence in this case and give both sides a fair and impartial trial or do you feel like what you have seen so adversely affected you that you would not be able to give the defendant a fair trial?
"[L.W.]: I feel like I probably could be able to give him a fair trial.
"THE COURT: Okay. So you think that you would be able to lay aside what you have heard and independently judge the case based on the evidence that you hear?
"[L.W.]: I think I could."
"[Prospective juror G.K.]: I remember seeing the news, [Channel] 33 news, and seeing a picture of the baby and the name, hearing the name associated with the picture of the baby. And IAnd I *752 don't remember if I actually saw Mr. Minor in that same, you know, newscast or not. I do remember hearing his name associated with that newscast. But up until this time, I didn't know howI don't rememberI hadn't recalled how the baby died. I just knew that the baby was killed.
"THE COURT: Let me ask you this: Based on what you heard and what you have read, have you formed an opinion as to the guilt or innocence of the defendant?
"[G.K.]: No, sir.
"THE COURT: All right. Would you be able to lay aside what you may have heard on television and read in the newspaper and listen to the evidence in this case and independently judge the defendant's guilt or innocence based on that evidence and the law as given to you by the Court?
"[G.K.]: I would to the best of my ability. I would try, yeah."
"THE COURT [questioning prospective juror D.K.]: Okay. Based on what you read in the newspaper, have you formed an opinion as to the guilt or innocence of the defendant in this case?
"[D.K.]: No, not really. No.
"THE COURT: All right. Would you be able to lay aside what you read in the newspaper, make your judgment in this case based on the evidence that you hear in this courtroom and the law given to you by the Court, or do you think that you would be influenced in any way with what you have read in the newspaper?
"[D.K.]: No, I don't think I would be influenced."
"THE COURT [questioning prospective juror R.R.]: Okay. Based on what you [R.R.] have read in the newspaper, have you formed an opinion as to the defendant's guilt or innocence?
"[R.R.]: No, sir.
"THE COURT: Okay. Would you be able to lay aside what you read in the newspaper and independently judge this case based on the evidence you hear in this courtroom?
"[R.R.]: Yes, sir."
"THE COURT [questioning prospective juror D.P.]: All right. Based on what you have seen on the TV and read in the newspaper, have you formed an opinion as to the guilt or innocence of the defendant in this case?
"[D.P.]: No, sir.
"THE COURT: Okay. Would you be able to lay aside what you heard on TV and read in the newspaper and independently judge this case based on the evidence you hear in this courtroom?
"[D.P.]: Yes, sir."
"THE COURT [questioning prospective juror L.R.]: Okay. Based on what you read in the newspaper, have you formed an opinion as to either the guilt or innocence of the defendant?
"[L.R.]: I have not. I only scanned it and I am only aware that the incident is alleged to have happened.
"THE COURT: Okay.
"[L.R.]: No details.
"THE COURT: Would you be able to lay aside what you read in the newspaper and independently make a judgment in this case based on the evidence that you hear in court?
"[L.R.]: Yes, I could."
(R. 437-38, 449-50, 457-58, 460, 462-63, 469-70, 474, 481-82, 493-94, 508-09, 531, 532, 533-34.)
Because each of these prospective jurors stated that he or she would base a decision on the evidence presented at trial and on the judge's instructions as to the law, Minor *753 has failed to establish any reversible error. Stewart v. State, supra; Bush v. State, 695 So.2d 70 (Ala.Cr.App.1995), aff'd, 695 So.2d 70 (Ala.Cr.App.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997); Harris v. State, supra; Wilkerson v. State, 686 So.2d 1266 (Ala.Cr.App.1996); and Clark v. State, 621 So.2d 309 (Ala.Cr.App.1992).
Lastly, Minor contends that jurors R.A., A.H., K.H., J.M., B.N., M.S., and T.T. should have been struck for cause because these jurors had "too close of relationships to law enforcement officers." (Minor's brief at p. 65-66.) Minor offers no facts to support this contention. The information concerning these prospective jurors' relationship with law enforcement officers was elicited during the prosecutor's questions on voir dire. Minor's defense counsel did not further explore the relationship of any of these prospective jurors with law enforcement officers when he conducted his voir dire. No evidence was presented that these jurors, despite their relationship with law enforcement officers, could not be fair and impartial. Therefore, because the record does not support a finding that the failure to strike these prospective jurors for cause prejudiced Minor, we find no reversible error. See Clark v. State, supra.

XV.
Minor contends that the trial court's finding that the defense failed to present a prima facie case of racial discrimination in the exercise of the State's peremptory challenges to prospective jurors was erroneous. See Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). (Issue XXXV in Minor's brief to this Court.) The record indicates that, after the striking of the jury and before it was seated, the following transpired:
"[Defense counsel]: We definitely want to file a Batson motion....
"I know that we have a number in terms of the percentages of black jurors struck by the D.A.'s office, and would file an objection based on that, on those strikes.
". . . .
"[Prosecutor]: Judge, as a wayas predicate to what I am about to say, there were seven total blacks available. The state struck only four. The defense struck one and two are on the jury. And I have to say that that just is nowhere near a prima facie case.
". . . .
"[Defense counsel]: Judge, we end up withif I am looking at these numbers right, we end up with 2 minorities or 2 blacks on the jury, 2 out of the 12. And that is primarily a result of the state's strikes of blackprospective black jurors from the venire. That is less than blacks make up in Tuscaloosa County and the population in this area and in the nation and, therefore, Mr. Minor is beinghas a jury technically not made up of his peers in terms of the racial balance that should be reflected on the jury to ensure that he gets a fair trial and that is a direct result of the blacks that have been struck from the jury by the state.
"THE COURT: Well, I think thethe representation is not so disproportionate as to, by itself, make a prima facie case. Is there something else that you had in mind on making a prima facie case?
"[Defense counsel]: Your Honor, the only additional thing I would like to have on the record is theis to have the state state its basis for striking the black jurors that were struck.
"THE COURT: But I think you have got to make out a prima facie case before we get to that point.
"[Defense counsel]: If it's the Court's ruling that at face value it is not sufficient for a prima facie case, then there would be no argument to have the state
"THE COURT: Well, you have got to show something, I think. You know, if *754 there were seven blacks on the venire and all seven were struck, I think, you know, that on its face would show a prima facie case. But we don't have anything on the record right now. Do you have any evidence or anything that you wanted to present, a history or
"[Defense counsel]: Well, Your Honor, of the 7 available black jurors, the state struck over 50% of that number. I mean, I think that'sgiven the small number of blacks, 7 out ofHow many did we start with? 47? Or 46?
"THE CLERK: To begin with? After we had the challenges, we had 45.
"[Defense counsel]: 45. And we had seven available out of that number and 4 of those 7 were struck by the state. I mean, that leaves you with potentially 3 jurors on the jury that could serve on the jury. That leaves you with a watered down representation by minorities and blacks on the jury in addition to the
"THE COURT: Well, how many strikes did the state have?
"THE CLERK: They had 17 and the defense had 16. That is counting their alternates.
"THE COURT: Well, I don't think using 4 out of 17 strikes to strike blacks is, you know, to establish a prima facie case. Have you got something else?
"[Defense counsel]: No, sir, I don't haveI don't have anything else. You can view it as 4 out of 17 but, technically, I think it is more properly viewed as 4 out of 7. I mean, you only had 7 to choose from, to remain and serve on a jury, and 4 of those 7 were struck by the state.
"THE COURT: Okay, well, I will hold, at least at this point, that the defense has not made a prima facie case. If you come up with something overnight, we can take that up, I guess, before they are impaneled.
"[Defense counsel]: All right, sir."
(R. 552-57.)
Minor did not offer any further argument to support his Batson motion and establish a prima facie case of racial discrimination prior to the impanelling of the jury the following morning. Essentially, the only assertion made by Minor's counsel in support of his motion was that there were seven black potential jurors and the state struck four of them. Two blacks served on Minor's jury, neither of whom was an alternate. Minor's counsel also made a general allegation that Minor was deprived of a jury composed of a fair cross-section of his peers because the number of blacks on his jury was not representative of the blacks "in Tuscaloosa County and the population in this area and in the nation and, therefore, Mr. Minor is being has a jury technically not made up of his peers in terms of the racial balance."
In Price v. State, supra, we addressed a similar situation and stated:
"`"A defendant claiming a Batson violation must make a prima facie showing that the prosecution used its peremptory strikes in a discriminatory manner. Jackson v. State, 594 So.2d 1289 (Ala.Cr.App. 1991). Only when the defendant establishes facts and circumstances that raise an inference of discrimination must the state give its reasons for its peremptory strikes. Carter v. State, 603 So.2d 1137 (Ala. Cr.App.1992)."

"`Stokes v. State, 648 So.2d 1179, 1180 (Ala.Cr.App.1994). We will reverse a trial court's ruling on a Batson motion only when that ruling is clearly erroneous. Ex parte Branch, 526 So.2d 609 (Ala.1987).'

"Clemons v. State, [Ms. CR-94-270, December 20, 1996] 720 So.2d 961, 974 (Ala.Cr.App.1996).
"In Edwards v. State, 628 So.2d 1021, 1024 (Ala.Cr.App.1993), the trial court found that the defendant had failed to *755 establish a prima facie case of racial discrimination where there had been 6 black members on a 35-40 member venire, i.e., the venire was 15%-17% black. One black veniremember was removed for cause, and the State struck two blacks, apparently leaving three on the jury, so that blacks comprised 25% of the jury. The defendant objected based only on the fact that the State struck two blacks who had never answered any questions during voir dire questioning. The trial court held that the defendant had failed to make a prima facie showing of racial discrimination, stating:

"`Batson, Ex parte Branch, 526 So.2d 609 (Ala.1987), and their progeny make it very clear that "`[t]he burden of persuasion is initially on the party alleging discriminatory use of peremptory challenges to establish a prima facie case of discrimination.'" Ex parte Bird, 594 So.2d 676, 679 (Ala.1991) (quoting Ex parte Branch, 526 So.2d at 622). Until this burden is met, the challenged party "is under no obligation to offer explanations for its peremptory strikes." Jackson v. State, 594 So.2d 1289, 1292 (Ala.Cr. App.1991). See also Huntley v. State, 627 So.2d 1013 (Ala.1992). Merely showing that the challenged party struck one more members of a particular race is not sufficient to establish a prima facie case. Harrell v. State, 571 So.2d 1270, 1271 (Ala.1990), cert. denied, 499 U.S. 984, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991); Ashley v. State, 606 So.2d 187, 192 (Ala.Cr.App. 1992); Jones v. State, 603 So.2d 419, 420-21 (Ala.Cr.App.1992). See also Hood v. State, 598 So.2d 1022, 1023 (Ala.Cr.App.1991). "When the evidence shows only that blacks were struck and that a greater percentage of blacks sat on the jury than sat on the lawfully established venire, an inference of discrimination has not been created." Harrell v. State, 571 So.2d at 1271. The trial court properly denied the appellant's Batson motion.'
"Edwards v. State, supra, at 1024.
"`"In Ashley v. State, 606 So.2d 187 (Ala.Cr.App.1992), the prosecution used three of its seven strikes to remove blacks from the pool of potential jurors. This court held that the `appellant failed to establish a prima facie case under Batson and Ex parte Branch [526 So.2d 609 (Ala.1987)] because the appellant failed to show any evidence of discrimination other than the number of blacks struck.' Ashley, 606 So.2d at 192. Similarly in the present case, the only evidence presented to the trial court by the appellant was the fact that three out of the seven potential black jurors were struck by the prosecution. There was no evidence presented that any of the factors set out in Ex parte Branch, 526 So.2d 609 (Ala.1987), which may be used to establish a prima facie case, existed. The evidence presented at trial was not sufficient to prove a prima facie case of a Batson violation. The trial court did not err in denying the appellant's Batson motion."

"`Moore v. State, 677 So.2d 828, 829 (Ala.Cr.App.1996).
"`"When determining whether a challenging party has shown a prima facie case of racial discrimination in the use of peremptory strikes, `the court is to consider "all relevant circumstances" which could lead to an inference of [such] discrimination.' Ex parte Branch, 526 So.2d 609, 622 (Ala.1987). The challenging party `may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial.' Batson, 476 U.S. at 96, 106 S.Ct. at 1723 (emphasis added). Normally, the challenging party has not shown that the prosecution used its peremptory *756 strikes in a racially discriminatory manner where the only evidence presented in support of a prima facie case of discrimination is the fact that blacks were struck by the prosecution. Ex parte Branch, 526 So.2d 609, 622-23 (Ala.1987), contains [a] nonexclusive list of factors that a challenging party might use to establish a prima facie case of discrimination. This list includes, `[a] pattern of strikes against [jurors of a certain gender or race] on a particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors.' Branch, 526 So.2d at 623 (emphasis added). A pattern `"implies that the [decisionmaker ... selected ... a particular course of] action at least in part `because of,' not merely `in spite of,' its adverse effects upon an identifiable group," Hernandez [v. New York], 500 U.S. 352, 360, 111 S.Ct. [1859] at 1866, [114 L.Ed.2d 395 (1991) ] (quoting Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (footnote and citation omitted in Hernandez)).' Freeman v. State, 651 So.2d 576, 583 (Ala.Cr. App.1994). When determining whether peremptory strikes were used in a manner to suggest [a] discriminatory `pattern of strikes,' `[m]erely showing that the challenged party struck one or more members of a particular race is not sufficient to establish a prima facie case [of discrimination].' Edwards v. State, 628 So.2d 1021, 1024 (Ala. Cr.App.1993)."

"`Bell v. State, 676 So.2d 1349, 1350 (Ala.Cr.App.1995)....'

"Clemons v. State, 720 So.2d at 975."
725 So.2d at 1059-60. See Pressley v. State, supra; and Farrior v. State, 728 So.2d 691 (Ala.Cr.App.1998).
Here, Minor, as did the defendant in Price, relied solely on the number of strikes made by the State against blacks, without any supporting evidence indicating a discriminatory intent or purpose, to support his Batson motion. Consequently, we concur with the trial court that Minor failed to make a prima facie showing of racial discrimination by the State. Minor has not shown that the trial court's denial of his Batson motion was clearly erroneous.
Additionally, Minor contends for the first time on appeal that the state exercised its peremptory challenges in a discriminatory manner as to gender; therefore, this claim is subject to plainerror review only. Specifically, he argues that the state's use of 11 of its 17 strikes to remove women from the venire established a prima facie showing of gender discrimination. Minor offers nothing further to support this contention.
We have reviewed the record, and we do not find sufficient evidence that the female veniremembers struck by the state shared only the characteristic of gender. The prosecutor conducted a thorough and meaningful voir dire examination. Nothing in the prosecutor's questions or comments indicate an intent to discriminate based on gender or indicate that female veniremembers were treated differently by the state than male veniremembers. Moreover, no evidence was presented indicating that the prosecutor had a history of discriminating against women when using his peremptory challenges. While we acknowledge that the prosecutor did use over half of his challenges to strike females, there is simply nothing in the record to support a finding of a prima facie case of gender discrimination in light of the factors set forth in Ex parte Branch, 526 So.2d 609 (Ala.1987), and J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).
As we stated in Pressley v. State, supra:
"`Without more, we do not find that the number of strikes used to remove women from the venire is sufficient to establish a prima facie case of gender discrimination.' *757 Ex parte Trawick, 698 So.2d 162, 168 (Ala.), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997)."
770 So.2d at 129. In this situation, Minor has failed to establish that he was so prejudiced that the outcome of his trial would have been different and the record does not support a finding of reversible error in this regard.

XVI.
Minor contends that the trial court improperly allowed the jury to separate over his objection. (Issue XX in Minor's brief to this Court.) He argues that he was prejudiced by the trial court's failure "to tell the jurors not to talk to anyone about the case." He further argues that he was prejudiced by the trial court's failure to ask the jurors whether they had been improperly influenced when the jurors came back from separation. (Minor's brief to this Court at p. 68.)
The trial court, in allowing the jury to separate, acted pursuant to § 12-16-9, Ala.Code 1975, amended effective June 15, 1995, which provides:
"In the prosecution of any felony case the trial court in its discretion may permit the jury hearing the case to separate during the pendency of the trial. The court may at any time on its own initiative or on motion of any party, require that the jury be sequestered under the charge of a proper officer whenever they leave the jury box or the court may allow them to separate."
Minor argues that jury separation is a procedural issue and is governed by Rule 19.3, not § 12-16-9, Ala.Code 1975. He claims that pursuant to Rule 19.3, separation of the jury is prohibited in capital cases without the consent of the defendant and defendant's counsel and, therefore, that the trial court's allowing the jury to separate was improper. (Minor's brief to this Court at p. 67.)
The Alabama Supreme Court recently addressed this issue in Ex parte Stewart, 730 So.2d 1246 (Ala.1999), wherein the Court held the following:
"Where two provisions directly conflict, this Court may presume that the Legislature intended to repeal the earlier provision by adopting the later one. The version of Rule 19.3 in effect at the time of Stewart's third sentencing hearing became effective on January 1, 1991. The amended version of § 12-16-9 became effective on June 15, 1995. The irreconcilable language of that later provision compels us to conclude, as the Court of Criminals Appeals did, that the Legislature intended to change the effect of Rule 19.3 insofar as it conflicted with § 12-16-9. When the Legislature, through a general act, changes the procedural rules promulgated by this Court, we are bound by the Constitution and the laws of this state to give effect to the Legislature's changes. Therefore, we conclude that the Court of Criminal Appeals correctly held that § 12-16-9 overrode the conflicting portions of Rule 19.3."
730 So.2d at 1250. See also Drinkard v. State, supra.
Accordingly, pursuant to § 12-16-9, Ala. Code 1975, as amended, the trial court had complete discretion to sequester the jury. The consent of Minor and Minor's counsel was not a prerequisite for the trial court's decision to allow the jury to separate.
"[T]he June 15, 1995, amendment to this statute [§ 12-16-9, Ala.Code 1975] eliminated the need for an agreement to separate the jury in capital cases, by vesting in the trial court the discretion to make the separation decision in such cases."
Ex parte Stewart, 730 So.2d at 1248.
We note that at the beginning of Minor's trial, the trial court instructed the jury as follows:
"Now, since this jury is not going to be sequestered, you're going to be going out to lunch and you're going to be *758 returning, too, tomorrow and you're going to be around the courthouse during your breaks.
"If you should hear someone, although they are not talking directly to you, who appears to be talking about this case, please just remove yourself a safe distance away so that you cannot hear what is being said so that you would not be influenced by something outside of the case.
"Now, just as you are not allowed to talk with anyone outside the case, I would also ask that you please do not discuss this case among yourselves while you're sitting on this jury until such time as you're sent back to deliberate. Of course, at that time, it would be appropriate to discuss the case among yourselves."
(R. 570-71.)
Additionally, before each recess the trial court admonished the jury of its responsibilities in accordance with its initial instruction. The record reveals that the trial court carefully instructed the jurors not to discuss the case before they began their deliberation. Moreover, we note that no incidents regarding improper jury influence were brought to the trial court's attention through the course of Minor's trial.
The June 15, 1995, amendment to § 12-16-9, Ala.Code 1975 vested in the trial court the discretion to make the separation decision in capital cases. Ex parte Stewart, supra. In deciding to allow the jury to separate, the trial court in this case exercised great caution, providing adequate instructions to the jury. Moreover, Minor provided this Court with only bare allegations of prejudice, with no factual support. Therefore, we find no abuse of discretion in the trial court's determination.

XVII.
Minor contends that "the presence of the victim's family at counsel table during his trial rendered the trial unfair, arbitrary and capricious." (Issue XXIV in Minor's brief to this Court.) Specifically, Minor argues that the presence of Ebious's great-grandfather at the counsel table "gave the witness a special role in the proceedings and graced him with the state's imprimatur." (Minor's brief to this Court at p. 72.) We disagree.
Section 15-14-56(a), Ala.Code 1975, specifically provides:
"Whenever a victim is unable to attend such trial or hearing or any portion thereof by reason of death; disability; hardship, incapacity; physical, mental, or emotional condition; age; or other inability, the victim, the victim's guardian or the victim's family may select a representative who shall be entitled to exercise any right granted to the victim, pursuant to the provisions of this article."
Moreover, this Court has previously addressed and rejected the argument raised by Minor concerning the presence of the victim's family members at the counsel table. In Henderson v. State, 583 So.2d 276 (Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied. 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992), this Court stated:
"The presence of a victim seated at the counsel table for the prosecution is specifically provided for by `The Alabama Crime Victims' Court Attendance Act,' codified at §§ 15-14-50 et seq., Code of Alabama 1975. This act gives victims of a criminal offense the right to be present in the courtroom and seated alongside the prosecutor during the trial of the individual charged with that offense."
583 So.2d at 285-86.
Additionally, in Roy Burgess v. State, ___ So.2d at ___, this could held:
"The right of the victim or the victim's representative to sit at the counsel table applies in both capital and noncapital cases. Coral v. State, 628 So.2d 954, 984 (Ala.Cr.App.), remanded on other *759 grounds, aff'd on return to remand, 628 So.2d 988 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994)."
Based on the foregoing, we conclude Ebious's great-grandfather had a right not only to be present in the courtroom, but also to sit at the prosecution's table, as a representative of Ebious's family, during Minor's trial. Because Ebious's great-grandfather did not testify at trial, we reject Minor's argument that the great-grandfather's presence at the counsel table was improper. We further conclude that no error, plain or otherwise, occurred when Ebious's great-grandfather was allowed to sit at the counsel table during the trial.

XVIII.
Minor contends that the trial court erred when it denied his request to have his experts, particularly his social worker, psychiatrist, and investigator, excluded from the requirements of "the rule." (Issue XVI in Minor's brief to this Court.)
Administration of "the rule" is within the sound discretion of the trial court. Ex parte Lawhorn, 581 So.2d 1179, 1181 (Ala.), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991). The trial court's discretionary power in this regard is embraced in Rule 9.3(a), Ala. R.Crim.P., which provides,
"Prior to or during any proceeding, the court, on its own motion or at the request of any party, may exclude witnesses from the courtroom and direct them not to communicate with each other, or with anyone other than the attorneys in the case, concerning any testimony until all witnesses have been released by the court."
Furthermore, in Young v. State, 416 So.2d 1109, 1111 (Ala.Cr.App.1982), this Court held:
"Where the rule for the exclusion of witnesses from the courtroom is invoked, it is within the sound discretion of the trial court to allow any one of the witnesses to remain in the courtroom during the examination of the others and the exercise of this discretion is not reviewable on appeal. Huskey v. State, 129 Ala. 94, 29 So. 838 (1901); Barnes v. State, 88 Ala. 204, 7 So. 38 (1890); Stone v. State, 55 Ala.App. 663, 318 So.2d 359 (Ala.Cr.App.1975). And this principle is applicable in a prosecution for first degree murder. Smarr v. State, 260 Ala. 30, 68 So.2d 6 (1953); Roynica v. State, 54 Ala.App. 436, 309 So.2d 475 (Ala.Cr. App.1974), cert. denied, 293 Ala. 772, 309 So.2d 485, cert. denied, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 85 (1975). The sequestration of witnesses in a criminal prosecution, while rarely withheld upon request, is nevertheless discretionary with the trial court, and even where a witness remains in the courtroom in violation of the rule, the trial court's decision as to his testifying or not is not open to review. Beddow v. State, 39 Ala.App. 29, 96 So.2d 175 (1956), cert. denied, 266 Ala. 694, 96 So.2d 178 (1957), cert. denied, 355 U.S. 930, 78 S.Ct. 412, 2 L.Ed.2d 414 (1958)."
See also Clemons v. State, supra (invocation and enforcement of the rule excluding witnesses from the courtroom is within the sound discretion of the trial court); Anderson v. State, 542 So.2d 292, 304 (Ala. Cr.App.1987), writ quashed, 542 So.2d 307 (Ala.), cert. denied, 493 U.S. 836, 110 S.Ct. 116, 107 L.Ed.2d 77 (1989); and Hall v. State, 500 So.2d 1282, 1291 (Ala.Cr.App. 1986).
Initially, we note that our review of the record refutes Minor's contention that he had a psychiatric expert. (R. 55-56.) The trial court took particular notice of Minor's lack of a psychiatric expert during the colloquy concerning this potential defense witness. Further, the record does not reflect any mention of the social worker by Minor at the hearing on the motion to exclude his witnesses from the rule. Additionally, contrary to Minor's contention on *760 appeal, the trial court did grant his motion to allow his investigator to remain in the courtroom. Minor has failed to show how he was prejudiced by the trial court's refusal to exclude his witnesses from the rule; therefore, we find no plain error.
Accordingly, no abuse of discretion occurred in the trial court's determination not to exclude certain witnesses from "the rule".

XIX.
Minor contends the trial court violated his right to confront witnesses against him because the trial court denied his pretrial motion to review the personnel files of certain law enforcement officers, who were witnesses for the state. (Issue VII in Minor's brief to this Court.) Specifically, he argues that he should have been allowed to examine the files for evidence of prior disciplinary actions against these officers regarding improperly obtained statements or complaints alleging the use of excessive force. At trial, the following exchange took place between Minor's counsel and Rocky Montgomery, one of the officers who interrogated Minor:
"[Defense counsel]: Now, you're familiar with, as I am sure Mr. Bush [one of the officers who interrogated Minor] is, and all of us that have watched some TV, and I used to be an investigator, the good cop bad cop scenario?
"[Montgomery]: Yes, sir.
"[Defense counsel]: Did you ever use that during this investigation?
"[Montgomery]: No, sir.
"[Defense counsel]: Is thatis that a recognized investigative technique that would be used?
"[Montgomery]: I have known it to be used, yes, sir.
"[Defense counsel]: All right. Briefly, if you would, for any of the jurors that might not have heard about it, explain to the jury what we are talking about.
"[Montgomery]: Where one
"[Prosecutor]: Judge, I object. There is no evidence of anything like that here.
"THE COURT: Well, I think I am going to sustain unless the relevancy is shown. I think that he testified that it was not used.
"[Defense counsel]: Your Honor, the defense asserts that it, in fact, was used and that some of thesome of the responses solicited from Mr. Minor and some of the statements that were made, particularly the statement, if he did, in fact, make it, from the backseat of the car, was in direct response to a statement made to Mr. Minor.
"THE COURT: Well, thisat this point, at least, there is no evidence of that.
"[Defense counsel]: No, sir. I will withdraw the question."
(R. 909-10).
On appeal, Minor argues that his cross-examination of Montgomery was improperly limited because the trial court denied his request for discovery of impeachment evidence. Therefore, he contends, he was denied the right to confront his accusers.
The Alabama Supreme Court held in Ex parte Land, 678 So.2d 224, 239 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996):
"[T]he latitude and extent of cross-examination of witnesses rest within the sound discretion of the trial court and the trial court's ruling on these matters will not be reversed except for an abuse of discretion."
(Citations omitted.) In Adams v. State, 659 So.2d 224 (Ala.Cr.App.1994), this Court addressed the analogous question whether exempting witness lists from discovery by the defense prevented adequate cross-examination of the state's witnesses. We stated:
"The United States Supreme Court addressed a similar issue in Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. *761 989, 94 L.Ed.2d 40 (1987). Ritchie was charged with several sexual offenses against his 13-year-old daughter. During discovery, he subpoenaed the office of Children and Youth Services (CYS), a state agency charged with investigating cases of suspected mistreatment and neglect. He sought to obtain the records concerning his daughter. Under Pennsylvania statute, the records were confidential and CYS refused to comply with the subpoena. On appeal to the United States Supreme Court, Ritchie contended that access to the records was required by the Confrontation Clause of the Sixth Amendment. The Court made it clear that it would not `transform the Confrontation Clause into a constitutionally compelled rule of pretrial discovery.' Ritchie, 480 U.S. at 54, 107 S.Ct. at 999, 94 L.Ed.2d at 53. The Court, in an opinion written by Justice Powell, summarized the law relating to the Confrontation Clause as follows:
"`The Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination.
"`. . . .
"`... The opinions of this Court show that the right to confrontation is a trial right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination.... The ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony. Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses. In short, the Confrontation Clause only guarantees "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."'

"Ritchie, 480 U.S. at 54, 107 S.Ct. at 998-99, 94 L.Ed.2d at 53-55. (Emphasis in Ritchie; footnote omitted; citations omitted.)
"Although an accused has considerable discovery rights, based on the current interpretation of the Sixth Amendment to the United States Constitution, those rights do not extend to pretrial discovery of witness lists. Here, the appellant had the opportunity to physically confront and to cross-examine the witnesses. His Sixth Amendment rights were not violated."
659 So.2d at 228-29.
Likewise, Minor was not entitled to the personnel records of law enforcement officers who were witnesses. In Drinkard v. State, supra, when considering whether the trial court erred in refusing to order the prosecution to disclose the criminal records of law enforcement personnel who were witnesses at trial, we stated:
"`There is no absolute right to discovery, including discovery of prior convictions of witnesses or of possible impeachment evidence, in criminal cases. Smith v. State, 639 So.2d 543 (Ala.Cr.App.1993); Bailey v. State, 421 So.2d 1364 (Ala.Cr.App.1982). Rather, the trial court has discretion in determining whether to order discovery of the prior convictions of witnesses or other possible impeachment evidence, and such a decision will not be overturned absent an abuse of discretion. Ross v. State, 555 So.2d 1179 (Ala.Cr.App.1989); Williams v. State, 451 So.2d 411 (Ala.Cr.App.1984); Wright v. State, 424 So.2d 684 (Ala.Cr. App.1982); Mardis v. State, 423 So.2d 331 (Ala.Cr.App.1982).'

"Davis v. State, 720 So.2d 1006, 1027 (Ala.Cr.App.1998)."
777 So.2d at 254-55. Applying the foregoing law to these facts, the trial court did not abuse its discretion when it refused to *762 order the state to produce the personnel records of the law enforcement officers who were witnesses.
Moreover, in reviewing the pertinent portions of the record, we find that the trial court did not abuse its discretion in limiting Minor's cross-examination of Montgomery. The record clearly shows that Minor attempted to impeach Montgomery by alleging that certain investigative techniques were used without first establishing the proper foundation. Minor never proffered any evidence to support his speculation that the law enforcement officers had engaged in inappropriate, coercive interrogation techniques. Although Minor suggests that the trial court sua sponte "at a minimum," should have examined the law enforcement officers' records in camera to determine if they contained impeachment evidence, he did not make such a request at trial and he offered no evidence to support his claim, other than speculation and conjecture. The trial court's order preventing the defense from requiring the state to disclose the law enforcement officers' personnel records did not violate the spirit of discovery and, consequently, did not improperly limit Minor's ability to confront state's witnesses. Finally, Minor has failed to demonstrate that the state violated Brady, see Smith v. State, 698 So.2d 189 (Ala.Cr.App.1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997). Cf. Barbour v. State, 673 So.2d 461 (Ala.Cr.App.1994), aff'd, 673 So.2d 473 (Ala.1995), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996).

XX.
Minor contends that the trial court erred in permitting state witnesses, Dr. Ashley Evans, a physician who examined Ebious at the hospital and Dr. Kenneth Warner, a forensic pathologist, to demonstrate through the use of a doll how Ebious's injuries, associated with shaken baby syndrome, may have occurred. (Issue III in Minor's brief to this Court.) Specifically, he argues that the doll used in the demonstrations was not comparable in size and physical characteristics to Ebious and therefore that the prejudicial effect of the demonstration outweighed any probative value. (Minor's brief to this Court at p. 14.) He further claims that the prosecutor engaged in improper conduct during his closing argument when he "vigorously shook the doll during his closing, remarking to the jury, `That's intent.'" (Minor's brief at p. 16.) Because Minor failed to object to the demonstrations during the trial, our review is limited to plain error. Rule 45A, Ala.R.App.P.
"The rule on the admissibility of experiments in open court is stated in Shows v. Brunson, 229 Ala. 682, 685, 159 So. 248 (1935).
"`Experiments or tests of this character in open court are usually within the discretion of the trial judge, guided by a sound judgment as to whether the result will be sufficiently relevant and material to warrant such procedure. 22 C.J. p. 700, § 899.
"`Similarity of conditions, and a test that will go to the substantial question in hand, should appear.'
"See also Hawkins v. State, 53 Ala.App. 89, 93, 297 So.2d 813 (1974). Both the scope and extent of the experiment, if allowed, rest within the sound discretion of the trial judge. The exercise of that discretion will not be reversed on appeal unless it has been clearly and grossly abused. Campbell v. State, 55 Ala. 80 (1876); C. Gamble, McElroy's Alabama Evidence, § 81.02(1) (3rd ed.1977).
"While the conditions of the experiment and of the occurrence in issue should be substantially similar, they need not be identical. McElroy, § 81.01(4).
"`A reasonable or substantial similarity suffices and only where the conditions are dissimilar in an essential particular should the evidence of an experiment be rejected. If we have a case where the conditions are not *763 identical, then the dissimilarity goes to the weight of the evidence of the experiment but not to its admissibility.'
"See also Eddy v. State, 352 So.2d 1161 (Ala.Cr.App.1977)."
Ivey v. State, 369 So.2d 1276, 1278-79 (Ala. Cr.App.1979). See also, C. Gamble, McElroy's Alabama Evidence, § 81.02 (5th ed.1996).
However, before the demonstration, the trial court should determine if the prejudicial effect of the demonstration substantially outweighs its probative value. Even if the trial court finds the demonstration to be relevant and helpful to the jury, the trial court may still exclude it if the probative value is substantially outweighed by the danger of unfair prejudice. See Rule 403, Ala.R.Evid.; McElroy § 81.02. "The power to make this determination is vested in the trial court." Hayes v. State, 717 So.2d at 37.
During the state's direct examinations of Dr. Evans and Dr. Warner, the prosecutor asked each witness to demonstrate on a doll provided by the state the type of shaking that would cause injuries similar to the ones suffered by Ebious. Defense counsel did not object; the trial court allowed the demonstrations. During Dr. Evans's testimony and Dr. Warner's testimony, each witness testified in general about a baby's head size, the softness of a baby's brain, and a baby's muscular development. In addition to demonstrating the force of the shaking necessary to cause injuries like those suffered by Ebious, the witnesses demonstrated positions in which Ebious may have been held to cause such injuries. The witnesses also testified that several distinct acts had to occur in addition to shaking for Ebious to have sustained the serious, fatal injuries he suffered.
On appeal, Minor complains that the state failed to establish that the doll's size and physical make-up were similar to Ebious's. Minor urges us to adopt the holding in United States v. Gaskell, 985 F.2d 1056 (11th Cir.1993), in which a demonstration of shaken baby syndrome was found to be unfairly prejudicial. We, however, conclude that the facts and analysis in Powell v. State, 226 Ga.App. 861, 487 S.E.2d 424 (1997) are more analogous to the facts of this case. In Powell, the appellant argued that the trial court erred in allowing a demonstration of shaken baby syndrome because the state failed to establish any similarity between the victim and the doll. The Georgia appellate court stated:
"We do not agree that the state was required to show similarity in head and neck strength, control and movement as part of the foundation. While there should be substantial and reasonable similarity between the facts proved in the case and the facts upon which the demonstration is based, the facts need not be identical; if the facts are sufficiently similar to accomplish the purpose of assisting the jury to intelligently consider the issue of fact presented, the evidence is admissible. See generally Stephens v. State, 214 Ga.App. 183, 185(4), 447 S.E.2d 26 (1994). Obviously, a demonstration of how shaken infant syndrome occurs would have to be done with a mannequin or doll rather than a real infant. Such an object will differ in many respects from a real child. However, any dissimilarity between the conditions of the demonstration and the actual occurrence affects the weight rather than the admissibility of the evidence. See West v. State, 200 Ga. 566, 571, 37 S.E.2d 799 (1946); Stephens, supra.
". . . .
"We note that we have considered the holding in U.S. v. Gaskell, 985 F.2d 1056 (11th Cir.1993), in which a demonstration of shaken baby syndrome was found to be unfairly prejudicial, but are not convinced that it requires a different result here. In Gaskell, unlike this case, defense counsel specifically objected to the degree of force used in the demonstration; the witness said he based his *764 presentation on a demonstration by a police officer whose knowledge was derived from a father in another case; the witness admitted he displayed a greater degree of force than that required to produce shaken baby syndrome; Gaskell had admitted shaking the child, though for resuscitation purposes, making the issue of the amount of force actually used critical; and, the conviction was not reversed solely on the demonstration, but also on two other errors in the trial of the case. We find the holding in State v. Candela, 929 S.W.2d 852 (Mo. App.1996), more persuasive. In Candela, the court recognized the trial court's broad discretion in admitting demonstrative evidence and stated that the trial court did not abuse that discretion in allowing a physician to shake a rag doll to illustrate the type of shaking generally involved in shaken infant syndrome, where the defendant was given ample opportunity to show the dissimilarity between the doll and the child. Id. at 867(5)."
Powell v. State, 487 S.E.2d at 426-27.
Neither the record before us nor Minor's general assertions in his brief to this Court establish a sufficient difference between the doll used in the demonstration and Ebious for us to conclude that the trial court abused its discretion in allowing the demonstration. Additionally, we note that Minor's counsel had ample opportunity during his cross-examination of Dr. Evans and Dr. Warner to develop the differences between the doll and Ebious. We also note that Minor's counsel elicited testimony from the witnesses about the intensity and length of the shaking involved in the actual occurrence versus the demonstrations. We cannot presume error based on a silent record and on the speculation of appellate counsel. Pressley v. State, supra; Magwood v. State, 689 So.2d 959 (Ala.Cr.App.1996), cert. denied, 522 U.S. 836, 118 S.Ct. 108, 139 L.Ed.2d 61 (1997); George v. State, supra; Arthur v. State, supra; and Gaddy v. State, 698 So.2d 1100 (Ala.Cr.App.1995), aff'd 698 So.2d 1150 (Ala.), cert. denied 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997). In light of the broad discretion granted the trial court in determining the admissibility of evidence, we conclude no plain error occurred here.
Moreover, we are unpersuaded by Minor's argument that the remark by Dr. Warner that, "I don't know if this isthis doll is really a great example," establishes, as a matter of law, the dissimilarity between the doll and Ebious. Immediately following this comment, Dr. Warner explained:
"[Dr. Warner]: But a baby's head is very, very heavy in relation to their body. And the best example of that is the baby's brain is about half of its adult size when it's born, whereas your heart is about one-tenth of its adult size. Your liver is about one-tenth. So the organs of the chest grow tremendously and the brain just doubles once in your life.
"So it has this heavy, heavy head, very weak neck muscles, and that is why when we bring a baby home from the hospital the doctor tells you to grip the baby like that.
"But, in shaking, in order to get actual movement of the brain itself against the inside of the skull, you need to shake like that. It is not just, you know, like littleplaying with the baby. It is enough shaking so that it becomes the equivalent of a person in an automobile accident who has whiplash."
(R. 1079-80.)
Dr. Warner, in his testimony, elaborated upon the dissimilarity between Ebious and the doll, informing the jury of the limitations of the demonstration. Clearly, the trial court was in the best position to observe the doll, the demonstration, and the testimony. Based on the evidence before us, we conclude that the trial court did not abuse its discretion by allowing the state to demonstrate how Ebious's injuries could have resulted from violent shaking.
*765 Minor further argues that the trial court erred in determining that the probative value of the demonstration outweighed its prejudicial effect. We note that Minor did not object to the demonstration or request a mistrial or an instruction on the limited use of the demonstrative evidencethis fact weighs against him. As noted earlier, the trial court is in the best position to determine whether evidence has a prejudicial effect on the jury and to weigh the relevancy of the evidence against its prejudicial effect. Consequently, Minor has failed to establish prejudice resulting in a miscarriage of justice. Rule 45A, Ala. R.App.P.
Lastly, with regard to the demonstrative evidence, Minor argues that the prosecutor engaged in improper argument and conduct during his second closing argument. In response to defense counsel's closing argument that Minor lacked the "constitution or intent" to hurt Ebious, the prosecutor argued:
"[Prosecutor]: A person acts intentionally, so far as the law is concerned, when he's engaged in conduct on purpose, in essence. If you pick up a child, you accidentally drop him, that is an accident. If you pick up a child and you do something that is an accident, that's an accident.
"(Whereupon, [Prosecutor] vigorously shook a doll.)
"[Prosecutor]: That's intent.
"(Whereupon, [Prosecutor] threw down the doll.)
"[Prosecutor]: That's intent. Hitting him repeatedly, even in the groin, that's intent, and that's murder. Not manslaughter, not reckless, not criminally negligent homicide, it's not negligence, that's murder."
(R. 1328-29.)
"`Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397, 399 (Ala. Cr.App.1978), and that court is given broad discretion in determining what is permissible argument. Hurst v. State, 397 So.2d 203, 208 (Ala.Cr. App.), cert. denied, 397 So.2d 208 (Ala. 1981). Moreover, this Court has stated that it will not reverse unless there has been an abuse of discretion. Miller v. State, 431 So.2d 586, 591 (Ala. Cr.App.1983).
"`. . . .
"`... In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala. Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App.1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued at their true worth and are not expected to become factors in the formulation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App. 1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App.1982).'

"Bankhead v. State, 585 So.2d 97, 105-07 (Ala.Cr.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991)."
Ivery v. State, 686 So.2d 495, 504 (Ala.Cr. App.1996).
In the present case, we review this issue under the doctrine of plain error. The colloquy set out above shows that the prosecutor shook the doll "vigorously," apparently in the heat of debate during his closing argument. In Ivery, supra, although we denounced the "reckless theatrics" of the prosecutor when during closing argument he picked up the murder weapon, a hatchet, and slammed it into the podium, we held that the act did not merit reversal. Noting that "to merit reversal *766 under the plain error standard, a prosecutor's conduct must not only be improper, but must also be prejudicial to the substantial rights of the accused," we noted the following facts to be determinative in our holding that the conduct did not rise to the level of plain error:
1. The issue whether Ivery decapitated the victim was not in dispute;
2. A video of the circumstances of the murder, including the use of a hatchet, was played before the jury and was entered into evidence;
3. The hatchet itself was admitted into evidence without objection and the testimony of several witnesses indicated that it had been used to decapitate the victim;
4. Testimony indicated that the victim was alive immediately before her head was cut off;
5. Defense counsel did not object when the prosecutor slammed the hatchet into the podium and did not request a curative instruction; and
6. The record is silent as to the effect that this spectacle may have had on the jury.
Ivery v. State, 686 So.2d at 507.
Likewise, we cannot say that the prosecutor's "vigorous" shaking of a doll during his closing argument constituted plain error. In this case, there was compelling evidence that Ebious had been shaken and beaten to death. Two expert witnesses testified that Ebious's injuries were caused by shaken baby syndrome. Another expert witness testified that the injuries suffered by Ebious could be caused only by force similar to that generated in an automobile or airplane accident. Defense counsel did not object to the display or request a curative instruction. There is no indication in the record about the effect of the prosecutor's conduct on the jury. Finally, the trial court properly instructed the jury on the element of intent and repeatedly instructed the jury that the arguments of counsel were not evidence. Therefore, we cannot say that the prosecutor's display constituted plain error.

XXI.
Minor claims the trial court erred in allowing Dr. Elizabeth Cockrum, Ebious's pediatrician, to testify as to another expert's opinion regarding Ebious's health. (Minor's brief at p. 42) (Issue IX in Minor's brief to this Court.) Dr. Cockrum's testimony was admitted in evidence without objection from Minor; therefore, we review it for plain error. Rule 45A, Ala.R.App.P.
Dr. Cockrum testified that on February 13, 1995, she examined Ebious when he was approximately two hours old. Her initial checkup was to determine if he had any congenital problems. Her examination indicated that "he was a normal, healthy term baby." (R. 598.) Dr. Cockrum further testified that on February 14, 1995, she witnessed a medical student evaluate Ebious's health. She explained that although she did not perform the examination herself, she observed it and signed the medical student's report indicating that Ebious was normal. Dr. Cockrum concluded her testimony by stating that she examined Ebious on February 15, 1995, just before his discharge from the hospital, and that, at that time, Ebious was healthy.
Minor contends on appeal that Dr. Cockrum's testimony regarding the results of the February 14 examination by the medical student constituted hearsay and was, therefore, improperly admitted. This error, however, if any, is harmless. The testimony of Dr. Cockrum indicates that she personally examined Ebious on two occasions and conducted Ebious's discharge examination from the hospital two days after his birth. Additionally, Dr. Cockrum established that the medical record in question was made in the course of normal hospital procedures and that she, in her role as instructor and supervisor, witnessed the examination and verified the report. See Rule 803(4), Ala.R.Evid. Based on Dr. Cockrum's testimony concerning *767 her personal observations of Ebious's health, especially in light of the fact that her final examination of Ebious was conducted after the medical student's examination and the evidence was part of a medical record, no error resulted in the admission of the evidence.

XXII.
Minor contends that the trial court erred in denying his motion in limine and in admitting evidence of his alleged escape from custody after his arrest. (Issue XXX in Minor's brief to this Court.) At the hearing on the motion in limine, defense counsel argued that the prejudicial effect of the evidence of escape substantially outweighed its probative value. The trial court, relying on Sartin v. State, 615 So.2d 135 (Ala.Cr.App.1992), determined that the evidence was relevant and that its probative value outweighed its potential prejudicial effect.
"Whether to grant a motion in limine is within the sound discretion of the trial court, and absent a showing of abuse, there is no reversible error. Primm v. State, 473 So.2d 1149, 1158 (Ala. Cr.App.1985)." Desimer v. State, 535 So.2d 238, 241 (Ala.Cr.App.1988). Moreover,
"The trial court may exclude relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice. Spellman v. State, 473 So.2d 618 (Ala.Cr.App.1985); C. Gamble, McElroy's Alabama Evidence, § 21.01(4) (4th ed.1991). Whether such evidence should be excluded because of its prejudicial nature is largely within the discretion of the trial court, and its determination in that regard will not be disturbed absent a clear showing of abuse. Spellman v. State; Ward v. State, 440 So.2d 1227 (Ala.Cr.App. 1983)."
Graves v. State, 632 So.2d 30, 31 (Ala.Cr. App.1992), aff'd. in pertinent part, 632 So.2d 33 (Ala.1993).
"`In a criminal prosecution the state may prove that the accused engaged in flight to avoid prosecution. This principle is based upon the theory that such is admissible as tending to show the accused's consciousness of guilt. The flight of the accused is admissible whether it occurred before or after his arrest.

"`The state is generally given wide latitude or freedom in proving things that occurred during the accused's flight. This is especially true of those acts of the accused which tend to show that the flight was impelled by his consciousness of guilt.'
"C. Gamble, McElroy's Alabama Evidence § 190.01(1) (4th ed.1991) (citations omitted). See also 2 Wigmore, Evidence § 276(4) (Chadbourn rev.1979); Chandler v. State, 555 So.2d 1138 (Ala. Cr.App.1989)."
Sartin v. State, 615 So.2d at 137 (Emphasis added); C. Gamble, McElroy's Alabama Evidence, § 190.01 (5th ed.1996); and DeSilvey v. State, 245 Ala. 163, 16 So.2d 183 (1943).
Applying the above law to the facts of this case, we conclude that the trial court did not err in admitting evidence of Minor's escape from jail. The testimony at trial was limited to the facts surrounding Minor's escape from jail, which occurred approximately two months after his arrest for the murder of Ebious. The trial court did not allow testimony about Minor's subsequent indictment for escape. In light of the record, the trial court did not abuse its discretion.
Minor, citing Ex parte Weaver, 678 So.2d 284 (Ala.1996), also argues that the trial court erred in its instruction to the jury on the use of the evidence of escape. In Ex parte Weaver, the Alabama Supreme Court held that the following jury instruction improperly suggested to the jury that the only inference it could draw from the flight evidence was a consciousness of guilt on the part of the defendant:

*768 "A defendant's flight to avoid prosecution may be considered by you as tending to show his consciousness of guilt."
Ex parte Weaver, 678 So.2d at 285.
In the present case, the trial court instructed the jury, in pertinent part, as follows:
"Now, evidence has been introduced in this case for the purpose of showing flight of the defendant, and when it is offered by the state, it may be considered by the jury in connection with the other evidence in the case.
"Now, it would be for the jury to say if it was flight as a matter of fact. You would have to determine from the evidence whether there was flight or not by the defendant, and then you would further consider such evidence in light of all the other evidence in the case, including any explanation or statement which may be offered by the defendant of the alleged flight, as to whether it was reasonable whether there was a reasonable explanation or not and all the other evidence in the case giving each part of it such weight as you think it would be entitled.
"Flight has been introduced in this case and may be considered by you on the issue ofon the issue of the defendant's consciousness of guilt."
(R. 1349.)
The trial court gave an accurate instruction of the law on flight. The trial court further instructed the jury to use the evidence in light of the other evidence presented. The trial court did not create in this charge the impermissible inference that the only reasonable conclusion that could be drawn from the evidence of flight was that Minor escaped to avoid prosecution for the murder of Ebious. The jury was instructed to make a reasonable determination about the evidence of flight in light of all the evidence presented. No error occurred.

XXIII.
Minor argues that the trial court improperly admitted photographs depicting the wounds of the deceased victim, which, he says, "served only to inflame and prejudice the jury." (Minor's brief at p. 97.)(Issue XXXVI in Minor's brief to this Court.)
Initially, we note that this Court has addressed this particular issue in Smith v. State, 581 So.2d 497 (Ala.Cr. App.1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991). In Smith we stated:
"`It has long been the law in Alabama that "[p]hotographs which show the external wounds in the body of a deceased victim, even though they are cumulative and based on undisputed matters, are admissible. The fact that they are gruesome is not grounds to exclude them so long as they shed light on the issues being tried." Burton v. State, 521 So.2d 91 (Ala.Cr.App.1987). See also Kinder v. State, 515 So.2d 55 (Ala.Cr.App.1986). The fact that a photograph is gruesome and ghastly is no reason to exclude it from evidence, so long as the photograph has some relevancy to the proceedings, even if the photograph may tend to inflame the jury. Magwood v. State, 494 So.2d 124, 141 (Ala.Cr.App. 1985). See also Hutto v. State, 465 So.2d 1211 (Ala.Cr.App.1984); Jones v. State, 439 So.2d 776, (Ala.Cr.App.1983); Godbolt v. State, 429 So.2d 1131 (Ala.Cr. App.1982)."
581 So.2d at 526, quoting Bankhead v. State, 585 So.2d 97, 109 (Ala.Cr.App.1989). Moreover, "`This rule of law applies not only to photographs, but to photographic slides as well. Goffer v. State, 430 So.2d 896 (Ala.Cr.App.1983).'" Lee v. State, 562 So.2d 657, 663 (Ala.Cr.App.1989).
"Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to *769 strengthen, or to illustrate other testimony presented may be admitted into evidence. Kuenzel v. State, 577 So.2d 474 [ (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991) ]."
Pilley v. State, [Ms. CR-96-1781, August 14, 1998] ___ So.2d ___, ___ (Ala.Cr.App. 1998).
We have reviewed the photographs and we conclude that their admission does not constitute reversible error. This evidence was admitted by the trial court in accordance with the caselaw set forth above.

XXIV.
Minor contends that the trial court erred in denying his motion for a judgment of acquittal because, he says, "the state failed to prove each element [of the offense] charged in the indictment." (Minor's brief at p. 102.)(Issue XXXIX in Minor's brief to this Court.)
"`"In reviewing a conviction based on circumstantial evidence, this court must view that evidence in a light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude."

"`Cumbo v. State, 368 So.2d 871, 874 (Ala.Cr.App.), cert. denied, 368 So.2d 877 (Ala.1979), citing United States v. Black, 497 F.2d 1039 (5th Cir.1974). Additionally, circumstantial evidence may form the proof of the corpus delicti; if facts are presented from which a jury may draw a reasonable inference that a crime has been committed, the case must be submitted to the jury. Breeding v. State, 523 So.2d 496, 500 (Ala.Cr.App.1987).'

"MacEwan v. State, 701 So.2d 66, 70-71 (Ala.Cr.App.1997).
"`"A defendant's guilt may be established by circumstantial evidence as well as by direct evidence. As long as the circumstantial evidence points to the guilt of the accused, it will support a conviction as strongly as direct evidence. In reviewing a conviction based on circumstantial evidence, `the test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable [hypothesis] except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude.'"

"`McMillian [v. State], 594 So.2d [1253] at 1263 [ (Ala.Cr.App.1991) ] (citations omitted). See also Potts v. State, 426 So.2d 886 (Ala.Cr.App. 1982), aff'd, 426 So.2d 896 (Ala.1983). This statement of the law refers to cases in which the evidence is entirely circumstantial.
"`"`The rule is clearly established in this State that a verdict of conviction should not be set aside on the ground of the insufficiency of the evidence to sustain the verdict, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it was wrong and unjust.'"

"`White v. State, 546 So.2d 1014, 1022-23 (Ala.Cr.App.1989), quoting Bridges v. State, 284 Ala. 412, 225 So.2d 821 (1969).'

"Jenkins v. State, 627 So.2d 1034, 1040 (Ala.Cr.App.1992), aff'd, 627 So.2d 1054 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994). Furthermore, the question of a defendant's intent at the time of the commission of a crime is usually a question for the jury. Crowe v. State, 435 So.2d 1371, 1379 (Ala.Cr.App.1983).

*770 "`In Jones v. State, 591 So.2d 569, 574 (Ala.Cr.App.1991), this court stated:
"`"`[T]he element of intent, being a state of mind or mental purpose, is usually incapable of direct proof, [and] it may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances.' Johnson v. State, 390 So.2d 1160, 1167 (Ala.Cr.App.), cert. denied, 390 So.2d 1168 (Ala. 1980). Accord, Fears v. State, 451 So.2d 385, 387 (Ala.Cr.App.1984); Young v. State, 428 So.2d 155, 158 (Ala.Cr.App.1982)."
"`Additionally, in Bishop v. State, 482 So.2d 1322, 1326 (Ala.Cr.App.1985), this court held:
"`"`Intent may be presumed from the act of using a deadly weapon. McArdle v. State, 372 So.2d 897 (Ala.Crim.App.), cert. denied, 372 So.2d 902 (Ala.1979), and from the character of the assault, including the nature and amount of force used in the fatal injury. Flint v. State, 370 So.2d 332 (Ala.Crim. App.1979).'

"`"Chaney v. State, 417 So.2d 625, 627 (Ala.Crim.App.1982). `However, this evidence must be sufficient to allow the jury to conclude, by fair inference, that the appellant was shooting at the person (named in the indictment) in particular with the intent to murder him." Free v. State, 455 So.2d 137 (Ala.Crim.App.1984). In Underhill on Criminal Evidence, § 540 (3d ed.1923), we find the following statement regarding proof of intent in an attempted murder charge:
"`"`Thus, as a general rule, the force or violence which was employed must be proven to have been intentional.... The intention to do great bodily harm, to murder or commit any other crime by means of an assault, may be inferred from the circumstances. Circumstantial evidence is usually the only available evidence of intention aside from the declarations of the accused. The intention may be inferred from the force or direction, or from the natural or contemplated result of the violence employed, from the weapon or implement used by the accused, from his threats or prior conduct towards the person assaulted, and generally from the extent and effect of the injury inflicted, or from any deliberate action which is naturally attempted and usually results in danger to the life of another.'"'

"Long v. State, 668 So.2d 56, 60 (Ala.Cr. App.1995)."
Davis v. State, 740 So.2d 1115, 1119-20 (Ala.Cr.App.1998).
Minor was charged with murder made capital because the victim was less than 14 years old. The state's evidence tended to show that before 9:00 p.m. on April 15, 1995, Ebious, a two-month old infant, was in good health. At around 9:45 p.m. that evening Ebious's mother left Ebious in the care of Minor. When she returned within an hour, Ebious was lifeless and not responding to stimuli. Dr. Lovelady, the emergency-room physician who examined Ebious at the hospital testified that when Ebious arrived, Ebious was not breathing and he had no pulse. Additionally, Dr. Lovelady testified that Ebious suffered from retinal bleeding, indicating to him that he had been severely shaken. Dr. Evans, a pediatrician who examined Ebious that same evening, testified that Ebious had suffered from at least three different traumatic events causing fractures to his ribs and severe retinal hemorrhaging. Dr. Warner, the physician who performed the autopsy on Ebious, testified that Ebious suffered 12 recent fractures to his ribs, a torn liver, a torn spleen, skull fractures, trauma to the scrotum area, and internal bleeding. According to Dr. Warner, the amount of force required to inflict such injuries upon an infant would have equalled the force of an automobile accident *771 or airplane accident. Minor admitted that he was alone with Ebious at the apartment immediately before Ebious was taken to the hospital.
Viewing the evidence in a light most favorable to the state, we conclude that sufficient evidence was presented to sustain Minor's conviction for capital murder. Clearly, the circumstances surrounding Ebious's death, the violent shaking and excessive force inflicted on an infant, and the nature and severity of Ebious's injuries were sufficient to support the conclusion that Minor had the specific intent to kill Ebious. A reasonable person would have known that such actions directed at a two-month-old infant, would result in the infant's death. Therefore, although there is no direct evidence that Minor intended to murder Ebious, the evidence supports the conclusion that he intentionally murdered Ebious. Hughley v. State, 574 So.2d 991 (Ala.Cr.App.1990)(sufficient circumstantial evidence was presented by the state through testimony of the pediatrician who examined the defendant's eight-month old son, describing injuries and testifying that the injuries were caused by shaken infant syndrome, to support defendant's conviction of intentional murder of son). Cf. MacEwan v. State, 701 So.2d 66 (Ala. Cr.App.1997); Ray v. State, 580 So.2d 103 (Ala.Cr.App.1991); and Paige v. State, 494 So.2d 795 (Ala.Cr.App.1986). Accordingly, viewing the evidence in a light most favorable to the State, we find that the State presented sufficient evidence of Minor's guilt and that the trial court properly submitted the case to the jury. Ample evidence was presented by the state to support the jury's conclusion; we will not disturb its verdict.

XXV.
Minor contends that the trial court erred when it failed to instruct the jury that it could consider evidence of his prior convictions for impeachment purposes only. (Issue I in Minor's brief to this Court.) Specifically, Minor claims the trial court erred because, he says, the trial court "did not tell the jury that it could consider Minor's prior convictions only as impeachment evidence, and it did not tell the jury that it could not consider the prior convictions as substantive evidence of Mr. Minor's guilt." (Minor's brief to this Court at p. 4.) Minor raises this issue for the first time on direct appeal; therefore, we review it for plain error. Rule 45A, Ala.R.App.P.
Initially, we note that the testimony concerning Minor's prior convictions was not elicited by the state. Minor admitted on direct examination that he had previously been convicted of second-degree assault, of possession of cocaine, and of statutory rape; therefore, the admission of this evidence by Minor, himself, was not for impeachment purposes. However, because he decided to testify, the state was allowed, during cross-examination, to question Minor about the prior convictions he had alluded to during his direct examination.
At the close of the guilt phase, the trial court instructed the jurors, in pertinent part, as follows:
"The law allows witnesses to be impeached in any number of ways. For example, a witness may be impeached by proof of convictions of crimes involving moral turpitude or a witness may be impeached by contradictory statements made by the witness either on the stand while testifying or at other times and other places, whether under oath or not.
"But the fact that a witness has been impeached and successfully impeached does not mean that you must necessarily disregard that witness's testimony, either in whole or in part, for there may be other facts and evidence or other testimony or other evidence that in your judgment may tend to corroborate either all or part of that witness's testimony. And, as I have already told you, you are the sole and exclusive judges of the credibility of the witnesses and the *772 weight that you will accord their testimony."
(R. 1347-48.)
The trial court, however, did not specifically instruct the jury that evidence of prior convictions could not be used to support a finding of guilt.
"`[E]vidence of prior criminal convictions for impeachment purposes may not be considered or taken into account in determining a defendant's guilt of the offense for which he is being prosecuted.' 81 Am.Jur.2d Witnesses § 569 at p. 575 (1976). `Proof of conviction of crime relates solely to the credibility of the witness, and may not be considered as substantive evidence.' 98 C.J.S. Witnesses § 537 at p. 474 (1957)....
". . . .
"A prior conviction admitted to impeach the accused `is not admissible as substantive evidence to prove guilt of the offense charged.' Chambers v. State, 264 Ala. 8, 10, 84 So.2d 342 (1955). `Where evidence is admissible only to impeach a witness or accused and should be limited thereto, the instructions must correctly state the law with respect thereto, and must be sufficient to prevent its consideration in support of other facts and must not be misleading.' 23A C.J.S. Criminal Law § 1241 (1961)."
King v. State, 521 So.2d 1360, 1361-62 (Ala.Cr.App.1987).
Additionally,
"Once the accused has been impeached by one of the permissible impeachment forms, the defense may want to take steps to minimize or offset the impact of the impeachment. The accused is entitled to have the jury instructed that such evidence is to be considered only as affecting the accused's credibility as a witness and not as tending to show guilt. The court is not required to give such an instruction unless the accused requests that it be given."
C. Gamble, McElroy's Alabama Evidence, § 165.01 (5th ed.1996).
The holding in King and § 165.01, McElroy's Alabama Evidence, clearly apply when the state cross-examines the accused and impeaches the accused by eliciting testimony of prior convictions. Once the state impeaches the accused, the accused is entitled to have the jury instructed that the evidence elicited is for impeachment purposes only and cannot be used to show guilt. However, the situation is different in this case. Here, Minor admitted the prior convictions on direct examination; therefore, the admission of the evidence by Minor was not for impeachment purposes. It seems to this Court that Minor's counsel, by using such a tactic, may have been attempting to diminish the effect of the state's impeachment evidence on the jury. If so, Minor's counsel may have made a strategic decision, and the trial court could have reasonably determined that Minor's counsel did not want to call further attention to Minor's prior convictions through an instruction to the jury. Cf. State v. Cassell, 140 N.H. 317, 666 A.2d 953 (1995)(holding that because "the defendant's prior convictions initially came to light during the defendant's own direct testimony" and not during cross-examination by the state pursuant to Rule 609(a), the trial court did not err in admitting the evidence without limiting its purpose).
We note that in Varner v. State, 497 So.2d 1135 (Ala.Cr.App.1986), we held that the trial court does not have a duty, sua sponte, to inform the jury that certain evidence may be considered by it only for the purpose of impeaching a witness's credibility. See Weaver v. State, 466 So.2d 1037 (Ala.Cr.App.1985); and Pardue v. State, 571 So.2d 320, 327 (Ala.Cr.App. 1989), rev'd on other grounds, 571 So.2d 333 (Ala.1990).
In the present case, Minor testified in his own defense; evidence of his prior felony convictions was elicited by his counsel. (R. 1218.) On cross-examination, the *773 state questioned Minor regarding his prior convictions. Minor provided specific, unsolicited details regarding the facts surrounding his prior convictions. (R. 1258-1263.) The record further indicates that Minor failed to request a limiting instruction during the state's cross-examination or during the trial court's instruction to the jury at the close of the evidence during the guilt phase.
Based on established precedent, Varner v. State, supra, and Weaver v. State, supra, and the plausibility that the trial court reasonably determined that the defense counsel had elicited Minor's admission of the prior convictions as part of trial strategy and did not want to call additional attention to the evidence through an instruction to the jury, we conclude that the trial court's failure to instruct the jury that evidence of Minor's prior felony convictions could be used only for the limited purpose of impeachment was not plain error.
In support of his argument, Minor cites State v. Brown, 296 S.C. 191, 371 S.E.2d 523 (1988), in which the South Carolina Supreme Court held that failure to charge the jury that evidence of defendant's prior convictions could be used only for impeachment purposes constituted reversible error. This case, however, is distinguishable from Brown.
In Brown, after Brown had advised the trial court that he wished to testify, the trial court
"informed him that evidence of any prior convictions could be used to impeach him. The judge told [Brown] if he admitted his prior convictions, the State would not be able to elicit this information on cross-examination. He further told [Brown] he would instruct the jury regarding the limited use of prior convictions for impeachment only.
"[Brown] took the stand and testified he was not involved in the murder or the related offenses which included armed robbery. He admitted he had previously pleaded guilty to four counts of armed robbery and one count of attempted armed robbery. The judge gave no charge regarding the limited use of this evidence of prior convictions. Trial counsel made no request and took no exception to the charge."
371 S.E.2d at 524. The South Carolina Supreme Court concluded based on precedent that the trial court's failure to give the instruction was reversible error.
In this case, when Minor informed the trial court that he wanted to testify, the trial court did not inform Minor that the state's cross-examination would be limited or that it would provide a limiting instruction to the jury. Minor, unlike Brown, testified without relying on such assurances. Therefore, in light of our determination that Minor's admission of the prior convictions on direct examination and his failure to request a limiting instruction may have been trial strategy and that his admissions did not rest upon assurances from the trial court, we do not find the holding in Brown to be persuasive.
Finally, Minor urges us to find error in the portion of the trial court's instruction that stated, "For example, a witness may be impeached by proof of convictions of crimes involving moral turpitude." This statement is an accurate, but incomplete, statement of the law because a witness may still be impeached for crimes of moral turpitude which carry a punishment of death or more than a year in prison. While we do not condone the giving of an incomplete statement of the law, like the one given by the trial court in this case, we do not find that the error constitutes plain error, especially in light of our review of the trial court's entire instruction to the jury. Because we must give any questioned language a reasonable construction and review the entire charge to determine if there was reversible error (see Travis v. State, supra), we conclude that no plain error occurred in this regard.

*774 XXVI.
Minor asserts numerous errors regarding the state's use of his prior felony convictions as impeachment evidence. (Issue VI in Minor's brief to this Court.) Specifically, Minor claims (1) that the trial court erred by admitting evidence of his prior convictions, (2) that the trial court erred by not limiting the state's eliciting details of his prior convictions, and (3) that the trial court did not properly apply Rule 609(a)(1), Ala.R.Evid., in admitting evidence of his prior convictions.
Prior to Minor's testifying, the following transpired outside the presence of the jury.
"[Defense counsel]: Judge, we would like to put one issue on the record, if the Court is ready.
"We have discussed with Willie Minor at length over the last several months and several weeks and the last few days... whether or not he would take the stand in his own defense.
"We explained to Willie throughout the course of those discussions with him that hethat he basically had the authority to insist on taking the stand if he so desired.
"We have and I have, of course, routinely advised him to reserve that judgment until after or during the course of the trial and that he would make that decision at that point.
"At this point, Mr. MinorweI have advised him that hethat it's not in his best interest to take the stand, given his prior criminal record and convictions.
"At this point, he insists on taking the stand in his own defense and we want to place that on the record and we would like to have the Court verify through Mr. Minor that he understands that and that he'she's insisting and voluntarily taking the witness stand.
"THE COURT: Okay. Well, Mr. Minor, you understand that under the Constitution of the United States and the laws of the State of Alabama that you have a privilege against self-incrimination, which means that you cannot be forced to testify.
"However, if you, in fact, do take the stand and testify, the State of Alabama would have the right, also, to ask you questions on cross-examination including [questions about] your prior criminal record.
"And you understand that by taking the stand you would be waiving or giving up your privilege against self-incrimination and be subject to cross-examination.
"Do you understand that?
"[Minor]: Yes, sir, I do, Your Honor.
"THE COURT: With the full understanding of your rights, it is your decision that you do wish to take the stand?
"[Minor]: Yes, sir, I do, Your Honor."
(R. 1190-93.)
At trial, Minor testified in his own defense. On direct examination by his own counsel, the following transpired:
"[Defense counsel]: And what criminal record did you have before that, before you met Lakeisha?
"[Minor]: Well, I had first-degree assault, second-degree assault, and possession of cocaine, and statutory rape.
"[Defense counsel]: And you pleaded guilty to those?
"[Minor]: Yes, sir."
(R. 1218.)
On cross-examination by the state, the following occurred:
"[Prosecutor]: Well, now, you are the same Willie Minor that in CC-92-311, convicted of the possession of a controlled substance, cocaine; is that right?
"[Minor]: Yes, sir.
"[Defense counsel]: Been asked and answered, Judge.
"[Minor]: Don't worry about it Mike. We can explain it to the jury.

*775 "THE COURT: I will overrule. He is entitled to go into it.
"[Prosecutor]: That's right, isn't it? You were convicted on July 22, 1992. Shayne Roland was your attorney.
"[Minor]: Yes. For possession of cocaine?
"[Prosecutor]: Uh-huh (yes).
"[Minor]: Yes, I was. I mean, me and six other friends of mine were standing on the corner. It was earlyI think it was Friday morning, but I am not sure exactly. But several of us were standing on the corner.
"One of the guys obtained a small pill bottle, throw it over there, over there in some bushes. Here I am standing like from here to that first bench and, the same thing, police interrogation, arrested me for it. But, verbally, by law, they cannot prove those were my drugs.
"Since I had got two years on the assault conviction, I did not fight it. I just got it ran on into my assault one and assault two and that is why I took the charge on possession of cocaine, though it was not my drugs that was obtained, but I was charged with them.
"And it's just likeI mean, in here, I will tell you all day those werethose aren't my drugs, but they going to believe the police because they officers of the law.
"[Prosecutor]: So that wasn't your drugs, either?
"[Minor]: No, it was not.
"[Prosecutor]: And you did not kill Ebious?
"[Minor]: No, I did not kill Ebious.
"[Prosecutor]: Well, in CC-91-1763, you are the same Willie Minor that pleaded guilty to the assault in that charge, assault in the firstassault in the second degree, when represented by Nettie Blume?
"[Prosecutor]: Yes, sir, I was. In this situation, what occurred, me and several friends went to
"[Defense counsel]: Your Honor, could we have a couple of minute[s] recess, please?
"[Prosecutor]: Judge, I object. I am in the middle of questioning and this witness is wanting to testify.
"THE COURT: Well
"[Minor]: Yes, sir. Me and several other friends was at the skating rink one night. We left the skating rink going in Denny's Restaurant to get something to eat.
"Two of my friends was walking across the street when several guys approached and attacked me, hit me across my left with an iron pipe. He kept on hitting me. Two of my other home boys were getting beat with a blackjack and a jack iron. So, at that point in time, I pulled my gun out and shot him in self-defense.
"But I did not plead guilty to self-defense. They would give me two years. I was guilty of shooting him and I did not want to take it to court.
"I got a two-year sentence and took it and that for that possession of cocaine was ran into those two years.
"[Prosecutor]: So that shooting was just self-defense. You really didn't commit a crime then either; is that what you're saying?
"[Minor]: Yes, sir. By shooting him, it is a crime to shoot a person, but it was in self-defense. But I didn't fight it or take it to trial as self-defense, but that is what it was, in self-defense.
"[Prosecutor]: And are you the same Willie Minor in CC-92-2113 that pleaded guilty to rape in the second degree?
"[Minor]: Yes, sir, I did. And, in that situation, I had a girlfriend stayed up in New York. Robert Wilson, [h]e introduced me to this female. I had been knowing her, but she lied about her age.
"Same thing, tried to put a baby on me. Got back around to her father and he went up there and pressed charges on me.

*776 "But, as she did tell police officers, I did not say anything to interrogate (sic) her to have sex with her and I did not force her to have sex with me. That is why I was charged with statutory rape and not first-degree because with first-degree rape carried a stretch of force but I did not commit any force. That is why I was caught with second-degree rape, given voluntarily.
"[Prosecutor]: Okay. And you had a lawyer then, too; is that right?
"[Minor]: Yes, I did.
"[Prosecutor]: Public defender's office?
"[Minor]: No. It was Wooldridge. My mother had a paid attorney, Wooldridge.
"[Prosecutor]: Okay. And you pleaded guilty in January 1993 on that?
"[Minor]: Yes, because he was getting it ran CC [concurrently] with the two years. So I got possessionI mean, first-degree assault, second-degree assault, possession of cocaine, and statutory rape. That was all ran into two years.
"I went down there and I did, what, 9 or 10 months down there in prison for those crimes. So you have got to look at the circumstances of those crimes.
"If they want to explain that the way I told you, then I am quite sure the district attorney's office would have gave me more than two years for all of those crimes that had been committed.
"[Prosecutor]: Actually, Mr. Minor, you have got an explanation for everything to minimize your responsibility, don't you?
"[Minor]: No. I mean, I was guilty. I was guilty of those crimes. Anyway Even under the circumstances I was still guilty because I done those crimes. But I am not guilty of beating my child and I will never plead guilty.
"My attorney advised me when I first got up here on the stand, he saidhe said, `Mr. Minor'[Defense counsel] kept saying, `Let me get you a life sentence and you go down there for 10 years and come up for parole.'
"I rather face the death penalty or life without parole than ever plead guilty to killing my child. That is why I took my case to trial, to prove my innocence."
(R. 1258-63.)
First, Minor contends that "the trial court erred by admitting [evidence of his] three prior convictions for assault, rape, and possession of a controlled substance because they are not crimes of false statement and because their prejudicial effect greatly outweighs their probative value." (Minor's brief at p. 29.)
Rule 609, Ala.R.Evid., provides:
"(a) General rule. For the purpose of attacking the credibility of a witness,
"(1)(A) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and
"(1)(B) evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; and
"(2) evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment."
Applying the foregoing Rule, we conclude that evidence of Minor's prior convictions for assault, rape, and possession of a controlled substance, each of which resulted in sentences of two years' imprisonment, were admissible for the purpose of impeaching Minor, provided the trial court determined that "the probative value of admitting this evidence outweighs its prejudicial effect to the accused." See Advisory Committee's Notes to Rule 609(a), Ala. R.Evid.
*777 Additionally, Minor urges us to conclude that the trial court did not perform the special balancing test required by Rule 609(a)(1)(B), Ala.R.Evid. We note that the trial court performed the Rule 403 balancing test with regard to evidence impeaching Lakeisha's testimony as required by Rule 609(a)(1)(A). Moreover, before Minor testified in his own behalf, the trial court informed him that evidence of his prior convictions could be used to impeach him. Throughout the record the trial court refers to Rule 609 and indicates that it is aware of the requirement of that rule. We infer from the references to Rule 609 throughout the record and to the application of that rule that the trial court was aware of its responsibility and performed the balancing test in this instance.
Moreover, even if we had found that the trial court did not engage in a balancing test to determine that the probative value of evidence of Minor's prior felony convictions outweighed its prejudicial impact, we would still find no reversible error. Here, after Minor testified, the state had the right, during its cross-examination, to impeach Minor's testimony. The evidence of Minor's prior felony convictions was clearly admissible for the state's impeachment of Minor. The prior felony convictions, according to Minor's testimony, were not similar to the circumstances of the present case and Minor has not indicated how the admission of the evidence was unfairly prejudicial. Therefore, we find no plain error in this regard.
The evidence of Minor's prior convictions was introduced by defense counsel on direct examination of Minor. We acknowledge that such strategy is apparently an attempt to lessen the impact of the prosecutor's anticipated impeachment of an accused by the use of prior convictions and to establish credibility with the jury. However,
"[u]nder the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby. There are numerous decisions which hold that a defendant cannot predicate error upon admission of testimony that is elicited by defense counsel and is responsive to defense questions. See, e.g., Ringer v. State, 489 So.2d 646 (Ala.Crim.App.1986); Lacy v. State, 484 So.2d 1192 (Ala.Crim. App.1986); Crittenden v. State, 414 So.2d 476 (Ala.Crim.App.1982); Williams v. State, 383 So.2d 547 (Ala. Crim.App.1979), affirmed, Ex parte Williams, 383 So.2d 564 (Ala.1980), cert. denied, 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980). By testifying about his prior convictions ..., [the defendant] opened the door for the prosecution to cross-examine him about these convictions. Smith v. State, 409 So.2d 455 (Ala.Crim.App.1981); Travis v. State, 397 So.2d 256 (Ala.Crim.App.1981), cert. denied, 397 So.2d 265 (Ala.1981); Knowles v. State, 364 So.2d 712 (Ala. Crim.App.1978)."
Phillips v. State, 527 So.2d 154, 156-57 (Ala.1988). See also Head v. State, 610 So.2d 1202 (Ala.Cr.App.1992). Consequently, no error occurred in this regard.
Minor also urges us to determine that the prosecutor "improperly elicited far more details about [his] priors than was allowable." (Minor's brief to this Court at p. 32.) Minor cites the following comment and question by the prosecutor as error: "So that shooting was just self-defense. You really didn't commit a crime then, either; is that what you're saying?" (R. 1261.) Additionally, Minor argues that the prosecutor's characterization of Minor as a "man who did not accept responsibility for his actions" and who had "an explanation for everything" was improper. (R. 1263.) The record shows that Minor did not object to these comments and questions at trial.
As the quoted portion of the record indicates, the prosecutor did not engage in an improper examination of Minor. Minor offered the details of his prior convictions without improper solicitation from *778 the prosecutor. Minor cannot now object to evidence that he voluntarily admitted. The prosecutor in the complained-of comments and questions was merely characterizing Minor's testimony. "It is always permissible to cross-examine a witness to ascertain his or her interest, bias, prejudice, or partiality concerning matters about which he or she is testifying, and generally anything that tends to show the witness's bias. Williams v. State, 710 So.2d at 1298. Minor's testimony reasonably gave rise to the inferences drawn by the prosecutor. Therefore, we find no plain error. Furthermore, because Minor's testimony was properly admitted in evidence, it was proper for the prosecutor to comment upon it during his closing argument to the jury. Williams v. State, supra.
Finally, Minor contends that the trial court erred in allowing the state to examine him concerning these convictions. We reject this argument. The record clearly establishes that Minor's testimony about his prior felony convictions was essentially unsolicited. Minor wanted to elaborate on the circumstances resulting in these convictions; therefore, no reversible error occurred in this regard.
Accordingly, the trial court did not err in allowing the state to impeach Minor by admitting evidence of his prior convictions.

XXVII.
Minor claims that the prosecutor improperly expressed his personal opinion regarding Minor's guilt by reading the indictment to the jury during his opening statement and telling the jury that the indictment was signed by the district attorney. (Issue XXXIV in Minor's brief to this Court.) Because Minor failed to make a timely objection, our review is limited to plain error.
In Boyd v. State, supra, we addressed this same issue, stating:
"[T]he district attorney's noting in reading the indictment to the jury, that it was signed by him, is not an injection of his personal belief or otherwise improper. Similarly, in Arthur v. State, 711 So.2d 1031 (Ala.Cr.App.1996), the appellant argued that the prosecutor improperly inserted his credibility in an attempt to bolster the possibility of conviction by stating that the indictment had been signed by him in his capacity as district attorney. This Court stated:
"`Despite the appellant's argument to the contrary, there was no implication by the prosecutor in this case that he believed the appellant to be guilty and, therefore, was prosecuting the case. The jury was amply instructed that an indictment is not an indication of guilt but rather a vehicle for bringing an individual to trial and the prosecutor's acknowledgment that he signed the indictment in his capacity as district attorney was a statement of fact rather than an opinion or insertion of credibility.'

"Arthur, 711 So.2d at 1054."
715 So.2d at 841-42.
As was the case in Boyd, reading of the indictment to the jury by the assistant district attorney and noting that the district attorney had signed the document was narrated as a statement of fact. We therefore find this claim to be without merit.

XXVIII.
Minor contends that the trial court erred in instructing the jury that "evidence of intoxication must amount to insanity before the jury could use it to convict Mr. Minor of manslaughter." (Minor's brief to this Court at p. 81.)(Issue XXIX in Minor's brief to this Court.)
"In Jones v. State, 362 So.2d 1303, 1315 (Ala.Cr.App.1978), the Court of Criminal Appeals held that the intoxication `must be of such character and extent as to render the accused incapable of consciousness that he is committing a crime.' Also, this Court has stated *779 that `[m]ere drunkenness, voluntarily produced, is never a defense against a criminal charge, and can never palliate or reduce the grade of an offense, unless it is so extreme as to render impossible some mental condition which is an essential element of the criminal act.' Gautney v. State, 284 Ala. 82, 88, 222 So.2d 175 (1969), quoting Walker v. State, 91 Ala. 76, 82, 9 So. 87, 89 (1891) (emphasis omitted). Intoxication `must be so excessive as to paralyze the mental facilities, and render the accused incapable of forming or entertaining the design to take life.' Id. The degree of intoxication necessary to negate specific intent and, thus, reduce the charge, must amount to insanity. Crosslin v. State, 446 So.2d 675 (Ala.Cr.App.1983), appeal after remand, 489 So.2d 680 (Ala.Cr. App.1986), citing Maddox v. State, 31 Ala.App. 332, 334, 17 So.2d 283, 285 (1944) (other citations omitted).
"Bankhead contends that the court's instruction requiring that the jury, in order to find a drunkenness defense applicable, had to find Bankhead insane due to intoxication, was prejudicial. We disagree. In an assault and battery case, voluntary intoxication is no defense, unless the degree of intoxication amounts to insanity and renders the accused incapable of forming an intent to injure. Lister v. State, 437 So.2d 622 (Ala.Cr.App.1983). The same standard is applicable in homicide cases. Crosslin, supra. Although intoxication in itself does not constitute a mental disease or defect within the meaning of § 13A-3-1, Code of Alabama 1975, intoxication does include a disturbance of mental or physical capacities resulting from the introduction of any substance into the body. § 13A-3-2. The degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill. A jury is capable of determining whether a defendant's intoxication rendered it impossible for the defendant to form a particular mental state. The trial court's instructions on intoxication were proper under Alabama law."
Ex parte Bankhead, 585 So.2d 112, 120-21 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993). Cf. Davis v. State, supra; Smith v. State, 756 So.2d 892, 906 (Ala.Cr.App.1998); and Williams v. State, supra.
The trial court instructed the jury, in pertinent part, as follows:
"Voluntary intoxication is not a defense to a criminal charge unless it is so extreme as to render impossible some mental condition which is anwhich is an essential element of the criminal act. Therefore, in this case, voluntary intoxication is not a defense to the charge of murder unless it is so extreme as to render Willie Minor impossible from forming the intent to kill Ebious Jennings.
"I further charge you that the degree of intoxication necessary to negate specific intent, such as the intent to kill required to support a charge of murder, must amount to insanity.
"The intoxication must be of such character and extent as to render the accused incapable of consciousness that he is committing a crime.
"Mere drunkenness voluntarily produced is never a defense against a criminal charge and can never reduce the grade of an offense unless it is so extreme as to render impossible some mental condition which is an essential element of the criminal act.
"Intoxication must be so excessive as to paralyze the mental faculties and render the accused incapable of forming or entertaining the design to take life.
"The degree of intoxication necessary to negate specific intent and, thus, reduce the charge, must amount to insanity.

*780 "The degree of intoxication required to establish that a defendant was inis incapable of forming an intent to kill is a degree so extreme as to render impossible the defendant to form the intent to kill."
(R. 1353-55.)
The trial court's instruction is in accordance with the applicable law; therefore, no reversible error occurred.

XXIX.
Minor contends that the trial court erred in refusing to give an instruction on criminally negligent homicide. (Issue XXVII in Minor's brief to this Court.) He argues that the failure to give the charge "violated [his] due process rights by precluding the jury from considering lesser included offenses which the evidence supported." (Minor's brief to this Court at p. 77.)
Initially, we note that the trial court instructed the jury on the lesser included offense of manslaughter; therefore, the jury was provided with a third alternative to capital murder or acquittal. See Beck v. Alabama, 447 U.S. 625, 633-38, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).
"With regard to charging on lesser included offenses, § 13A-1-9(b), Ala.Code 1975, provides: `The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense.' In Boyd v. State, 699 So.2d 967 (Ala.Cr.App. 1997), we explained:
"`"A defendant accused of a greater offense is entitled to have the trial court charge on any lesser included offense if there is any reasonable theory from the evidence to support the lesser charge, regardless of whether the state or the defendant offers the evidence. Ex parte Pruitt, 457 So.2d 456 (Ala.1984); Parker v. State, 581 So.2d 1211 (Ala.Cr.App.1990), cert. denied, 581 So.2d 1216 (Ala.1991). A court may properly refuse to charge on a lesser included offense ... when... it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense.... Anderson v. State, 507 So.2d 580 (Ala.Cr.App.1987)...."
"699 So.2d at 972."
Dunaway v. State, 746 So.2d at 1034.
Minor argues that the trial court should have instructed the jury on criminally negligent homicide because, he says, "there was conflicting evidence as to whether he committed criminally negligent homicide." (Minor's brief to this Court at p. 77.) Minor, however, does not provide any facts and he makes no argument incorporating the facts of this case to support his claim. "A person commits the offense of criminally negligent homicide if he causes the death of another person by criminal negligence." § 13A-6-4, Ala. Code 1975.
"A person acts with criminal negligence with respect to a result or to a circumstance which is defined by statute as an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."
Section 13A-2-2(4), Ala.Code 1975. Moreover,
"`The only difference between manslaughter under Section 13A-6-3(a)(1), and criminally negligent homicide is the difference between recklessness and criminal negligence. "The reckless offender is aware of the risk and `consciously disregards it.' On the other hand, the criminally negligent offender is not aware of the risk created (`fails to perceive') and, therefore, cannot be guilty of consciously disregarding it." Commentary to Section 13A-2-2. "The *781 difference between the terms `recklessly' and `negligently' ... is one of kind, rather than degree. Each actor creates a risk of harm. The reckless actor is aware of the risk and disregards it; the negligent actor is not aware of the risk but should have been aware of it." C. Torcia, 1 Wharton's Criminal Law, Section 27 (14th ed.1978)(emphasis in original).'

"Phelps v. State, 435 So.2d 158, 164 (Ala. Cr.App.1983)."
Allen v. State, 546 So.2d 1009, 1013 (Ala. Cr.App.1988). Furthermore, a charge on criminally negligent homicide is not appropriate where the acts resulting in death are not the result of inadvertent risk. Allen v. State, 546 So.2d at 1013.
From the evidence presented at trial, there was no reasonable theory that would have supported a finding that Minor's actions were characteristic of the creation of an inadvertent risk. Here, the evidence clearly showed that Ebious was violently shaken and beaten. It further indicated that Minor understood the risk involved in shaking and beating of an infant. Therefore, no rational basis existed from the evidence presented to justify an instruction on criminally negligent homicide; the trial court properly denied Minor's request for a charge on the lesser included offense of criminally negligent homicide. Allen v. State, supra; Phelps v. State, 435 So.2d 158 (Ala.Cr.App.1983). See Hughley v. State, supra (evidence sufficient to support a conviction for intentional murder where the state established that the defendant's eight-month-old infant died of "shaken infant syndrome" and the defendant was the only person in the house when the victim was injured).

XXX.
Minor contends that the trial court's reasonable doubt instruction was unconstitutional. (Issue XXVIII in Minor's brief to this Court.) Specifically, he argues that the trial court erred by using the phrase "abiding conviction" in reference to reasonable doubt because, he says, the use of the phrase "abiding conviction" improperly reduced the state's burden of proof. See Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). He raises this claim for the first time on appeal; therefore, we review it for plain error, in accordance to the guidelines of Rule 45A, Ala.R.App.P.
The trial court charged the jury in pertinent part as follows:
"Now, in this case, as I have told you, the burden of proving the defendant's guilt rests upon the State of Alabama and, before a conviction can be had, the State of Alabama must convince each and every member of the jury beyond a reasonable doubt that the defendant is guilty and, unless the State of Alabama does so, the defendant will be entitled to an acquittal.
"Now, in determining whether or not the State of Alabama has met their burden of proof that the defendant is guilty beyond a reasonable doubt, you should consider and compare all of the evidence that has been presented to you, weigh it and if, after doing so, your minds are left in such a condition that you have an abiding conviction of the truthfulness of the charge, then you are convinced beyond a reasonable doubt and it would be your duty to convict the defendant.
"The reasonable doubt which would entitle the defendant to an acquittal cannot be a mere fanciful, vague or speculative doubt, but it must be a doubt which is founded upon a substantive basis.
"Now, this substantive basis may arise from a consideration of all of the evidence, it may arise from a consideration of any part of the evidence, or it may arise from what, in your judgment, amounts to a lack of evidence and it must remain after a careful consideration of all of the evidence such as fair, reasonable, conscientious persons would entertain under all of the circumstances.

*782 "Now, you will observe that the State of Alabama is not required to prove the defendant's guilt beyond all doubt but simply beyond a reasonable doubt.
"If, after comparing and considering all of the evidence that has been presented to you, your minds are left in such a condition that you cannot say you have an abiding conviction of the truth of the charge, then you would not be convinced beyond a reasonable doubt and it would be your duty to acquit the defendant of the charge."
(R. 1338-40.)
Clearly, these instruction do not contain the flaws denounced in Cage. Moreover, the United States Supreme Court held in Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), that an instruction on reasonable doubt phrased in terms of an "abiding conviction" correctly stated the state's burden of proof. No reversible error occurred with regard to the trial court's instruction on reasonable doubt. Hyde v. State, supra; Alonzo Burgess v. State, supra; Price v. State, supra; Ex parte Brooks, 695 So.2d 184 (Ala.), cert. denied, 522 U.S. 893, 118 S.Ct. 233, 139 L.Ed.2d 164 (1997); Travis v. State, supra; Arthur v. State, supra; Williams v. State, supra; Ponder v. State, 688 So.2d 291 (Ala. Cr.App.1996); and Ex parte Slaton, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997).

XXXI.
Minor contends the trial court erred by not instructing the jury that it was to make the ultimate decision regarding the voluntariness of his statements. (Issue V in Minor's brief to this Court.) Because Minor did not object to the failure of the trial court to instruct the jury on this issue, we review this issue under the plain error rule. Rule 45A, Ala.R.App.P.
After a pretrial suppression hearing, the trial court determined that Minor's statements were voluntary and admissible. During his trial, after the state had established the proper foundation, the trial court admitted Minor's videotaped statements into evidence, and the tapes were viewed by the jury. According to Minor, the trial court, by not instructing the jury "that the voluntariness of [his] statements [was] a question of fact for the jury to decide," "took `from the jury its ultimate responsibility of determining the voluntariness of the confessions.'" (Minor's brief to this Court at p. 28, quoting Bush v. State, 523 So.2d 538, 560 (Ala.Cr.App. 1988)).
In Ex parte Trawick, supra, the Alabama Supreme Court, addressing a similar issue, stated:
"Trawick next argues that the trial court erred to reversal by failing to instruct that the jury, and not the trial court, was to make the ultimate decision regarding the voluntariness of Trawick's confession. After a pre-trial hearing on the voluntariness of the confession, the trial court ruled that it was admissible, and the confession then became central to the State's case against Trawick. Trawick contends that, by allowing the confession into evidence over his objection, the trial court implied to the jury that the confession was voluntary and proper. Trawick concludes that the trial court was required to instruct the jury that there was still an issue of fact as to the voluntariness of the confession, and he contends that its failure to do so was reversible error.
"This Court has recognized that a trial court cannot lawfully prevent a jury from making a determination of voluntariness as affecting the weight and credibility to be given a defendant's statements. Ex parte Singleton, 465 So.2d 443 (Ala.1985). In Singleton, the trial judge specifically told the jury that he had already determined that the defendant's statement was voluntary and therefore admissible; however, the judge also clearly instructed that it was *783 the jury that was to ultimately determine whether the confession was voluntary. This Court ruled that these comments did not imply that the jury should accept or believe the defendant's confession merely because it had been ruled admissible.
"In this case, there is even less to indicate that the trial court in any way implied to the jury that Trawick's confession was voluntary merely because it was admissible. In admitting Trawick's confession into evidence, the trial court did not tell the jury that it had previously ruled upon the voluntariness of Trawick's confession. The trial court properly instructed the jury that the court would rule only as to whether evidence could be admitted into the case and that the jury would be the sole and exclusive judge of the truth of the evidence that was admitted. The trial court specifically stated that it did not get involved in the jury's `job' as the finder of fact. We find no plain error in the trial court's instruction."
Ex parte Trawick, 698 So.2d at 174.
Likewise, the trial court in the present case admitted Minor's statements without instructing the jury that it had made a preliminary determination on the voluntariness of the statements or that the jury was to consider the voluntariness of the statements as a factor going to the weight of the evidence. Unlike in Bush v. State, supra, the trial court did not inform the jury that it had made a preliminary determination on the admissibility of Minor's statements; therefore, the trial court never created any inference concerning the weight or credibility of Minor's statements. Consequently, we reject Minor's contention that by not instructing the jury on voluntariness, the trial court eliminated some of the jury's responsibilities. At the close of the evidence, the trial court instructed the jury as follows:
"You are the sole judges as to the weight that you will accord the evidence in this case. You should take the evidence that has been presented to you together with all the proper, just and reasonable inferences therefrom, apply your common sense, and in an honest, fair, and impartial manner determine what you believe the truth to be.
". . . .
"You should weigh all of the evidence and reconcile it if you can reasonably do so. If you cannot reconcile it, you ought to take just such evidence that you think is worthy of belief and give it just such weight as you think it is entitled.
". . . .
"If you cannot reconcile all of the testimony of all of the witnesses, then, again, at that point, you would judge the credibility of the witnesses as to judging the credibility and what weight that you will accord their testimony. In so doing, you may accept or reject the testimony of any witness and accept only the testimony you consider worthy of belief.
"If you believe that a witness has testified willfully falsely, you may disregard that witness's testimony in whole or in part.
". . . .
"Now, evidence has been introduced in this case for the purpose of impeaching certain witnesses and discrediting their testimony.
"The law allows witnesses to be impeached in any number of ways. For example, a witness may be impeached by proof of convictions of crimes involving moral turpitude or a witness may be impeached by contradictory statements made by the witness either on the stand while testifying or at other times and other places, whether under oath or not.
"But the fact that a witness has been impeached and successfully impeached does not mean that you must necessarily disregard that witness's testimony, either in whole or in part, for there may be other facts and evidence that in your judgment may tend to corroborate either all or part of that witness's testimony. *784 And, as I have already told you, you are the sole and exclusive judges of the credibility of the witnesses and the weight that you will accord their testimony.
". . . .
"Now, the defendant in this case has testified on his own behalf, and this he has a perfect right to do. You cannot capriciously disregard his testimony any more than that of any other witness.
"The law is that you take his testimony in the case and consider it along with all of the other evidence in the case. But while considering this testimony, you may take into consideration the fact that he is the defendant and interested in the result of this case and any punishment must be borne by him."
(R. 1345-50.)
The trial court properly instructed the jurors that they were "the sole and exclusive judges of the credibility of the witnesses and the weight that you will accord their testimony." (R.1345-46.) Such instruction implicitly included Minor's statement. Because the trial court's oral charge adequately explained the jury's duty to evaluate the evidence, no plain error occurred in this regard. Price v. State, supra.

Sentencing-Phase Issues

XXXII.
Minor contends that his having to appear in shackles in front of the jury was improper. (Issue XXVI in Minor's brief to this Court.) He argues that the shackles "prejudicially portrayed [him] as a dangerous man who required physical restraint even before the jury deliberated on a sentencing verdict." (Minor's brief to this Court at pp. 75-76.) We disagree.
"`"Every court has power to preserve and enforce order in its immediate presence; to prevent interruption, disturbance, or hindrance to its proceedings; and to control all persons connected with a judicial proceeding before it.'" Thomas v. State, 555 So.2d 1183, 1184-85 (Ala. Cr.App.1989), quoting Clark v. State, 280 Ala. 493, 497, 195 So.2d 786 (1967), appeal dismissed, cert. denied, 387 U.S. 571, 87 S.Ct. 2071, 18 L.Ed.2d 967 (1967). `"While recognizing that an accused generally has a right to be tried without being subjected to physical restraints, and that this right has been embodied in various constitutional and statutory guaranties, the courts have also recognized that this right is subject to exception, especially on such grounds as the need to prevent (1) the accused's escape, or (2) the accused's resort to violence, or (3) the accused's disruption of the trial."' Thomas, 555 So.2d at 1185, quoting Annot., 90 A.L.R.3d 17, 23 (1979)."
Wood v. State 699 So.2d 965, 966 (Ala.Cr. App.1997). See also Martin v. State, 51 Ala.App. 405, 286 So.2d 80, 84 (1973).
In Campbell v. State 484 So.2d 1168, 1170 (Ala.Cr.App.1985), this Court concluded that no abuse of discretion resulted from the trial court's requirement that the appellant be handcuffed during his trial. We noted that the appellant in that case "had substantial reason to attempt to escape, since he faced a sentence of life without parole, considering his five previous bank robbery convictions and the charges against him in this case." See also McWilliams v. State, 640 So.2d 982 (Ala.Cr.App.1991), aff'd in part, remanded on other grounds, 640 So.2d 1015 (Ala. 1993).
Here, the record reveals that Minor had previously escaped from prison. (R. 264, 557-61, 1256-58, 1286, 1349.) The record also reveals that Minor was shackled just before the sentencing phase of his trial, outside the presence of the jury. (R. 1369.) Minor's history of escape, coupled with the impending sentence of either death or life imprisonment without parole clearly presented the risk of escape. In light of no showing of actual prejudice by Minor and because we recognize the risk of escape existed in this case, we find no *785 abuse of discretion in the trial court's decision to restrain Minor.

XXXIII.
Minor contends that the trial court "impermissibly precluded [him] from presenting crucial mitigation evidence at the sentencing phase of his trial." (Minor's brief at p. 46.)(Issue XI in Minor's brief to this Court.) Specifically, he argues that the trial court erred in granting the state's motion in limine and preventing him from presenting the results of his polygraph test because, he says, the trial court incorrectly based its determination of the admissibility of the test results on Frye v. United States, 293 F. 1013 (D.C.Cir.1923).
In Turner v. State, 746 So.2d 355 (Ala. 1998), the Alabama Supreme Court reiterated in a footnote that Frye remains the standard to determine the admissibility of scientific testimony on subjects other than DNA. Under Frye, the reliability of the test must have been established and the test must have gained acceptance by the scientific community before the trial court can admit the evidence.
In Ex parte Hinton, 548 So.2d 562 (Ala. 1989), cert. denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989), the Alabama Supreme Court addressed a similar issue, stating:
"The [polygraph] test results were also properly excluded during the sentencing phase. Section 13A-5-45(d) provides for the admission of any evidence `which has probative value and is relevant to sentence.' Polygraph examinations are not probative, because the premise that a machine can reflect whether a person's answers are deceptive has not been sufficiently established, [Ex parte] Dolvin, [391 So.2d 677 (Ala.1980) ], and because the admission of the results of the polygraph examinations would tend to distort the truth-finding process. The danger that the jury will be overawed by the polygraph examiner's opinion has been pointed out by the Court of Criminal Appeals. Wynn v. State, 423 So.2d 294 (Ala.Cr. App.), cert. denied, 423 So.2d 294 (Ala. 1982)."
Ex parte Hinton, 548 So.2d at 569. See also C. Gamble, McElroy's Alabama Evidence, § 490.01(4) (5th ed.1996).
Based on the foregoing law, the trial court did not err in refusing to admit evidence of the results of Minor's polygraph test during the sentencing phase of his trial.

XXXIV.
Minor also maintains that the prosecutor committed misconduct by informing the jury in his argument during the sentencing phase of his trial that the jury's "sentencing verdict" was "advisory." (Minor's brief at p. 93.) (Issue XXXIV(B) in Minor's brief to this Court.) Specifically, he argues that the comments by the prosecutor diminished the jury's role in sentencing, in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). Because Minor failed to present this issue to the trial court, we review for plain error only. Rule 45A, Ala.R.App.P.
We recently addressed a similar issue in Hagood v. State, 777 So.2d 162 (Ala.Cr.App.1998), stating:
"`In Martin v. State, 548 So.2d 488 (Ala.Cr.App.1988), aff'd, 548 So.2d 496 (Ala.1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989), this Court reiterated the rule enunciated in Caldwell v. Mississippi, that the prosecutor could not mislead a jury to believe that, while it may impose a death sentence upon a defendant, the ultimate responsibility for determining the appropriateness of the death sentence lay elsewhere. The Martin Court stated as follows:
"`"Under Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985), `it is constitutionally impermissible to rest a death sentence *786 on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere.' However, the comments of the prosecutor and the instructions of the trial court accurately informing a jury of the extent of its sentencing authority and that its sentence verdict was `advisory' and a `recommendation' and that the trial court would make the final decision as to sentence does not violate Caldwell. `Comments which accurately explain the respective functions of the judge and jury are permissible under Caldwell "as long as the significance of [the jury's] recommendation is adequately stressed."' Harich v. Wainwright, 813 F.2d 1082, 1101 (11th Cir. 1987). Here, neither the prosecutor nor the trial court misrepresented the effect of the jury's sentencing recommendation. The cases of Caldwell, supra; Mann v. Dugger, 817 F.2d 1471 (11th Cir.), vacated, 828 F.2d 1498 (1987); Adams v. Wainwright, 804 F.2d 1526 (11th Cir.1986), modified, Adams v. Dugger, 816 F.2d 1493 (11th Cir.1987); and Harich, supra, each involved a situation where the prosecutor and the trial court misled the jury as to its critical role in sentencing under state law. In Hooks v. State, 534 So.2d 329 (Ala.Cr.App. 1987), this Court reviewed the decisions of other jurisdictions which have confronted this issue and concluded: `The trial judge's and the prosecutor's remarks clearly defined the jury's role in the sentencing scheme. Thus, the jury could not have been confused as to its responsibility in the sentencing process. The remarks made here were a correct statement of the law and did not tend to mislead or misinform the jury. Therefore, we conclude the remarks were not improper under Caldwell, supra.'
"`548 So.2d at 494.'"

"Travis v. State, 776 So.2d 819 (Ala.Cr. App.1997). See also, Price v. State, 725 So.2d 1003 (Ala.Cr.App.1997); Ex parte Taylor, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996); Mason v. State, 768 So.2d 981 (Ala.Cr.App.1998). After reviewing the record in its entirety, as well as the context in which the allegedly inappropriate comments were made, we find that `there is "no reasonable possibility that the jury was misled, misinformed, or confused as to its critical role in sentencing under Alabama law."` Price, quoting Taylor v. State, 666 So.2d 36, 51 (Ala.Cr.App.1994). `The prosecutor's comments and the trial court's instructions "accurately informed the jury of its sentencing authority and in no way minimized the jury's role and responsibility in sentencing."' Weaver v. State, 678 So.2d 260, 283 (Ala.Cr.App.1995), rev'd on unrelated ground, 678 So.2d 284 (Ala.1996)."
Hagood v. State, 777 So.2d at 202-03. See also Ex parte Taylor, 666 So.2d 73 (Ala. 1995). Cf. Thomas v. State, 766 So.2d 860 (Ala.Cr.App.1998); and Bui v. State, 717 So.2d 6 (Ala.Cr.App.1997).
Here, the comments by the prosecutor correctly informed the jury of its role. The remarks did not mislead or misinform the jury as to its responsibility or the importance of its decision. Therefore, the comments were not improper under Caldwell; they do not constitute error, plain or otherwise.
Minor also claims that the cumulative effect of various instances of alleged prosecutorial misconduct throughout the guilt and sentencing phases of his trial is sufficient to warrant reversal. Minor correctly notes that the Alabama Supreme Court has held that the cumulative effect of errors may warrant reversal when the individual errors alone would not. See Ex parte Tomlin, 540 So.2d 668 (Ala.1988). However, unlike Tomlin, in which the Supreme Court found several errors, we find no instances of prosecutorial misconduct *787 that mandate reversal. `"`Because we find no error in the specific instances alleged by the appellant, we find no cumulative error.'"' Lane v. State, 673 So.2d 825 (Ala.Cr.App.1995). See also Stewart v. State, supra; and Henderson v. State, supra. Therefore, Minor's claim alleging cumulative error is without merit.

XXXV.
Minor contends that the "the trial court improperly instructed the jury that mitigating circumstances had to outweigh aggravating circumstances to sentence [him] to life without parole, and thereby improperly created a presumption of death." (Minor's brief at p. 84.) (Issue XXXI in Minor's brief to this Court.) We note that Minor did not object to the trial court's instructions at the sentencing hearing. Because this case involves the death penalty, this fact does not bar our review; however, it weighs against any claim of prejudice made by Minor. See Stewart v. State, supra.
As stated earlier in this opinion, on review of the trial court's oral charge to the jury we examine the instruction in the context of the overall charge and we must give any questioned language a reasonable construction. See Travis v. State, supra.
At the conclusion of the sentencing hearing, the trial court instructed the jury in pertinent part as follows:
"THE COURT: Ladies and gentlemen, at this time, it becomes the Court's duty to instruct you so that you will know the law in order to be able to recommend the appropriate punishment to the defendant in this case.
"Now, you must determine which of the following punishments are recommended under the facts and circumstances of this case: number one, life imprisonment without the possibility of parole; or, number two, the death penalty.
"In making this recommendation to the Court, you will decide whether or not the aggravating circumstances outweigh the mitigating circumstances.
". . . .
"The issue at this sentencing hearing concerns circumstances of aggravation and circumstances of mitigation, you should consider and weigh against each other in deciding what the proper punishment to be recommended should be.
"In making your recommendation concerning the punishment, you must determine whether any aggravating circumstance exists and, if so, you must determine whether any mitigating circumstance or circumstances exist.
"In making your determination concerning the existence of aggravating and mitigating circumstances, you should consider the evidence presented to you at this sentencing hearing. You may also consider any evidence that was presented during the guilt phase of the trial that is relevant to the existence of any aggravating or mitigating circumstances.
"Now, at the sentencing hearing, the state has the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances.
"Any aggravating circumstances which were proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for the purposes of the sentencing hearing.
"Unless at least one aggravating circumstance exists, this sentence shall be life imprisonment without parole.
"Now, the defendant is allowed to offer any evidence of mitigating circumstances.
". . . .
"Now, the jury must consider any evidence presented by the defendant as to mitigating circumstances.
". . . .
"Now, the jury cannot determine that Willie Dorrell Minor be sentenced to death unless at least 10 jurors find that the statutory aggravating circumstances outweigh the mitigating circumstances.

*788 "Even if any of you find the existence of a statutory aggravating circumstance, you cannot automatically recommend the imposition of the death sentence. You are bound by law and your oath as jurors to consider the mitigating factors found in the statute and any other mitigating evidence presented by the defendant and you may recommend the imposition of the sentence of death only if you conclude that the aggravating circumstances outweigh the mitigating circumstances.

". . . .
"Any mitigating circumstance standing alone may be sufficient to support a sentence of life imprisonment without the possibility of parole, providing that the mitigating circumstances outweigh any aggravating circumstance.
"It is the quality of the evidence that must be given primary consideration by you. The quality or importance of the evidence may or may not be equal to the quantity of the evidence, that is, in the number of witnesses or exhibits presented in this case.
". . . .
"Now, the process of weighing aggravating and mitigating circumstances is a balancing process wherein one aggravating circumstance may outweigh several mitigating circumstances. On the other hand, a single mitigating circumstance may outweigh several aggravating circumstances.
"The function of the jury at this sentencing hearing shall be to return a verdict as follows:
"If the jury determines either that no aggravating circumstance exists or that one or more aggravating circumstances exists but do not outweigh the mitigating circumstances, you shall recommend a verdict that the penalty be life imprisonment without parole.
"If the jury determines that one or more aggravating circumstances exist and that they outweigh the mitigating circumstances, the jury shall recommend a verdict that the death penalty be imposed."
(R. 1484-95.)(Emphasis added.)
The trial court's instructions are in accordance with § 13A-5-46, Ala.Code 1975, and are substantially similar to the instructions cited with approval in Stewart v. State, supra; Hooks v. State, 534 So.2d 329 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989). Cf. Fortenberry v. State, 545 So.2d 129 (Ala. Cr.App.1988), aff'd, 545 So.2d 145 (Ala. 1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990). The trial court's instructions, when given a reasonable construction, do not constitute reversible error.
Moreover, we conclude that the instruction could not reasonably be read, as Minor suggests, as improperly instructing the jury on the balancing process. Consequently, we do not consider the trial court's instruction violative of the Due Process Clause of the Fourteenth Amendment, or the Fifth, Sixth and Eighth Amendments.

XXXVI.
Minor contends that the trial court's finding that the offense was "especially heinous, atrocious, or cruel" when compared to other capital cases was arbitrary and capricious. (Issue XXXIII in Minor's brief to this Court.) This argument was never presented to the trial court; therefore, we review it under the plain error rule. Rule 45A, Ala.R.App.P.
"`In Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), this Court held that the standard applicable to the "especially heinous, atrocious, or cruel" aggravating circumstance under § 13A-5-49(8) is that for a crime to fit within that section it must be one of "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim."
"`. . . .

*789 "`This Court has decided upon an approach for the purposes of § 13A-5-49(8). In comparing capital offenses for the purposes of determining whether a capital offense was "especially heinous, atrocious or cruel," the court uses the Kyzer standard. Capital offenses falling under § 13A-5-49(8) are, pursuant to the Kyzer standard, those "conscienceless or pitiless homicides which are unnecessarily torturous to the victim." Kyzer, 399 So.2d at 334.'"
Dunaway v. State, 746 So.2d at 1040, quoting Ex parte Bankhead, 585 So.2d at 124-25. See Ex parte Clark, supra.
With regard to its finding that the crime committed was especially heinous, atrocious, or cruel, the trial court stated the following:
"In the case at bar, the defendant, on the evening of April 15, 1995, was left alone, in the apartment of Lakeisha Jennings, with the victim, who was the defendant's infant son. Upon returning home, Lakeisha Jennings noticed that the victim was not breathing. The infant was taken to the hospital where he died. An autopsy showed that all the infant's ribs were broken, and his spleen and liver were lacerated. The victim's skull was fractured and showed injuries consistent with shaken infant syndrome. Blood in the testicles showed injury there as well. Dr. Kenneth Warner, the forensic pathologist, testified that these injuries were the worst, nonautomobile-crash injuries he had ever seen in a child. Almost all the infant's blood was in the abdominal cavity and testicles; this fact indicated severe internal injuries. The broken bones were consistent with someone either stomping on the child or slamming his body against some hard object.
"The physicians testified that undoubtedly the baby experienced severe pain for several hours prior to his death. The court finds that the State has proven, beyond a reasonable doubt, that compared to other capital murder cases, this murder was especially heinous, atrocious, and cruel, thereby constituting an aggravating circumstance under Code of Alabama § 13A-5-49(8)."
(C.R.312-13.)
The record does not support Minor's contention that the trial court's finding of this aggravating circumstance was arbitrary and capricious. Ebious suffered fractures on both the left and right sides of six ribs. His skull was fractured from the top to the base. Additionally, his spleen and liver were torn and his left lung was damaged. Ebious suffered massive internal bleeding in the following areas: the thalamus, the left kidney and pancreas, the left adrenal gland, the left and right testes, the left and right chest cavities, and in the left peritoneal cavity. Ebious also suffered retinal hemorrhaging, which indicated that he had been subjected to violent shaking.
Expert testimony from Dr. Evans indicated that Ebious's injuries were the result of being violently shaken for at least 30 seconds and from blows to the head, abdomen, and testicles. Dr. Warner testified that the injuries suffered by Ebious were usually observed only in a child who had been in a plane crash or an automobile accident. Dr. William Shamblin, one of the attending physicians who examined Ebious, testified, "I have never seen an adult nor a child of any age receive the injuries that were present in this  in this baby." (R. 1395.) He additionally testified that Ebious would have been in excruciating pain for at least 20 minutes and that the "shaking and damage to the head would probably not have caused unconsciousness too quickly, so Ebious would have been pretty well awake during most of the process." (R. 1399.)
Based on the evidence presented, the trial court's finding of the aggravating circumstance that the offense was "especially heinous, atrocious, or cruel" was adequately supported by the record; that finding was not arbitrary or capricious. The cruelty *790 practiced upon Ebious is clearly demonstrated by the nature and the extent of his physical injuries. Additionally, Ebious was in intense and severe pain before he died. Minor's conduct was significantly more harsh than that necessary to commit a murder, and the trial court appropriately used that conduct in reaching its finding that the offense was "especially heinous, atrocious, or cruel." See Bui v. State, 551 So.2d 1094, 1117 (Ala.Cr.App.1988), aff'd, 551 So.2d 1125 (Ala.1989), vacated on unrelated grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991), remanded, 627 So.2d 848 (Ala.1991)(sufficient evidence was presented to support the application of the especially heinous, atrocious, or cruel aggravating circumstance because testimony indicated that "each child must have experienced prolonged pain and terror (for a period of up to 30 minutes) before losing consciousness"). Cf. Henderson v. Texas, 962 S.W.2d 544 (Tex. Crim.App.1997), cert. denied, 525 U.S. 978, 119 S.Ct. 437, 142 L.Ed.2d 357 (1998)(affirming Henderson's conviction of capital murder of a three-and-a-half-month old child whom she was babysitting.).
Additionally, we reject Minor's argument that "the trial court's instructions failed to channel and limit the sentencer's discretion sufficiently to minimize the risk of ... arbitrary and capricious action." (Minor's brief at p. 91.) The trial court's instruction to the jury regarding its finding of the aggravating circumstance that the crime committed was especially heinous, atrocious, or cruel, was proper and provided adequate guidance. Moreover, the trial court's instruction is substantially similar to the jury instruction which this Court approved in Knotts v. State, 686 So.2d 431, 446-447 (Ala.Cr.App.1995). See also Hagood v. State, supra; Price v. State, supra; Hutcherson v. State, 677 So.2d 1174 (Ala.Cr.App.1994), rev'd on other grounds, 677 So.2d 1205 (Ala.1996); Haney v. State, 603 So.2d 368 (Ala.Cr.App. 1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Bankhead v. State, supra; and Hallford v. State, supra.

XXXVII.
Minor contends that the "Alabama statute limiting court appointed attorneys' fees to one thousand dollars for out-of-court work for each phase of trial is deplorable and unconstitutional." (Minor's brief to this Court at p. 103.) (Issue XL in Minor's brief to this Court.) See § 15-12-21(d), Ala.Code 1975. First, we note that Minor did not present this issue to the trial court; therefore, our review is for plain error. Rule 45A, Ala.R.App.P.
Upon considering the constitutionality of § 15-12-21(d), Ala.Code 1975, we reiterate what we said in Boyd v. State, supra, wherein the appellant raised an identical issue:
"[T]his court has previously rejected similar claims and adheres to its prior decisions on this matter. Smith v. State, 581 So.2d 497, 526-29 (Ala.Cr. App.1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991); May v. State, 672 So.2d 1310, 1311 (Ala.1995)."
Boyd v. State, 715 So.2d at 851. See also Johnson v. State, 620 So.2d 679 (Ala.Cr. App.1992), rev'd on other grounds, 620 So.2d 709, cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993). Minor offers nothing new to support his argument; therefore, in accordance with our previous decisions, we find his contention to be without merit.

XXXVIII.
Minor contends that the Alabama death-penalty statute is "constitutionally defective because it does not state what weight the trial court is to give the jury's recommendation." (Minor's brief to this Court at p. 100.) This particular issue was recently addressed and rejected in Smith v. State, supra, wherein this Court, quoting Harris v. State, 513 U.S. 504, 511-15, 115 S.Ct. 1031, 1035-37, 130 L.Ed.2d 1004 (1995), held:

*791 "`We have rejected the notion that a "specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." Franklin v. Lynaugh, 487 U.S. 164, 179, 108 S.Ct. 2320, 2330, 101 L.Ed.2d 155 (1988). Equally settled is the corollary that the Constitution does not require a State to ascribe any specific weight to particular facts, either in aggravation or mitigation, to be considered by the sentencer. See, e.g., Blystone v. Pennsylvania, 494 U.S. 299, 306-307, 110 S.Ct. 1078, 1083, 108 L.Ed.2d 255 (1990); Eddings v. Oklahoma, 455 U.S. 104, 113-115, 102 S.Ct. 869, 876-877, 71 L.Ed.2d 1 (1982); Proffitt [v. Florida], 428 U.S. [242] at 257-258, 96 S.Ct. [2960] at 2969, 49 L.Ed.2d 913 [ (1976) ] (joint opinion of Stewart, Powell and Stevens, JJ.). To require that "great weight" be given to the jury recommendation here, one of the criteria to be considered by the sentencer, would offend these established principles and place within constitutional ambit micro-management tasks that properly rest within the State's discretion to administer its criminal justice system. We therefore hold that the Eighth Amendment does not require the State to define the weight the sentencing judge must accord to an advisory jury verdict.'"
Smith v. State, 756 So.2d at 920. See also Stewart v. State, supra.
In addition, Minor also contends that the "jury's verdict recommending the death penalty violated the Eighth Amendment prohibition against the arbitrary infliction of capital punishment because it failed to specify whether the jury found one or more of the statutory aggravating circumstances that were a prerequisite to the imposition of a death sentence." (Minor's brief to this Court at p. 101.)
This Court has previously discussed this particular issue:
"`We have previously addressed this issue and concluded that there is no statutory or constitutional requirement that the jury make specific findings of aggravating or mitigating circumstances during the sentencing phase of a capital case under Alabama's capital offense statute.
"`"This court in Bush v. State, 431 So.2d 555 (Ala.Cr.App.1982), aff'd, 431 So.2d 563 (Ala.1983), cert. denied, Bush v. Alabama, 464 U.S. 865 [,104 S.Ct. 200, 78 L.Ed.2d 175] ... (1983), stated that `any such contention that the jury should make specific findings enumerating the aggravating circumstances it found to exist was foreclosed by Proffitt v. Florida, 428 U.S. 242 [96 S.Ct. 2960, 49 L.Ed.2d 913] ... (1976).' In Proffitt, the United States Supreme Court stated that `since ... the trial judge must justify the imposition of a death sentence with written findings, meaningful appellant review of each such sentence is made possible.' 428 U.S. at 250 [96 S.Ct. at 2965].... Because the trial court was required to and did set forth findings of fact as a basis for the sentence of death, as required by § 13-11-4 [now § 13A-5-47], we find that appellant can be afforded meaningful appellate review in accordance with the rule in Proffitt and Bush.'"

"`Morrison v. State, 500 So.2d 36, 42 (Ala.Cr.App.1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987). See also Ex parte Clisby, 456 So.2d 105 (Ala.1984).'"
Stewart v. State, 730 So.2d at 1245, quoting Haney v. State 603 So.2d at 388.
Accordingly, we find no merit to Minor's contentions.

XXXIX.
Minor argues on appeal that the manner of execution used by the State of Alabama constitutes cruel and unusual punishment. (Issue XXXIX in Minor's brief to this Court.) However, this Court has held on numerous occasions that death *792 by electrocution does not constitute cruel and unusual punishment.
"The United States Supreme Court addressed the death by electrocution issue in In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890). In determining what constitutes cruel and unusual punishments, the Court stated: `Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel within the meaning of that word as used in the constitution. It implies there is something inhuman and barbarous,something more than the mere extinguishment of life.' Id. at 447, 10 S.Ct. at 933. In holding that such a punishment is not cruel or unusual, the Court reasoned `that this act was passed in the effort to devise a more humane method of reaching the result.' Id. Accord Spinkellink v. Wainwright, 578 F.2d 582, 616 (5th Cir.1978). Appellant's contention is therefore without merit; death by electrocution does not amount to cruel and unusual punishment per se, but is a constitutional means of imposing a sentence of death."
Jackson v. State, 516 So.2d 726, 737 (Ala. Cr.App.1985), remanded on other grounds, 516 So.2d 768 (Ala.1986). See also Boyd v. State, supra; Sullivan v. Dugger, 721 F.2d 719 (11th Cir.1983); Lindsey v. Smith, 820 F.2d 1137, 1155 (11th Cir.1987), cert. denied, 489 U.S. 1059, 109 S.Ct. 1327, 103 L.Ed.2d 595 (D.Ala.1989); Lowenfield v. Phelps, 817 F.2d 285 (5th Cir.1987), aff'd, 484 U.S. 231, 108 S.Ct. 645, 98 L.Ed.2d 568 (D.La.1988); Stephens v. State, 580 So.2d 11, 26 (Ala.Cr.App.1990), aff'd, 580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991); and Thompson v. State, 542 So.2d 1286 (Ala.Cr. App.1988), aff'd, 542 So.2d 1300 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989).
"There is an abundance of caselaw, however, that holds that the death penalty is not per se cruel and unusual punishment. Neither is electrocution, as a means of capital punishment, cruel and unusual punishment, in violation of the Eighth Amendment. Williams v. State, 556 So.2d 737, 741 (Ala.Cr.App.1986), aff'd in part, rev'd in part on other grounds, 556 So.2d 744 (Ala.1987); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); Boykin v. State, 281 Ala. 659, 207 So.2d 412 (1968), reversed on other grounds, Boykin v. State, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)."
Scott v. State, 728 So.2d 164, 171 (Ala.Cr. App.1997), aff'd, 728 So.2d 172 (Ala.1998).
Accordingly, we reject Minor's contention that the manner of execution used by the State of Alabama constitutes cruel and unusual punishment.

XL.
Minor claims the trial court failed to allow Minor's counsel to adequately preserve the record because, he says, the appellate record did not contain documents the trial court sealed for appellate review. (Issue XXXVII in Minor's brief to this Court.) In a pretrial order, the trial court stated:
"Motion To Require State To Make Known Any Mitigating Circumstances As To This Defendant, Of Which The State Or Its Agents Are Aware. As to this motion, any evidence or documents withheld, by the State, from the defendant, shall by presented to the Court for an in camera review on or before June 7, 1996. The Court will review these materials for any exculpatory evidence as defined by Brady v. Maryland. Copies of any materials not required to be given to the defendant shall be placed in a sealed envelope in the custody of the Clerk for preservation for possible review at a later date, by an Appellate Court."
*793 At a subsequent pretrial hearing, the trial court stated:
"The next matter, the State of Alabama, on Friday the 7th, produced for me records which they had not disclosed to the defendant. I have reviewed these records.
"There is only one little bit of information contained in those record[s] that ispossibly could be considered to be exculpatory, and this was a statement made by Lakeisha Jennings to her therapist. And basically it's to the effect that she stated that on the occasion that Mr. Minor had been drinking and smoking dope before she left him with the baby, which that could possibly go to his ability to appreciate the criminality of his actions and could be exculpatory on the issue of intent and also, should the defendant be found guilty, on the issue of what sentence he would beto receive.
"And, if you would like, I willI will give you an extracted portion from the record of that statement."
(R. 261-62.)
We have reviewed the documents ordered sealed by the trial court and find nothing that might be considered exculpatory, that would be favorable to the defense, or that would be discoverable under Rule 16.1(c), Ala.R.Crim.P.
Minor also attempts to show that the State violated the requirements of Brady v. Maryland, supra, with regard to this sealed file. In order to show a Brady violation, Minor "must establish 1) that the prosecution suppressed evidence, 2) that the evidence was favorable to the defense, and 3) that the evidence was material." Ellis v. State, 641 So.2d 333, 337 (Ala.Cr. App.1994). Minor has not met any of these requirements. He has failed to show that the prosecution failed to disclose exculpatory evidence to the defense or that any of the information contained in the sealed file was favorable to his defense or material to the issue of his guilt. Additionally, he has not shown that there is a reasonable likelihood the contents of the sealed file would have impacted the jury's verdict. Therefore, the trial court did not err in refusing to provide Minor with copies of the disputed documents.
As we stated in Barbour v. State, supra:
"`"A motion for discovery is not a mere `fishing expedition.' ... The accused is simply not entitled to pursue a `scatter gun' approach in his motion to produce." Perry v. State, 371 So.2d 969, 970 (Ala.Cr.App.), cert. denied, 371 So.2d 971 (Ala.1979) (citations omitted). Brady "did not envision the type `fishing expedition' requested by appellant." Giddens v. State, 333 So.2d 615, 618 (Ala.Cr.App.1976).'"
673 So.2d at 465, quoting Timmons v. State, 487 So.2d 975, 982 (Ala.Cr.App. 1986).

XLI.
Minor contends that the cumulative effect of all the errors he alleges on appeal entitles him to a new trial. (Issue XLII in Minor's brief to this Court.) We disagree.
"Because no single instance of alleged error constituted reversible error, we will not consider the cumulative effect to be any greater. See Boyd v. State, 715 So.2d 825, 851 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 (Ala.1998)."
Roy Burgess v. State, ___ So.2d at ___. See also Frazier v. State, supra; Smith v. State, supra; Mack v. State, 736 So.2d 664 (Ala.Cr.App.1998); Crymes v. State, 630 So.2d 120, 123-24 (Ala.Cr.App.1993), aff'd, 630 So.2d 125 (Ala.1993); Johnson v. State, 541 So.2d 1112 (Ala.Cr.App.1989); and McNeely v. State, 524 So.2d 375 (Ala.Cr. App.1986).
We have reviewed each allegation of error Minor raises on appeal and we have searched the record for plain error; we find no reversible error. Accordingly, we conclude that the cumulative effect of *794 these alleged errors does not warrant a reversal. See Roy Burgess v. State, supra.
Pursuant to Rule 45A, Ala.R.App.P., we have searched the entire record for any plain error, whether or not brought to the attention of the trial court or to our attention. We find no plain error, i.e., error that would have injuriously affected the substantial rights of Minor, either in the guilt phase or the sentencing phase of the trial.
In its written sentencing order, the trial court found the following:
"After considering evidence presented at the trial, the sentencing hearing, and the pre-sentence report, the court finds that the defendant was previously convicted on the 17th day of August, 1992 of Assault II. The court finds, beyond a reasonable doubt that, this conviction constituted a statutory aggravating circumstance under Code of Alabama, § 13A-5-49(2).
"In the case at bar, the defendant, on the evening of April 15, 1995, was left alone, in the apartment of Lakeisha Jennings, with the victim, who was the defendant's infant son. Upon returning home, Lakeisha Jennings noticed that the victim was not breathing. The infant was taken to the hospital where he died. An autopsy showed that all the infant's ribs were broken, and his spleen and liver were lacerated. The victim's skull was fractured and showed injuries consistent with shaken infant syndrome. Blood in the testicles showed injury there as well. Dr. Kenneth Warner, the forensic pathologist, testified that these injuries were the worst, nonautomobile-crash injuries he had ever seen in a child. Almost all the infant's blood was in the abdominal cavity and testicles; this fact indicated severe internal injuries. The broken bones were consistent with someone either stomping on the child or slamming his body against some hard object.
"The physicians testified that undoubtedly the baby experienced severe pain for several hours prior to his death. The court finds that the State has proven, beyond a reasonable doubt, that compared to other capital murder cases, this murder was especially heinous, atrocious, and cruel, thereby constituting an aggravating circumstance under Code of Alabama § 13A-5-49(8).
"No other evidence was presented, as to statutory aggravating circumstances, and the court did not find or consider any other statutory aggravating circumstances.
"The court has also considered each statutory mitigating circumstance:
"1. The defendant has no significant history of prior criminal activity: The defendant has three (3) prior felony convictions, so this mitigating circumstance is not applicable.
"2. The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance: There was no evidence presented regarding the defendant's emotional state at the time of the crime.
"3. The victim was a participant in the defendant's conduct or consented to it: The victim was a baby and incapable of participation or consent.
"4. The defendant was an accomplice in the capital offense committed by another person, and his participation was relatively minor: The defendant was the sole perpetrator of the crime.
"5. The defendant acted under extreme duress or under the substantial domination of another person: There was no evidence presented as to this circumstance.
"6. The capacity of the defendant to appreciate the criminality of this conduct, or to conform his conduct to the requirements of the law was substantially impaired: The defendant had been drinking beer earlier in the day, but according to his testimony, he had sobered up enough to play basketball. In addition, the defendant had smoked a *795 quantity of marijuana just prior to the murder, and was undoubtedly under the influence of marijuana at the time of the crime. The court finds that the defendant's ability to appreciate the criminality of his conduct was reduced.
"7. The age of the defendant at the time of the crime: The defendant was 22 years old, at the time of the crime. The court finds that the defendant's age constitutes a mitigating circumstance.
"Other evidence showed that the defendant came from a good family and did well in school till the 9th grade, when he began abusing alcohol and drugs. Witnesses on the defendant's behalf testified the defendant was well mannered and respectful. The defendant started work at the age of 17 and held a job for about a year. The defendant quit that job and held another for a short time and was hospitalized for drug problems. The defendant has attempted suicide on a least two occasions. One suicide attempt after being charged in this case. The court considers these factors to be nonstatutory mitigating circumstances.
"The defendant was evaluated by Taylor Hardin Secure Medical Facility. While the defendant did show some situational depression, he was found to be fairly intelligent, and not to be suffering from any mental disturbances. No further treatment or testing was recommended.
"After carefully considering the jury's advisory verdict, and after carefully weighing and balancing the aggravating and mitigating circumstances, the court finds that the aggravating circumstances outweigh the mitigating circumstances and the court sentences the defendant to death by electrocution."
(C.R.312-15.)
The record supports the trial court's decision, and we concur with its findings. The trial court carefully weighed the aggravating circumstances and the statutory and nonstatutory mitigating circumstances before sentencing Minor to death.
In accordance with § 13A-5-53, Ala.Code 1975, we now address the appropriateness of Minor's conviction and sentence of death. Minor was convicted of the capital offense of murder when the victim is less than 14 years old. See § 13A-5-40(a)(15), Ala.Code 1975.
"This review shall include the determination of whether any error adversely affecting the rights of the defendant was made in the sentence proceedings, whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence, and whether death was the proper sentence in the case."
Section 13A-5-53(a).
Section 13A-5-53(b), Ala.Code 1975, requires this Court to determine:
"(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
"(2) Whether an independent weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence; and
"(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
Our review of the record indicates that the trial court did not impose the sentence of death as a result of the influence of passion, prejudice, or any other arbitrary factor. § 13A-5-53(b)(1), Ala.Code 1975. Additionally, after conducting an independent weighing of the aggravating circumstance and mitigating circumstances, we conclude that death is the proper sentence. Finally, in light of both the crime committed and the appellant, we determine that Minor's sentence is neither excessive nor disproportionate to the penalties imposed in similar cases. (Issue XXXII in Minor's *796 brief to this Court.) See, e.g., Dunaway v. State, supra.
Accordingly, Minor's conviction and sentence of death are affirmed.
APPLICATION OVERRULED; RULE 39(k) MOTION DENIED; OPINION OF AUGUST 27, 1999, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
LONG, P.J., and McMILLAN, COBB, and BASCHAB, JJ., concur.
NOTES
[1] This case was originally assigned to another judge on the Court of Criminal Appeals. It was reassigned to me on February 15, 1999. Although I was not a member of this Court when this case was orally argued, I have reviewed the audiotapes and videotapes of the argument.
[2] See Miranda v. Arizona, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966).
[3] Minor raises this same challenge with regard to prospective juror J.M.; however, we do not address this challenge because the trial court properly granted the state's challenge for cause based on J.M.'s unaltering views on capital punishment.